**M.C. JEFFERS, Al Porter, Evangeline Brown, Clyde Collins, O.C. Duffy, Earl Foster, the Rev. Elihue Gaylord, Shirley M. Harvell, Linda Shelby, J.C. Jeffries, Lavester McDonald, Joseph Perry, Clinton Richardson, T.E. Patterson, Earnest Simpson, Brian Smith, and Charlie Statewright, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,**

**v.**

**Bill CLINTON, in his Official Capacity as Governor of Arkansas and Chairman of the Arkansas Board of Apportionment; W.J. McCuen, in his Official Capacity as Secretary of State of Arkansas and Member of the Arkansas Board of Apportionment; and Steve Clark, in his Official Capacity as Attorney General of Arkansas and Member of the Arkansas Board of Apportionment, Defendants.**

No. H–C–89–004.

United States District Court, E.D. Arkansas, E.D.

Dec. 4, 1989.

First Dissenting Opinion of Judge Eisele Dec. 7, 1989.

Second Concurring and Dissenting Opinion of Judge Eisele Jan. 26, 1990.

P.A. Hollingsworth, Little Rock, Ark.,
L.T. Simes, II, West Helena, Ark., Kath-

leen Bell, Helena, Ark., Olly Neal, Jr., Marianna, Ark., Don E. Glover, Dermott, Ark., Penda D. Hair, Washington, D.C., Donna L. Dennis, New York City, Julius L. Chambers, Dayna L. Cunningham and Sherrilyn Ifill, NAACP Legal Defense Fund, Inc., New York City, and Sheila Y. Thomas, NAACP Legal Defense Inc., Washington, D.C., for plaintiffs.

Frank J. Wills, III, Atty. General's Office, Little Rock, Ark., for defendants.

Before ARNOLD, Circuit Judge, EISELE, Chief District Judge, and HOWARD, District Judge.

ARNOLD, Circuit Judge.[*]

In 1981 the Arkansas Board of Apportionment, consisting of the then Governor, Secretary of State, and Attorney General, placed into effect a plan of apportionment for the General Assembly. Seventeen black electors [1] bring this suit, claiming the plan violates Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.*, and the Fourteenth and Fifteenth Amendments to the Constitution of the United States. They ask us to hold the existing arrangement of Senate and House districts unlawful, order a new plan into effect for the 1990 elections, and place the State of Arkansas under the preclearance procedure laid out in Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c).

We heard evidence for twelve days. Numerous exhibits are before us. We have carefully considered the proof with due regard to the intensely practical nature of the political process. We now hold that the plaintiffs have demonstrated a violation of their rights under federal law. The 1981 apportionment plan created only five legislative positions, one in the Senate and four in the House, representing districts in which a majority of the voting-age popula-

tion was black. We find that a total of 16 such districts, three in the Senate and 13 [2] in the House, could have been created, and that these districts would have been reasonably contiguous and compact. We further find that voting in the areas of the State in question is markedly polarized by race. Both black and white voters usually prefer candidates of their own race. Black voters are far from powerless. They exercise significant, sometimes decisive influence. But they can elect a candidate of their choice, in a district in which the voting-age population is majority white, only if that candidate is white. For the foreseeable future, the present location of legislative district lines will make it very difficult to elect more than six black legislators, out of a total in both houses of 135 members. And this is so even though black people make up about 16 per cent. of the total population of the State of Arkansas.

In this situation, black citizens have less opportunity than other members of the electorate to elect representatives of their choice. This is a violation of Section 2(b) of the Voting Rights Act, 42 U.S.C. § 1973(b). For reasons we shall explain in this opinion, plaintiffs have proved a violation of the law in all of the areas of the State called in question by this suit, except for Pulaski County. We hold that no more elections may be held under the unlawful 1981 apportionment plan. The defendants will be enjoined from giving any further force or effect to that plan. A new, lawful plan must be drafted, in time to be in place for next year's elections; the filing period for these elections will begin on the third Tuesday in March—March 20, 1990. See Ark. Code Ann. § 7–7–203(c) (1987). The parties are directed to submit plans for compliance to this Court on or before January 15, 1990. We especially emphasize the duty of the

---

[*] Judge Howard joins in this opinion. Judge Eisele will file a separate opinion, concurring in part and dissenting in part, in due course. See *infra* p. 219.

[1] Plaintiffs made a motion for class certification, but we denied it as untimely. It was not filed within 90 days of the complaint, as required by E.D.Ark.R. 24.

[2] This number includes a single-member majority-black district in Crittenden County, which this Court ordered into effect in *Smith v. Clinton*, 687 F.Supp. 1310, *remedy adopted, id.* at 1361 (E.D.Ark.), *aff'd mem.,* —— U.S. ——, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988).

defendants, the present members of the Board of Apportionment, to submit a plan. The responsibility of complying with the law is primarily theirs. Promptly after January 15, 1990, we will convene an evidentiary hearing on the remedy, if necessary, and thereafter enter an order embodying a new plan and directing that it be used for the 1990 legislative elections.

The opinion we file today decides only plaintiffs' statutory claim under Section 2 of the Voting Rights Act. Plaintiffs' constitutional claim and their request for preclearance as a remedy for constitutional violations remain under advisement. We will decide these questions in a second written opinion in due course. Our ruling on the statutory claim will require substantial adjustments in the existing apportionment plan. If relief is to be effective for next year's elections, time is of the essence. We therefore think it proper to file this opinion, which will start the process of re-drawing the lines, promptly. We need time, however, to consider the hard issues of intent and remedy that plaintiffs' constitutional claim raises, and we do not wish to delay the whole case while we take that time.

## I.

The Board of Apportionment is created by Article VIII, Section 1 of the Constitution of Arkansas. Its present members are Governor Bill Clinton, Secretary of State Bill McCuen, and Attorney General Steve Clark. They are defendants in this case. The Board's members in 1981 were Governor Frank White, Secretary of State Paul Riviere, and Attorney General Clark. The plan presently in effect (except as modified as to Crittenden County by *Smith v. Clin-*

*ton, supra*) was adopted on June 28, 1981, by a vote of two to one. Governor White dissented. The plan created 35 single-member districts for the Senate. Of the 100 members of the House, the plan called for 74 to be elected from single-member districts and 26 from multi-member districts.[3] (We note, parenthetically, that only two of the multi-member districts in the House are in the area of the State towards which this suit is primarily addressed: the two-member district in Crittenden County, which no longer exists because of *Smith*, and a three-member district in Pulaski County. This three-member district has a majority-black voting-age population, and all three of its State Representatives are black. This lawsuit, however, is not primarily about single-member versus multi-member districts. It is about dilution of black voting strength. We see no reason why the multi-member districts in other parts of the State would be affected by the relief we are granting.)

Under the plan adopted in 1981, only two House districts had a voting-age population that was majority black—one of the three-member districts in Pulaski County and a single-member district in Jefferson County. (We use voting-age-population (VAP) percentages because they are the numbers relevant for purposes of voting, which is what this case is about. Under the one-person, one-vote principle, of course, which requires that legislative districts be substantially equal[4] in population, it is total population that counts, regardless of age or eligibility to vote. But this case is about effective use of the elective franchise, not equality of population. Black VAP numbers run consistently lower than total-population numbers in the areas affected by this

---

**3.** As a consequence of our decision in *Smith, supra,* 76 Representatives are now chosen from single-member districts, and 24 from multi-member districts. Fifteen of the 24 House members chosen from multi-member districts are from Pulaski County, which is divided into five three-member House districts, each one of which is coterminous with a single-member Senate district.

**4.** Substantially greater leeway, in terms of deviation from absolute equality, is allowed in the drawing of state legislative districts, as opposed to the drawing of congressional (U.S. House of Representatives) districts. The 1981 plan allowed legislative districts to deviate by as much as five per cent. above or below the ideal size. The Supreme Court has indicated that a deviation of as much as ten per cent. above or below the ideal size can be upheld. See *Connor v.*

suit.) We insert at this point in the opinion a map of Arkansas (Map 1) showing each of the House districts in the affected areas, including black VAPs for districts located along the Mississippi River (an area referred to as the Delta).

MAP 1

The shaded areas indicate concentrations of black population. It is important to note that although these districts are located in the area of the State containing the greatest concentration of black people, none of them, as the 1981 plan was drawn, had a

*Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977).

majority-black VAP. The Senate plan follows the same pattern. Of the 35 single-member Senate districts, only one has a majority-black VAP. We insert at this point Map 2, which shows the Senate districts. No black person has ever been elected to the State Legislature (in this century, anyway) from a district that did not have a majority-black VAP.

MAP 2

II.

Before we get to the substance of the case, we must deal with defendants' argument that the suit is barred by laches,[5] that it was filed too late. The apportionment plan challenged was adopted in 1981, but suit was not filed until January 22, 1989. Only one election, that of 1990, re-

5. The plea is laches, not limitations. This is a suit in equity, and defendants do not argue that it is governed by any statute of limitations.

mains to be run before the State must be reapportioned anyway, because of the 1990 Census. So this case, defendants say, should be dismissed. If plaintiffs are still unhappy after the 1991 reapportionment, they can file suit then. This Court rejected a similar contention in *Smith v. Clinton*, 687 F.Supp. at 1312–13. But defendants earnestly press the argument and claim that *Smith* can be distinguished. We therefore address the point at some length.

Laches is an equitable defense. It means essentially this: if suit is unreasonably delayed, and this delay causes prejudice to the defendants, a court of equity may dismiss the complaint. The greater the delay, or the more unreasonable, the less prejudice need be shown; and vice versa. The Court must weigh the facts and interests on both sides, summon up the discretion of a chancellor, remember that it is a court of conscience and not of legal stricture, and come as close as it can to a fair result. Frequently there are some good arguments on both sides, and that is the case here. We start by quoting our discussion of the issue in *Smith v. Clinton:*

> First, the injury alleged by the plaintiffs is continuing, suffered anew each time a State Representative election is held under the [illegal] structure. Second, there have been significant developments since the 1981 Arkansas reapportionment. The Voting Rights Act was amended in 1982, and the Supreme Court's interpretation of the statute in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), lays down a rather uncompromising structure for the application of the law in vote-dilution cases. Third, we note that the plaintiffs are required to prove that, as a result of the challenged structure, a white majority bloc is usually able to defeat the preferred candidates of the minority. Of course, evidence of this circumstance would be unavailable unless the structure had been in place for some time.

687 F.Supp. at 1313.

All of these factors are present here, but defendants claim *Smith* was different. See Defendants' Post–Trial Brief, 2 n. 1.

There, we dealt only with the dilutive effect of one two-member district. The relief affected only that district. There was no ripple effect. No other district's boundaries were disturbed. See *Smith*, 687 F.Supp. at 1313 n. 4. But here there would be some ripple effect. Plaintiffs claim that there should be as many as 16 (13 in the House, 3 in the Senate) majority-black districts. Relief cannot be accomplished simply by dividing up one or more existing multi-member districts. If the single-member districts requested, or any of them, are created, the boundaries of some adjacent districts will necessarily shift to some extent. Plaintiffs assert that the ripple effect will be confined to 26 of the State's 75 counties, all of them south and east of a diagonal line roughly splitting the State from northeast to southwest, but even as so limited the necessary changes would be substantially greater than those occasioned by *Smith*.

With this argument in mind, we compare plaintiffs' delay to defendants' prejudice. It is reasonable to start the clock running on June 30, 1986, when the Supreme Court handed down *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). This case is the pole star of the law in this area. Only with this decision can the law be said to have jelled. The present plaintiffs moved for leave to intervene in *Smith v. Clinton* on June 1, 1988, less than two years later. This motion was denied on July 1, 1988. The order denying the motion suggested plaintiffs could bring a separate suit, which they did about six months later. Suit was filed about 14 months before the filing deadline for the 1990 elections. (Compare *Smith*, 687 F.Supp. at 1312, in which candidates had filed and begun to campaign in the challenged district at the time of the hearing on plaintiffs' motion for preliminary injunction.) This sort of case takes an enormous amount of preparation, and it is to plaintiffs' credit that they took time to prepare it thoroughly before coming to court. This sequence of events does contain some delay, but most if not all of it was reasonable.

What about prejudice to defendants? As noted, the expense, trouble, and disruption

of compliance (assuming, as we must at this stage of the analysis, that the complaint has some merit) will be substantial, and more so than in *Smith*. But the expense, trouble, and disruption are not a consequence of plaintiffs' delay in filing. They would have occurred whenever the suit was filed—even if it had been filed, say, right after passage of the 1982 amendments to the Voting Rights Act. There is some additional increment of public confusion that will be caused by changing district lines less than two months before filing opens, and less than four months before the first primary election. It is also true that the census data relied on by both sides—and that presumably will be the basis of any remedial plan—become increasingly stale as time passes after the 1980 census. But it is by no means clear that these data, however inaccurate they may become in terms of absolute numbers, will also be inaccurate in relative terms. On the contrary, what evidence we have on the subject indicates that, although population as a whole has declined in the affected areas of the State, the proportions of blacks and whites have remained virtually constant. See Testimony of Dr. Engstrom, Dr. Morrison, Senator Benham, Representative McGinnis, and Representative Cunningham. And in any event the staleness of the 1980 census data cannot be escaped. For even under defendants' theory, which is that the case should be dismissed, the 1990 elections will be run in districts based on 1980 census data. The true comparison is between out-of-date districts that (by hypothesis) dilute the black vote, and out-of-date districts that do not.

The question is essentially one of judgment and degree. Logic cannot absolutely exclude either answer. In our judgment, the defense of laches must fail. In part, the expense and disruption that will undeniably occur are nothing but a consequence of the wrong that has been done. The illegality, the injury, extend beyond a single district, and so the remedy that must be applied will necessarily be more trouble than it was in *Smith*. To the extent that electoral confusion and disruption exceed what they would have been if the case had

been filed earlier, we think that fairness and equal opportunity in voting are worth it. We will not say to these plaintiffs, "Wait for another census. The time is not yet ripe." They have heard these words too many times in the past.

### III.

We turn now to the merits of plaintiffs' Section 2 claim. As amended in 1982, the statute now reads as follows:

**§ 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**

**(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

**(b)** A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

██ The statute embodies a "results" test. A voting practice or procedure (like an apportionment plan) violates the law if it results in denial or abridgement of the right to vote on account of race or color.

The law focuses on effects, not purpose or motivation. Subsection (b) adds a further direction to the courts: we are to consider "the totality of circumstances," which is lawyer's language for "all the facts," and decide whether members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

### A.

At the outset, defendants make two legal arguments that would bar the action altogether if successful. First, they say that under the plain language of Section 2(b) plaintiffs must show two separate things: (1) that they have less opportunity to participate in the political process; and (2) that they have less opportunity to elect representatives of their choice. Even if they have shown the second, the argument runs, they cannot win this case, because they cannot make the first showing. There are no presently existing legal barriers to voting by black citizens in Arkansas, and therefore they have just as much opportunity to participate in the political process as anyone else.

This argument fails to reckon with the present effects of past racial discrimination, much of it official and governmental. In *Smith v. Clinton*, we made the following findings:

> (1) The Court takes judicial notice that there is a history of racial discrimination in the electoral process in Arkansas. See *Perkins v. City of West Helena*, 675 F.2d 201, 211 (8th Cir.), *aff'd mem.*, 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982). We do not believe that this history of discrimination, which affects the exercise of the right to vote in all elections under state law, must be proved anew in each case under the Voting Rights Act.

> (2) We further find that the history of discrimination has adversely affected opportunities for black citizens in health, education, and employment. The hangover from this history necessarily inhibits full participation in the political process.

687 F.Supp. at 1317 (footnote omitted). By order entered on October 2, 1989, the first day of the trial in this case, we made the same findings.

■ Moreover, the argument fails purely as a logical and linguistic matter. Even if plaintiffs failed to show less opportunity to participate in the political process, a showing that they have less opportunity to elect candidates of their choice would suffice to establish their claim. The right protected is the aggregate of these opportunities— the right to effective participation in the political system: "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by the black and white voters to elect their preferred representatives." *Thornburg*, 478 U.S. at 47, 106 S.Ct. at 2764. An example from a less exalted field of human endeavor will illustrate the point. Suppose you say that I have less ability to chip and putt than you do. If I am just as good a chipper as you are, but not so good at putting, this statement, as a matter of ordinary speech, is still a true one. It is a combination of qualities (play around the green) that we are discussing, and the comparison is between our respective totals or aggregates of these qualities. So in the context of Section 2: it is a combination of abilities (abilities to use the elective franchise) that we are comparing. If I can vote at will but never elect anyone, my political ability is less than yours. Elections, and winning them, are the whole point of voting. This is, at any rate, one reading of the statute that is grammatically available, and the statute should be construed liberally in favor of its object, which is to open up the electoral process to full participation.

■ Second, defendants also argue that Section 2 just doesn't apply at all to cases involving single-member districts. Both *Thornburg* and *Smith*, they say, were multi-member district cases. Single-member districts submerge no one. The majority wins, but that's inherent in any democratic system. We disagree with this reading of the law. Nothing in the words of the stat-

ute supports it. Section 2 says nothing about any kind of districts. It is directed against certain described effects, regardless of the form of the political device or mechanism that produces them. *Thornburg*, to be sure, is a multi-member district case (in the Supreme Court, that is),[6] but it implies that a particular configuration of single-member districts can give rise to a vote-dilution claim, see 478 U.S. at 50 n. 16, 106 S.Ct. at 2766 n. 16, and in principle there is no reason why this should not be so. *Accord, Neal v. Coleburn*, 689 F.Supp. 1426 (E.D.Va.1988) (county single-member districts dilute black voting strength in violation of Section 2). Defendants cite *Butts v. City of New York*, 779 F.2d 141, 148 (2d Cir.1985), a pre-*Thornburg* opinion, for the proposition that vote-dilution claims won't lie with respect to single-member districts, but we do not so read the case. It holds that a particular device—the requirement of a run-off if no candidate gets 40% of the vote—does not violate Section 2 in a particular electoral unit choosing a single official. It does not hold that unlawful dilution is impossible when a multi-member body's members are chosen from single-member districts that have been drawn in such a way as to split a certain class of voters among different districts.

We agree that *Thornburg* and *Smith* cannot be automatically applied to the single-member context. Dilution may be much more obvious in a case like *Smith*, where a potential majority of black voters was submerged in a two-member district. But the basic principle is the same. If lines are drawn that limit the number of majority-black single-member districts, and reasonably compact and contiguous majority-black districts could have been drawn, and if racial cohesiveness in voting is so great that, as a practical matter, black voters' preferences for black candidates are frustrated by this system of apportionment, the outlines of a Section 2 theory are made out. Whether such a claim will succeed depends on the particular factual context, including all of the factors that *Thornburg, Smith*, and the legislative history of Section 2 say are relevant.

**B.**

We first address the major *Thornburg* factors, factors that must be present if the predicate of a vote-dilution claim is to be laid. In evaluating a Section 2 claim, the Court must first determine whether three preconditions to a legally substantial impairment of plaintiffs' ability to elect the candidates of their choice have been met. First, the claimant minority must establish that it is sufficiently large and geographically compact to constitute a majority in a single-member district. Second, the plaintiffs must show that the group to which they belong is politically cohesive. *Thornburg*, 478 U.S. at 50–51, 106 S.Ct. at 2766–67. Third, the minority voters must show that the "majority votes sufficiently as a block to enable it—in the absence of special circumstances, such as a minority candidate running unopposed ... to defeat the minority's preferred candidate." *Id.* at 51, 106 S.Ct. at 2766 (footnote omitted). The latter two factors can be shown by proving that voting in the jurisdiction is highly racially polarized. *Ibid. Accord, Smith*, 687 F.Supp. at 1314–1315.

In the first place, we find that black communities in the areas of the State challenged by plaintiffs are sufficiently large and geographically compact to constitute a majority in single-member districts. This finding is based primarily on the testimony of plaintiffs' expert, Jerry Wilson. As already noted, this testimony, taken together with the details set out in Mr. Wilson's report, PX 5, establishes that the Board of Apportionment could have drawn, in 1981, thirteen majority-black House districts and three majority-black Senate districts. These districts could have been drawn in the areas of the State which are the focus

---

**6.** In *Thornburg* the plaintiffs had originally challenged one single-member district, in addition to multi-member districts, as being the result of the fracturing of a concentration of black voters that could have made up a majority in a single district. The District Court found this single district violated Section 2, and the defendants did not appeal this finding. See *Gingles v. Edmisten*, 590 F.Supp. 345 (E.D.N.C.1984).

of this suit. For the convenience of the reader, we insert at this point in the opinion Maps 3 and 4, showing Mr. Wilson's alternative districts for the House and Senate, respectively.[7]

MAP 3

**7.** We use the term "alternative districts," rather than "proposed districts." At this stage of the case, the liability stage, plaintiffs need show only that majority-black districts could have been drawn. At the *relief* stage of the case, when plaintiffs will, presumably, submit an apportionment plan of their own, they will not necessarily be bound by these alternative districts. Plaintiffs should also make suggestions, fully reflecting their position, to defendants during the process of preparation of defendants' plan.

MAP 4

As the maps indicate, some of the districts look rather strange, but we do not believe this is fatal to plaintiffs' position. Their alternative districts are not materially stranger in shape than at least some of the districts contained in the present apportionment plan. The one-person, one-vote rule inevitably requires that county lines and natural barriers be crossed in some instances, and that cities and other political and geographic units be split ·in others.

Defendants question the compactness and contiguity of plaintiffs' alternative districts, but, with perhaps one exception, all of these questions have been resolved to our satisfaction. Initially, defendants took the position that some of the alternative districts put forward by plaintiffs contained "islands," that is, areas completely surrounded by the alternative district, but not part of it. This criticism, in particular, was leveled against alternative House districts 1, which includes part of the City of

Marianna, 11, which includes part of the City of Magnolia, and 10, which includes part of the City of McGehee. An examination of the exhibits and study of the testimony of the opposing experts satisfy us that there are in fact no islands in House districts 1 and 11, as put forward by plaintiffs. We are not sure that we completely understand the geographical situation with respect to hypothetical district 10, but even if there is an island within this district, the problem can be easily cured simply by cutting off the "finger" referred to in Mr. Wilson's rebuttal testimony. See PX 91, 92. If this change is made, the problem of insularity clearly disappears, and does so without violating the one-person, one-vote rule, and without deviating from the goal of creating a majority-black district. We note, incidentally, that the existing apportionment plan indisputably contains islands—Senate district 27, for example, wholly surrounds Senate district 28.

We also have little difficulty in finding that voting patterns are highly racially polarized, in the sense that black and white voters prefer different candidates with a high degree of frequency. Furthermore, the white voting majority is powerful enough, and consistent enough, to defeat black voters' preferences for black candidates almost without exception.

In making this finding we rely primarily on actual events and practical politics. Since 1978 there have been ten races for membership in the State Legislature in which black candidates ran against white candidates in majority-white districts. The black candidate lost every one of these races. Complete election returns for seven of these ten races are in the record before us, and substantial evidence with respect to the other three was also introduced. In all but one of these races, that in which Earl Foster was the black candidate for State Representative in House district 88 in 1984, there was a high correlation between the race of the voter and the level of support for the black candidate. And even in Foster's case, he was the candidate preferred by blacks in his home county, and was not the candidate preferred by whites in any of the counties covered by the district in ques-

tion. The fact is that there is a strong tendency for white voters to vote for white candidates when there is a black candidate in the race. Black voters behave in exactly the same fashion. This is not a particularly admirable commentary on the voting behavior of either race, but it is a fact in present-day Arkansas politics, and there is no reason to suppose that it will change substantially in the near future. Evidence concerning so-called exogenous elections, that is, elections for positions other than membership in the State Legislature, also supports this conclusion.

Both sides spent a good deal of time and energy debating the merits of various statistical methods. The plaintiffs' expert, Dr. Richard Engstrom, used three such methods: single regression, double regression, and homogeneous-precinct analysis. The defendants' expert, Dr. John Wildgen, objected particularly to double-regression analysis, claiming that it could show nothing about the behavior of individual voters. Yet, both the Supreme Court, *Thornburg*, 478 U.S. at 53–61, 106 S.Ct. at 2767–72, and this Court, *Smith*, 687 F.Supp. at 1316–17, have accepted testimony based on bivariate (that is, double) ecological regression and homogeneous-precinct analysis. We recognize, as Dr. Wildgen argues, that these statistical methods cannot predict the behavior of individuals, but we do not believe that plaintiffs make any such claim. Furthermore, exhibit after exhibit was introduced in the form of "scattergrams," in which the votes for black and white candidates are plotted for various precincts. To our untrained eye, the cumulative effect of these exhibits is overwhelming, whatever the technical merits or demerits of the various statistical theories. And our own experience as citizens of this State, which we are not required to lay aside, strongly confirms this conclusion.

There are some exceptions to this pattern of racially polarized voting. Judge Edwin Keaton, Municipal Judge in Camden, was re-elected in 1988 against a single white opponent, but he failed to win a majority of the white vote despite being an incumbent. In addition, black candidates for the House

have occasionally received a majority of the white vote, but only when running as incumbents in majority-black districts. And even in these races, the proportion of the black vote received by these candidates was much greater than that of the white vote.

Races not involving direct competition between white and black candidates do not lend themselves to such a clear pattern. Where two white candidates are running, for example, black voters can hold the balance of power. We do not wish to minimize this aspect of political reality, but we do not believe it has sufficient weight to negate the clear proof of polarization. The Supreme Court in *Thornburg* used a statistical analysis based solely on elections in which black and white candidates faced each other, and so did we in *Smith*. There, we stated that analysis of elections in which there are no black candidates proves only that "[c]andidates favored by blacks can win, but only if the candidates are white." 687 F.Supp. at 1318. White voters, in short, can elect white candidates against black opposition, but black voters cannot elect black candidates against white opposition, with insignificant exceptions. We hope the day will come when this is no longer true, when voters of both races will vote for the person and not for the color of his or her skin. Whatever distaste we may personally have for racial stereotypes in politics, the relevant question for present purposes is the preferences of voters in real life, and we believe they have been clearly established. It is true here, as it was in *Smith*, see 687 F.Supp. at 1317, that there is racially polarized voting in races for the Arkansas State Legislature, that black voters usually vote cohesively, as a unit, and that white voters have the strength under the present plan of apportionment (except in majority-black districts) to enable them to frustrate the choices made by black voters.

### C.

■ What we have written so far suffices to establish that the plaintiffs have proved the essential predicate for a Section 2 violation. But it does no more than that.

We must now examine all of the other relevant factors and decide whether, on balance, a diminution of black political opportunity, in violation of Section 2, has been shown. For this purpose we begin with the list of relevant factors contained in the report of the Senate Judiciary Committee on the bill that became the 1982 amendment to the Voting Rights Act. The relevance of this list is confirmed by the Supreme Court's opinion in *Thornburg*, 478 U.S. at 44–45, 106 S.Ct. at 2763–64. *Accord, Smith*, 687 F.Supp. at 1314. The list appears in S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, reprinted in 1982 U.S.Code Cong. & Admin.News 177, 205–07, and reads as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are;

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The second of these factors (racial polarization in voting) has already been fully discussed. We have taken judicial notice of the first (history of official discrimination in voting) and fifth (effects of past discrimination in education, employment, etc.) factors. *Accord, Smith,* 687 F.Supp. at 1317 & n. 7. The record made in this case, however, is much fuller than the one made in *Smith,* and we deem it appropriate to summarize some of the details of the proof on these points. We will try to keep the discussion within short compass. Much of the proof in this case was already obvious to any conscious Arkansan, and we do not wish to pile Pelion upon Ossa.

*History of Official Discrimination in Voting.* In addition to the findings made in *Smith* and in *Perkins v. City of West Helena,* 675 F.2d 201 (8th Cir.), *aff'd mem.,* 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982) (maintenance of at-large elections for discriminatory purpose), we also call attention to *Sherpell v. Humnoke School Dist. No. 5,* 619 F.Supp. 670, 680–81 (E.D. Ark.1985), *appeal dismissed,* 814 F.2d 538 (8th Cir.1987). There, this Court found that the Humnoke School District No. 5 of Lonoke County, Arkansas, maintained an at-large system of electing school-board members for the discriminatory purpose of limiting black political opportunity.

Some of the history relied on by plaintiffs can be dismissed or minimized on the ground that it occurred so long ago that its effects have by now disappeared almost completely. In this category we would place the General Assembly's rejection of the Fourteenth Amendment, the white primary, and the poll tax (abolished by the voters in 1964). But other incidents cannot be so easily disposed of. A number of witnesses testified to the difficulties experienced by blacks in electoral politics in various of the areas affected by this litigation. Polling places have been moved on short notice; deputy voting registrars have, with isolated exceptions, been appointed only as a result of litigation; efforts have been made to intimidate black candidates. It is not necessary to decide at this point which (if any) of these barriers were motivated by invidious discrimination. It is sufficient for present purposes to note that these and similar practices clearly result in discouraging black participation in elections. Partly this is due to a higher level of illiteracy, poverty, economic dependence, even timidity, among the black population. And while defendants can hardly be blamed for creating these conditions, it is an inescapable fact that they are in large part the legacy of a history of discrimination, much of it governmental, beginning with the constitutionally sanctioned institution of human slavery.

We think it proper to refer to one additional instance of racial intimidation, occurring in 1986, in order to make the point that official discrimination designed to suppress black political activity is not wholly a thing of the past, at least not in the Delta. Roy Lewellen, a black lawyer in Marianna, Lee County, ran for the State Senate in 1986 against the white incumbent, Senator Paul Benham. At about the same time, the Sheriff and the Prosecuting Attorney instituted a well-publicized criminal prosecution against Mr. Lewellen for witness bribery. Mr. Lewellen testified in some detail before us. He gave a number of reasons for his belief that the prosecution was designed to discourage him in particular and black political activity in general. We find this testimony entirely credible. Defendants called no witnesses to rebut it.[8] Mr. Lewel-

---

8. Senator Benham did testify that he had nothing personally to do with the prosecution. We believe him; but the fact remains that the Sheriff had warned Lewellen not to run, and that

len's difficulties were to some degree of his own making. He allowed himself to be drawn into an equivocal situation with a prosecution witness in a criminal case in which he represented the defendant. But this is not the whole explanation for what happened. We do not think that a white lawyer, even one who opposed the political powers that be, would have been treated this way. This kind of intimidation no doubt had a powerful chilling effect. In making this finding, we are consistent with the provisional findings made by this Court, on motion for preliminary injunction, in *Lewellen v. Raff,* 649 F.Supp. 1229 (E.D. Ark.1986), *aff'd,* 843 F.2d 1103 (8th Cir.), *opinion modified,* 851 F.2d 1108 (8th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989).

In short, there is a long history of official discrimination. It has a present effect. And some instances of it are still occurring.

*Effects of Past Discrimination in Employment, etc.* Much has already been said on this subject. See, *e.g., Smith,* 687 F.Supp. at 1317 n. 7 (income and education data for Crittenden County). Education is probably the key point here. Many more whites than blacks are high-school graduates, and many blacks were educated in schools that were both separate (by compulsion of law) and unequal. There is a tremendous amount of white poverty, especially in the Delta, but poverty among blacks is more nearly the rule than the exception. Blacks tend to have fewer telephones and fewer cars. If a person has no phone, cannot read, and does not own a car, the ability to do almost everything in the modern world, including vote, is severely curtailed. The point, again, is not that defendants produced these conditions. We are convinced that the two defendants who testified before us, Governor Clinton and Attorney General Clark, are determined to alleviate them. But as long as blacks, as a group, remain in a depressed socio-economic status, their political power will necessarily be less, and the impact on them of vote-diluting boundary lines will be greater.

We insert at this point a table setting out some of the economic facts of life for the two races in the 16 counties where this suit challenges district lines.

SOCIOECONOMIC FACTORS FOR BLACKS AND WHITES BY COUNTY [*]

| COUNTY | HIGH SCHOOL GRADUATES[°] (%) | | —PER CAPITA— INCOME ($) | | FAMILIES BELOW POVERTY LEVEL (%) | | NO TELEPHONE + AVAILABLE (%) | | NO VEHICLE + AVAILABLE (%) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | WHITE | BLACK | WHITE | BLACK | WHITE | BLACK | WHITE | BLACK | WHITE | BLACK |
| Ashley | 60.2 | 25.2 | 6,023 | 2,987 | 12.2 | 36.3 | 8.5 | 28.4 | 7.6 | 30.8 |
| Chicot | 53.4 | 26.4 | 6,318 | 2,165 | 15.3 | 54.6 | 10.6 | 32.9 | 7.3 | 43.7 |
| Columbia | 60.6 | 32.6 | 7,014 | 2,739 | 8.2 | 37.9 | 6.9 | 33.0 | 7.5 | 28.7 |
| Crittenden | 61.4 | 19.6 | 6,970 | 2,293 | 8.6 | 51.6 | 7.3 | 28.5 | 4.7 | 36.3 |
| Cross | 48.1 | 24.4 | 6,070 | 2,429 | 12.1 | 38.2 | 13.1 | 28.1 | 8.9 | 30.4 |
| Desha | 58.5 | 25.1 | 6,909 | 2,594 | 10.0 | 42.0 | 8.9 | 32.3 | 9.2 | 37.4 |
| Phillips | 58.3 | 22.9 | 6,299 | 2,336 | 11.8 | 53.6 | 10.9 | 30.5 | 9.0 | 42.0 |
| Pulaski | 75.9 | 54.2 | 8,188 | 3,873 | 5.2 | 24.8 | 5.2 | 14.7 | 6.2 | 23.4 |
| Jefferson | 65.7 | 41.8 | 7,084 | 3,143 | 8.0 | 37.5 | 6.8 | 18.6 | 6.3 | 29.7 |
| Lee | 43.7 | 20.1 | 5,339 | 1,923 | 16.4 | 59.4 | 15.9 | 29.5 | 10.9 | 37.4 |
| Lincoln | 49.8 | 24.5 | 5,353 | 2,031 | NOT AVAILABLE | | NOT AVAILABLE | | NOT AVAILABLE | |
| Mississippi | 52.3 | 27.7 | 5,685 | 2,426 | 13.4 | 45.0 | 13.5 | 30.5 | 9.6 | 33.6 |
| Monroe | 48.8 | 23.0 | 5,743 | 2,173 | 16.8 | 50.8 | 9.6 | 26.6 | 10.2 | 47.6 |
| Nevada | 55.1 | 27.7 | 5,916 | 2,859 | 9.7 | 43.1 | 11.7 | 35.6 | 7.5 | 20.5 |

charges were brought after that advice was ignored. The point here is the motivation of those who instigated the prosecution, not whether Senator Benham himself was among them.

| COUNTY | HIGH SCHOOL GRADUATES° (%) | | —PER CAPITA— INCOME ($) | | FAMILIES BELOW POVERTY LEVEL (%) | | NO TELEPHONE + AVAILABLE (%) | | NO VEHICLE + AVAILABLE (%) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | WHITE | BLACK | WHITE | BLACK | WHITE | BLACK | WHITE | BLACK | WHITE | BLACK |
| Ouachita | 60.9 | 32.5 | 6,648 | 3,037 | 6.8 | 36.5 | 6.8 | 16.6 | 7.6 | 27.2 |
| St. Francis | 57.4 | 26.0 | 6,056 | 2,402 | 14.7 | 47.4 | 13.1 | 29.2 | 7.6 | 33.0 |

\* According to 1980 Census.
° Among persons 25 and over.
+ In housing units occupied by Blacks or Whites.

---

*Use of Majority–Vote Requirements and Other Devices.* We do not believe that any of the challenged districts is unusually large. Races for the State Legislature require each candidate to run for a designated seat, so "single-shot voting" would have no practical significance. There is a requirement that candidates for the State Legislature get a majority of the vote in the primary to obtain a party nomination. And this majority-vote requirement, in four separate recent instances in which black candidates either won office by a plurality or were threatening to win, has been expanded to cover elections (*e.g.*, for municipal judge) to which it has traditionally not been applied. We do not stop to determine at this point whether the run-off primary, either in its origin or in its recent extensions, is the product of discriminatory intent. That issue will be addressed when we consider plaintiffs' constitutional claims and their request for preclearance under Section 3(c). For present purposes we simply note the existence of a majority-vote requirement affecting races for the General Assembly and many other public offices in Arkansas.

*Candidate slating process.* No evidence was introduced on this subject. As far as we know, the process of slating plays no part in races for the Arkansas Legislature. Nominations are made by primary, not (except in rare instances) by committee or convention. Anyone who wants to run simply files as an individual in the primary. If a candidate cannot pay a filing fee, petitions may be used to get on the ballot, and this method of ballot access is now fairly common.

*Racial Appeals in Campaigns.* Racial appeals, some quite offensive, are common in campaigns in which a white candidate is running against a black candidate. Some-times simply informing the voters that one's opponent is black seems to be enough to do the trick. Some white candidates have bought newspaper ads or distributed political leaflets containing their black opponent's picture. Sometimes references to race are more explicit. In the Mayor's race in Pine Bluff in 1975, for example, a supporter of a white candidate publicly warned that if white voters didn't turn out, there would be a black mayor. Sometimes coarser words are spoken. We have in mind especially the testimony of Andrew James Willis of McGehee and his brother, Carol Willis, who is now an assistant to Governor Clinton. In 1976 Carol Willis ran for County Judge of Desha County, the first black person ever to do so, in this century anyway. Mr. Willis received obscene phone calls, including racial slurs. One night on his way home, he was run off the road by a group of individuals wearing hoods. And at a public rally his white opponent used profanity and a racial epithet—not in his actual speech, to be sure, but in open conversation. Both of the Messrs. Willis testified to this incident, and we believe them. The defendants offered no evidence to the contrary. After the election, the County (headed by the County Judge who had defeated Carol Willis) stopped or reduced its business with the Willis Funeral Home. The County had been paying the funeral home $100 to bury black paupers. The County even went so far as to pay a "white" funeral home $500 (a premium rate) to bury a black pauper—an event unheard of at the time and probably still unique. We find here a macabre echo of the testimony of R.C. Henry, the longtime (black) Chairman of the Lee County Republican Committee, from 1979 to 1989. To this day, the races live separately, he said, they go to church separately, and they even die separately. And as late as Octo-

ber 2 of this year, the City of Marianna was maintaining, at public expense, a cemetery for whites only.

*The Extent to Which Blacks Have Been Elected.* The statute expressly provides that members of a protected class have no right to be "elected in numbers equal to their proportion to the population." 42 U.S.C. § 1973(b). But "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision may be considered...." *Ibid.* This factor points strongly in plaintiffs' favor in the present case. Only in majority-black districts have black candidates been elected to the Arkansas General Assembly. All other black candidates have been defeated. It was not until 1972 that any blacks were elected to the Legislature in this century. Four black members, three in the House and one in the Senate, were elected at that time. Today there are only six black members, and one of them owes his seat to this Court's decree in *Smith.* No black person has ever won statewide office by election. And in all of the 75 counties of Arkansas, no black person has ever been elected, since Reconstruction, to any county-wide constitutional office. There are increasing numbers of black officials, even in the Delta, but in almost every instance they have been elected in majority-black single-member districts (we refer primarily to city councils, school boards, and quorum courts), and many of these districts owe their existence to civil-rights litigation. We believe, in addition, that many potential black politicians have simply not run. They know that as a practical matter their candidacy would probably be futile.

*Lack of Responsiveness of Elected Officials.* Plaintiffs claim that white legislators in the Delta are insensitive to the concerns of poor black people. Certainly there is a widespread feeling to this effect among black voters, and plaintiffs presented several witnesses who genuinely feel left out of the political process. These feelings are not without basis. If a person is blindfolded and taken to a given part of town, and the blindfold is then removed, he or she will almost certainly be able to tell whether the residential area is predominantly white or black. Housing is still largely segregated—not by law, but, just as effectively, by choice and economic necessity. Houses in black parts of town tend to be run down, streets and gutters are not as well kept, and there are more open ditches. Certainly this condition is due in part to the unresponsiveness of local government over the years, a situation that, however, is now beginning to change with the election of more black City Council members and Justices of the Peace.

We are not convinced, however, that the charge of unresponsiveness can be sustained as to the members of the State Legislature, and it is with them that we must be particularly concerned in this case. Members of the House like Representatives Cunningham, McGinnis, Flanagin, and Dawson are anything but unresponsive. They are well aware that a large proportion of their constituency is black, and they make assiduous and sincere efforts to represent these voters. There is bound to be some public dissatisfaction, among blacks as well as whites, with almost any office holder, but the charge that white legislators in the Delta are unresponsive to black needs has not been proved to our satisfaction on this record. No doubt some are more responsive than others, but such individual variations in political philosophy and conduct will always be found.

As examples of unresponsiveness, plaintiffs pointed particularly to two pieces of legislation, one that became law and one that did not. In 1987, a bill was passed to impose additional regulations on the use of the absentee ballot. The bill was sponsored by House members from the Delta, and plaintiffs claim that its purpose was to suppress the incipient effective use of the absentee ballot by black voters. There is some evidence to support this claim. Despite a long history of difficulty and fraud with the absentee ballot in Arkansas, it was not until 1987 that the bill in question was passed. (Among other things, the bill allows only close relatives to deliver absentee ballots from voters to the county clerk. In practice, plaintiffs say, this restriction

operates against elderly black people, who may not have relatives and are not able to get to the courthouse themselves. The option of mailing the ballot remains, but some poor people cannot afford the postage.) On balance, we find this claim unpersuasive. The legislation was passed overwhelmingly, with votes from all parts of the State, including all of the black members of the House of Representatives. It is facially neutral, and we find plausible the claim that there were real abuses in absentee balloting that needed to be addressed.

Plaintiffs also presented a considerable amount of testimony about H.B. 1130, which was introduced during the 1989 regular session of the General Assembly, but failed to pass in the Senate. This bill, sponsored by Governor Clinton, would have done two principal things: it would have removed from the State income-tax rolls a large number of low-income people, including many black people, and it would have imposed on taxpayers with incomes in excess of $100,000 a year a flat tax rate of 7% on their entire income. Plaintiffs claim that white legislators in the Delta opposed this bill, thus preferring the needs of a few rich constituents to those of thousands of low-income blacks. We do not agree with this claim. Representatives Cunningham and Schexnayder, for example, cosponsored H.B. 1130, and Representatives Dawson and Flanagin and Senator Benham voted for it. Some white legislators from the Delta did oppose the bill, but their motives in doing so, we think, were honestly political. Representative Nancy Balton, for example, testified that middle-class voters in her district asked her to oppose the bill. Nothing in the bill directly injured them, but some of them felt that poor people on welfare were living better than they were, and therefore they opposed anything that would improve the lot of these people. The reasoning is faulty, but the sentiment is all too familiar, and state legislators, like national ones, often vote on the basis of public perception of the effects of proposed legislation, as opposed to the effects in reality. This is a serious problem, but we do not believe it is a racial one.

There is some evidence of unresponsiveness on the part of the Legislature. Some white members, on being approached by black citizens in their own districts for help, referred these constituents to black legislators representing other areas. And black members have found it difficult to get white members to cosponsor some bills of interest to black voters—for example, the bill to create a holiday in honor of Dr. Martin Luther King, Jr. But on the record as a whole, the charge of unresponsiveness has not been proved.

*The Strength of Policies Underlying the Plan of Apportionment.* We are not quite sure how to apply this criterion in the present case. There was no policy, nor could there be a valid one, explicitly requiring the cracking or splitting of black-majority areas. The Board of Apportionment did profess allegiance to a number of other policies, however, including the undesirability of crossing natural barriers like rivers, the undesirability of splitting cities, a preference for continuity in representation (that is, avoiding situations where incumbents would have to run against each other), a desire to depart as little as possible from the 1971 apportionment plan, and a desire to cross political boundaries, like county lines, as little as possible. There was, in addition, the overriding policy of equality of population, which was probably the uppermost thought in the Board's mind at the time.

Some of these policies were not consistently applied. The cities of Little Rock, Pine Bluff, and El Dorado were split, but each of those cities is so large that it had to be split. It could not have been contained wholly within one House district. On the other hand, the City of Pine Bluff, which could have made up one Senate district, was split between two Senate districts, evidently to avoid the necessity of a political race between two senior senators. One reason given for preserving Crittenden County as a multi-member district was the desire to avoid splitting the City of West Memphis. There is a surface inconsistency here with the decision to split the City of El Dorado, but it is explained, perhaps, by the fact that Union County, of which El Dorado

is the county seat, is the largest county in the State in geographic area, and therefore a logical candidate for the creation of separate single-member districts. The policy against creating districts which are divided by a natural barrier, now urged upon us as a reason not to create a district that would contain territory in Pulaski County on either side of the Arkansas River, was violated in the drawing of House district 85, which includes territory on either side of the Arkansas River in Desha County, forcing citizens north of the river to drive more than 90 miles to reach the largest city in their district, where their state representative lives.

There are a number of crosscurrents here, and they point in various directions. On the whole, we are not persuaded that this factor has much weight. There were fairly strong policies underlying the apportionment plan, but they were not always consistently applied. To a certain extent, this is an inevitable part of line-drawing under the one-person, one-vote regime.

### D.

Having fully reviewed the relevant factors, we must now balance them and come to a conclusion on the ultimate issue: whether black voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The areas of the State that are in issue include Pulaski County, Jefferson County and some adjacent territory, areas in South Arkansas including parts of Ouachita, Nevada, and Columbia Counties, and the area generally referred to as the Delta, including Mississippi, Lee, Phillips, Cross, St. Francis, Desha, Chicot, and Ashley Counties, together with some adjacent territory. (Crittenden County, which is also in the Delta, is not affected, except for one corner: it was dealt with in *Smith*, and neither side in this case asks for a change in House districts 48 and 49, which comprise most of the County.) To put it another

way, the claim directly involves the following House districts: 56 through 70, 88, 80–83, 38, 47, 74, 75, 73, 85, and 100. It also directly involves the following Senate districts: 27, 28, 19, and 30.

We think the case is clear with respect to all these areas except Pulaski County (which includes House districts 56 through 70). The proof justifies consideration of the Delta, the Jefferson County area, and the Ouachita–Nevada Counties area as a group. There are some differences within the group, but as a whole it shares a significant number of common characteristics. Voting is markedly polarized between the races. With the exception of House district 82, in Jefferson County, there are no districts, House or Senate, with a majority-black voting-age percentage. A number of such districts, nine in the House and two in the Senate, could have been created. (The number of House districts, nine, is exclusive of the new majority-black House district in Crittenden County created by *Smith*.) These districts would have been reasonably compact and contiguous. The history of official discrimination, the frequency of racial appeals in campaigning, the absence of successful black candidates, the effects of discrimination in education, employment, and health—all these factors point in favor of plaintiffs' claim. Also on the plaintiffs' side is the existence of a majority-vote requirement. The slating-process factor[9] is not in this case at all, and the state-policy factor does not point strongly either way. On the other hand, there are a number of responsive white legislators. On balance, a clear answer emerges. In these areas, black political opportunity is significantly lessened by the 1981 apportionment plan, and the plan violates Section 2 of the Voting Rights Act.

What about Pulaski County? Is it materially different from the areas we have just discussed? Many of the same factors are present. Voting is polarized, and four reasonably compact and contiguous[10] majori-

---

**9.** See *supra* p. 209.

**10.** We reject defendants' argument that plaintiffs' alternative district 7 is not reasonably com-

pact because it contains territory on both sides of the Arkansas River. There are a number of bridges across the River, and legislative districts have been split by it in the past. Moreover, it

ty-black single-member House districts could have been drawn, as opposed to the one three-member majority-black district that was drawn. (There are five single-member Senate districts, only one of them majority black, but the black population is not large enough to make possible more than one majority-black Senate district.) There has been no successful black candidate for the Legislature outside the majority-black areas. There have been some racial appeals in elections. The history of official discrimination affects voting in the entire State. Socio-economic disparities between the races are marked.

On the other hand, racial polarization in voting is less pronounced in Pulaski County. In 1976, Robert Johnston, an incumbent white House member, defeated a black opponent in a majority-black district. He had to have significant black support to do so. In 1984, a black candidate, Glenn Mahone, won the Democratic nomination for a House seat in a majority-white district against a white opponent in the runoff. He was defeated by the Republican nominee in the general election, but winning the Democratic nomination is better than any black candidate has done in legislative races in majority-white districts elsewhere in the State. In 1986, a black candidate for Congress, Thedford Collins, was defeated in the district as a whole, running fourth out of five in the Democratic Primary. But in Pulaski County he ran third and did well in some white areas, primarily among affluent voters. He was endorsed by the *Arkansas Democrat,* one of two state-wide newspapers, and shared with one other candidate the endorsement of the *Arkansas Gazette,* the other state-wide newspaper. Both newspapers are controlled by white people. And Marion Humphrey, elected municipal judge by a plurality in 1988, would not have won without significant white support. There have been racial appeals in elections, but they have not included the grosser features of some of the other incidents we have described.

Furthermore, the extent of socio-economic depression among black people is less pronounced in Pulaski County. As the table appearing at p. 211 above shows, among the 16 counties affected by the case, Pulaski County has the highest percentage of black high-school graduates, the highest black per capita income, the smallest proportion of black families below the poverty level, the smallest percentage of black people without a telephone, and the second smallest percentage of black people without a car. More importantly, the whole political atmosphere, with respect to black opportunity and participation, seems more open. Carol Willis, a man of wide political and governmental experience to whom we referred earlier, summed it up: Pulaski County is different.

Is it different enough? The question, in the end, is one of judgment, as to which reasonable politicians and judges may differ. We are instructed to approach such questions with "a searching practical evaluation of the past and present reality," and to take "a functional view of the political process." *Thornburg,* 478 U.S. at 45, 106 S.Ct. at 2763 (citations and internal quotations omitted). Furthermore, the list of factors in the Senate Report "is neither comprehensive nor exclusive[;] ... other factors may also be relevant and may be considered." *Ibid* (footnote omitted). We think a factor not yet mentioned tips the balance against plaintiffs' claim in Pulaski County: the preference of the black community in Pulaski County, as expressed by two of its elected representatives, for the status quo. State Representatives Irma Hunter Brown and Grover Richardson, who in 1981 were two of the three black members serving in House district 62–64, both told the State Board of Apportionment that they preferred the existing multi-member arrangement to a system of 15 single-member districts in Pulaski County. See PX 14C (Minutes of the Public Hearing of May 12, 1981, before the Board of Apportionment). Others who appeared advocated

---

might be possible to create a new majority-black district entirely north of the River. See Post-

Trial Brief for Plaintiffs 44–45 & n. 31.

single-member districts in principle, but Representatives Brown (who is still in office) and Richardson, the only two black elected officials to speak, disagreed. Mr. Richardson seemed to favor single-member districts in Eastern Arkansas, but he thought "the three [black] representatives [in Pulaski County] favor[ed] the multi-member district." PX 14C, p. 11. Ms. Brown had mixed emotions on the subject but came down in the end to the view that the existing arrangement "was a little more palatable." *Id.* at 20. Both Representative Richardson and Representative Brown stuck to this view even under close questioning by Bill Bethea, who represented Governor White at the hearing. They seemed to find more strength and cohesion in the multi-member arrangement, especially for minority interests. We recognize that many political scientists disagree with this view, and that the opinions of two elected officials do not necessarily represent the views of all of their constituents, let alone the views of black citizens in other parts of the County. We note, however, the testimony of Governor White in the present case that no black citizen of Pulaski County asked for single-member districts.

After a careful consideration of all the factors, we resolve this close question in favor of the defendants. It would be unfair to fault the Board of Apportionment for acceding to the expressed wishes of the only two black legislators from Pulaski County who appeared before it.

In sum, we hold that no violation of Section 2 of the Voting Rights Act has been shown in Pulaski County. With respect to the other areas of the State challenged in this suit, we hold for the plaintiffs. Section 2 is being violated in those areas.

## IV.

We must now fashion a remedy. A few comments may be helpful to the parties. In the first place, active participation at the remedial stage of this case on the part of the defendants, the members of the State Board of Apportionment, is vitally important. We are ordering them to submit a plan. They are the authorities charged by state law with the responsibility of drawing a plan of apportionment, and they should also bear the primary responsibility for conforming the present plan to the requirements of federal law. They are closer to and more familiar with all of the many factors, political, demographic, and social, that deserve to be considered. A suggested plan submitted by plaintiffs is also important. The alternative districts they have suggested already, at the liability stage of the case, may need to be adjusted, but plaintiffs have shown a considerable degree of skill in drawing them. We assume that defendants will consider the views of plaintiffs and all other interested and affected citizens in preparing their plan.

The task will not be simple. It is not just a matter of drawing districts that will have a majority-black voting-age population. There will inevitably be a ripple effect, necessary changes in the boundaries of adjacent districts. This effect should be limited as much as possible. It should be possible to limit it only to those districts which are directly adjacent to the new majority-black districts to be created. In this way, most of the legislative districts in the State will not be disturbed. We see no need for any changes in that part of the State which lies north and west of a diagonal line running from the southwest to the northeast. Nor, for reasons already given, need there be any changes in Pulaski County.

We are not holding that the law requires the creation of any particular number of majority-black districts. We know, and have found in this opinion, how many such districts can be created, and we also know that their lines can be drawn so as to make them reasonably compact and contiguous. There is, therefore, a sort of presumption that any plan adopted should contain that number of majority-black districts. There may be practical problems which we cannot foresee, though, and we are not foreclosing our duty to consider them after both sides submit their plans.

We are requiring that plans be submitted by the parties on or before January 15, 1990. At the trial, defendants took the position that they would need 90 days within which to draft a plan, if we found liability on their part. We are giving them considerably less time, but we are doing so, we think, for good reason. First, the 90-day time period was mentioned as being necessary to re-draw the lines for the entire State, and that will not be necessary. Second, a good deal of the groundwork has already been laid by the detailed proof made in this case at the liability stage, including the maps of alternative districts introduced by the plaintiffs. Finally, if relief is to be effective at all, it must be in place sufficiently in advance of the 1990 elections to allow the public and prospective candidates to make necessary adjustments to the new lines. All of this will require a great deal of time, expense, and dislocation, but we believe the Voting Rights Act leaves us no alternative. The Act does not permit either this Court or the defendants to subject the plaintiffs and those they represent to another election conducted on an unlawful basis. The lines will have to be re-drawn again after the 1990 census, but fair and lawful representation in the Legislature to be elected in 1990 remains of great importance, especially in view of the fact that its members will draw new lines for congressional districts. Only if relief is afforded now will plaintiffs get in on the ground floor of this process to the extent required by law.

Judge Eisele has advised that he will dissent for the laches of the plaintiffs in filing this action and the inappropriateness of the requested injunctive relief so near to the next reapportionment and the 1990 elections. He further advises that he will concur with the majority in the finding that there was a Section 2 violation although he would exclude not only Pulaski County but also Jefferson County and House districts 74, 75, 82, and 100. Since he disagrees with certain of the Court's findings and conclusions, he will in due course file a dissent and concurring opinion in order to further set forth his views. He agrees with the majority, however, that its opinion on Section 2 of the Voting Rights Act should be filed at this time and that an appropriate order, or orders, be entered for the purpose of giving the defendant Board and all interested parties as much time as possible to redistrict in accordance with the Court's opinion. Judge Eisele also disagrees with the majority's opinion that, because the Court has found that the Board in 1981 could have created thirteen majority-black House districts and three majority-black Senate districts, there is some sort of a presumption that the present Board in 1990 should, in complying with this Court's order, create that number of House and Senate districts. He will also explain his views on this remedy issue in his opinion.

An order is being entered today to carry out the conclusions and directions expressed in this opinion.

## CONTENTS

Dissenting Opinion, filed Dec. 7, 1989 (# 1) ........................... 219–226
Concurring and Dissenting Opinion, filed Jan. 19, 1990 ................ 226–284
OVERVIEW ...................................................... 227
    I.  SECTION 2 OF THE VOTING RIGHTS ACT: THE INTERPRETIVE
        FRAMEWORK ..................................................228
      A.  A Walk Through the Statute ......................................229
      B.  To Make Out A Section 2 Violation, Must Plaintiffs Prove Both Of The
          Following: That, As A Result of The 1981 District Lines, Blacks (1)
          Have Less Opportunity To Participate In The Political Processes;
          and (2) Have Less Opportunity To Elect Representatives Of Their
          Choice? .....................................................230
      C.  Introducing The "Zimmer" and "Senate" Factors ....................231
    II.  CONSTITUTIONAL LIMITATIONS: USE OF "REPUBLICAN FORM OF
        GOVERNMENT" GUARANTEE OF ARTICLE IV, SECTION 4, U.S.
        CONSTITUTION ..............................................232

III. HAVE PLAINTIFFS SHOWN THAT THE 1981 DISTRICTING PLAN RESULTS IN BLACKS HAVING LESS OPPORTUNITY THAN OTHERS TO PARTICIPATE IN THE POLITICAL PROCESS? .............237

IV. HAVE PLAINTIFFS SHOWN THAT THE 1981 DISTRICTING PLAN RESULTS IN BLACKS HAVING LESS OPPORTUNITY THAN OTHERS TO ELECT CANDIDATES OF THEIR CHOICE? .................239

V. THE THORNBURG FACTORS.........................................240
   A. Political Cohesiveness ............................................241
      1. Black Voting Behavior......................................241
      2. White Voting Behavior .....................................243
   B. What is a "Minority?" ...........................................250

VI. THE "ZIMMER" AND SENATE FACTORS .....................252
   A. Relevance and Effect ............................................252
   B. Application of Senate Factors in This Case........................255
      1. Senate Factor # 1 ..........................................255
      2. Senate Factor # 5 ..........................................257
      3. Senate Factor # 3 ..........................................257
      4. Senate Factor # 6 ..........................................259
      5. Senate Factor # 7 ..........................................261
      6. Lack of Responsiveness of Elected Officials .....................262
      7. The Strength or Tenuousness of Policies Underlying the Plan of Apportionment.........................................262

VII. THE MAJORITY'S DECISION TO EXCLUDE PULASKI COUNTY DISTRICTS: AN ANALYSIS.......................................262

VIII. DID PLAINTIFFS ESTABLISH ONE OR MORE SECTION 2 VIOLATIONS? .......................................................263
   A. Mississippi and Crittenden Counties ...............................266
   B. Phillips County ................................................267
   C. Chicot, Desha and Ashley Counties ...............................270
   D. St. Francis and Lee Counties ....................................272
   E. Jefferson County and Pine Bluff .................................273
   F. Lincoln and Cleveland Counties ..................................274
   G. Ouachita, Nevada and Columbia Counties .........................275
   H. The Senate Districts ...........................................276
   I. Summary .....................................................277

IX. CONCLUSION ....................................................278

ADDENDUM: THE EIGHTH CIRCUIT REVERSAL IN WHITFIELD: SAME PROBLEM; SAME RESULT..................................281

---

EISELE, Chief District Judge, dissenting. (Eisele # 1)

Filed Dec. 7, 1989.

The majority opinion dealing with Section 2 of the Voting Rights Act was filed herein on December 4, 1989. In that opinion, the majority concluded that the claims of the plaintiffs were not barred by the doctrine of laches. I dissent.[1]

I agree with Judge Arnold that laches is an equitable defense which means essentially that if there is unreasonable and un-justified delay in the filing of a lawsuit, and this delay causes prejudice, the court of equity may dismiss the complaint. As stated by Judge Arnold:

> The greater the delay, or the more unreasonable, the less prejudice need be shown; and vice versa. The Court must weigh the facts and interests on both sides, summon up the discretion of a chancellor, remember that it is a court of conscience and not of legal stricture, and come as close as it can to a fair result. Frequently there are some good argu-

---

1. This opinion deals only with the issue of laches. I will, at a later date, file an opinion setting forth my views of "Section 2" violations. And, as pointed out in Judge Arnold's opinion, page 199, plaintiffs' constitutional claims and their request for preclearance as a remedy for constitutional violations remain under advisement.

ments on both sides, and that is the case here.

Again I agree.

It is important to first note how legislative redistricting fits into our constitutional schemes for a representative democracy.

Regular, periodic legislative redistricting is indeed unique in the election law area. It is absolutely essential if we are to have fair and equal representation and if we are to give meaning to the one-person, one-vote concept. Yet, since our nation was formed, most legislative redistricting has, for practical reasons, been done on a decennial basis, keyed as it is to our national census procedures. The willingness to "let things alone" for such a long period (ten years) reflects the practical manner in which we carry out the democratic principle of proportional representation.[2] We are all aware that within such a span of years, there can be dramatic changes in the populations of the various legislative districts. It is generally conceded that the farther one gets from the last census the more unreliable are the population figures as a measure of the *current* weight actually reflected in each legislator's vote. And we know that the number of black and white residents may also change dramatically and not necessarily proportionately. For example, in *Rybicki v. State Board of Elections*, 574 F.Supp. 1082 (N.D.Ill.1982), evidence adduced at trial showed that between the 1970 and 1980 census, the number of senate districts in which blacks constituted a majority had increased from five to six. *Id.* at 1092. In one district alone, the racial composition had changed from 21.6 percent black in 1970 to 57.7 percent black in 1980. *Id.* at 1109. Still society accepts the utility of a decennial system and implicitly accepts that as time passes the apportionment may no longer comport with constitutional requirements. This necessarily detracts from the conclusion in *Smith v. Clinton*, 687 F.Supp. 1310, (E.D.Ark.), *aff'd*, —— U.S. ——, 109 S.Ct. 548, 102 L.Ed.2d 576

(1988) that the recurring harm (assumedly occurring at each new election) justifies greater leniency in imposing time limits on the commencement of a voting rights challenge to redistricting plans. Population changes since the last regular redistricting may have corrected or mooted the original vice (*ergo*, no recurring harm) or, indeed, may have exacerbated such vice or created new constitutional infirmities which will have to be corrected at the *next* decennial redistricting. We simply do not know. For the most part, we are left to guess at the realities of the current situation. Because of the seven-year delay, we are left standing in sand.

The 1980 census data shows that several of the House districts drawn by the defendant Board in 1981 (in addition to those in Pulaski and Jefferson Counties) had majority-black populations even though the voting-age-black populations were less than 50 percent. District 74 has 52 percent black total population but 47 percent black-voting-age population. District 75 had 51 percent black total population but only 45 percent black-voting-age population. And District 100 had 52 percent and 47 percent, respectively. Indeed, one Senate district— District 30—had a 51 percent black total population but only 43 percent black-voting-age population. What inference can be drawn from these figures? One is that in 1981 blacks had a higher percentage of their total population in the "under–18" category than did whites. This means that, if all other factors (including in-and-out migrations and death rates) remained constant, more blacks than whites, proportionately, would reach the age of 18 during the period between 1980 and 1989. All persons nine years of age or older by a certain date in 1980 would be over 18 by that same date in 1989. The predictable consequence would be that the percentage of black-voting-age population would increase and the percentage of white-voting-age population would decrease in those districts during

---

**2.** As research develops new and reliable methods and technologies for accurately fixing population figures within legislative districts on a current, or more current, basis, we may decide that more frequent redistricting is called for.

On the other hand, even where accurate current data is available, we may opt for some fixed period between redistricting in the interest of stability and continuity.

that nine-year period. But we do not know the relative migration rates of blacks and whites during that period and we do not have a handle on the relative relevant mortality rates. Nevertheless, this exercise is instructive because it suggests how different might be the 1989 data (if it were available) from the 1980 census figures.

Assuming that plaintiffs knew, or should have known, of the factual and legal bases for their dilution claim back in 1981 when the reapportionment was adopted, or in 1982 when the Voting Rights Act was amended, and nevertheless allowed over seven years to pass before objecting, then it is not unreasonable to say that the strong practical reasons underlying our decennial reapportionment system also require the conclusion that they delayed entirely too long. Stability and continuity require redistricting plans, once in place for a substantial period of time, to remain in force and effect until the next decennial redistricting, unless a plaintiff can show some strong legitimate reason or excuse for postponing or delaying a challenge.

Was information available to plaintiffs and other citizens back in 1981 upon which to base their dilution claim? The answer is: Yes.

First, the 1981 reapportionment of Arkansas' General Assembly generated ample publicity and public debate before and after the Board of Apportionment adopted its plan for state House and Senate districts. Numerous public hearings were conducted throughout the state. Attorney General Clark testified that for a period of several months he received comments, suggestions and criticisms of various proposed districting plans almost daily.

It is interesting also to note that plaintiffs have in this lawsuit complained bitterly that a majority of the defendant Board members refused to grant even a 30–day extension back in late June of 1981 to enable interested parties to present information on adequate minority representation. However, this series of events is also relevant to the question of whether plaintiffs' delay in commencing the present action was reasonable. It is relevant because it shows that during this period of time in 1981 there existed a well-informed and highly-organized advocacy group representating the same interests as are championed by the plaintiffs here. Its work more than amply laid the groundwork for the present challenge. But that work, and the evidence developed then inexplicably lay unused for nearly eight years, only to be dusted off when this suit was filed near the close of the decade and only fifteen months before the commencement of the 1990 census.

As the apportionment process began, Ms. Brownie Ledbetter testified that she was appointed to serve as co-chairperson of the Committee for Fair Representation, a coalition of some eighteen national and local organizations concerned with various aspects of the reapportionment—including its effect on black voters. The coalition, which included the Arkansas Education Association, the Arkansas AFL–CIO, Common Cause, the state chapter of the National Organization of Women, the NAACP and the Urban League, organized public forums and called for additional public hearings in an effort to bring to the attention of the Board of Apportionment the need to insure adequate minority representation in both the House and Senate.

More importantly, the committee obtained copies of computer tapes which held census data for the state of Arkansas—the same tapes used by the Board of Apportionment. With the help of a technical support staff, the committee was able to analyze this data to determine the effect various districting proposals would have on blacks and other minorities, and then develop alternative proposals. And these tapes, or copies of them, were again used many years later by plaintiffs' expert Dr. Jerry Wilson to analyze the existing apportionment and develop alternate maps showing that a number of majority black House and Senate districts could have been drawn back in 1981. The information needed to mount an attack on the plan was as available to the plaintiffs here as it was to Ms. Ledbetter and the organizations involved with the Committee for Fair Representa-

tion. And evidence concerning polarized voting and other issues was also available. This is obvious if one simply examines the evidence introduced *in this case.* Much of that evidence arose out of elections and events occurring *before* 1982. And almost all of the evidence used in this case was available by 1986.[3]

The decennial legislative redistricting process contemplated by Article VIII, Section 1 of the Constitution of Arkansas provides an opportunity for the Board of Apportionment to obtain and consider the views of all affected persons and groups before settling upon an apportionment plan. The whole process may be extended (as was done in 1981)[4] and there is little time pressure anyway because that process ordinarily occurs in off-election years. But the majority's order entered December 4, 1989, directs the defendants to come up with a new plan by January 15, 1990, that is, within a period of 41 days which embraces the Christmas and New Year holidays. The Court chose this early date because it recognized that the "election season" for 1990 will begin soon thereafter. (Indeed, it notes that the filing period will begin on March 20, 1990.) Once the new plan is adopted and filed with the Court, there should be an opportunity for interested parties to object to the plan. If objections are filed, a hearing will probably be required, and, after this Court acts, there is the possibility of appeals. The prospect that this Court may have to interfere with the state's election schedule is a real one.

And if election sequences are not altered or enjoined, there is at least the probability that legislative races will be held under the cloud of one or more appeals. Under certain circumstances such prospects of difficulty, expense, and confusion could be accepted as reasonable and essentially unavoidable. But here?

The defendants have a Hobson's choice: (1) whether to spend a large amount of money in an effort to obtain updated current census figures, or (2) to simply rely on the stale, outdated 1981 census figures. Whether the first alternative is even available in the short period provided by the Court is questionable. If such information can be and is obtained, it is possible that it will send all parties "back to the drawing board," invite further controversy, and require new hearings. If the Board simply relies on the 1981 figures, it will have no assurance that its decisions will have any current validity. And, all for what purpose? To create legislative districts for use in only *one* election. Then, in 1991, the new Board will redistrict on the basis of the 1990 census figures. It is open to question whether it is fair or reasonable to require such immense expenditures of time and money to create, for one election, districts whose lines will probably be changed again within another year. And, if the Board uses the 1981 census data, it will be creating, for one election, essentially hypothetical legislative districts as to whose validity no one can even guess prior to the 1990 census.

**3.** The most important evidence in this case is that which established black and white voting age populations in the legislative districts in question. This evidence is derived from the 1980 census, which became available in 1981. This evidence reveals that in 1981 there were geographically compact concentrations of minority voters that were split or fractured among the various districts. The census data is also the source of information concerning the comparative socioeconomic conditions of blacks and whites. A majority of the Court then simply took judicial notice of the fact that these conditions discouraged blacks from participating in the political process, thereby establishing one of the so-called Senate factors. *See* Order of October 2, 1989 *citing Perkins v. City of West Helena,* 675 F.2d 201 (8th Cir.) *aff'd mem.,* 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982). Similarly,

the Court was able to take judicial notice of Arkansas' history of official discrimination with respect to voting. *Id.* The evidence of racial polarization was largely derived from the report of Dr. Richard Engstrom, who analyzed some 46 Arkansas elections in which black candidates opposed white candidates. Of these elections, thirty-two occurred in 1986 or earlier. *See* Plaintiffs' Exhibit 3 and Tables 1 and 2 herein.

**4.** The state plan constitution mandates that the Board adopt a new reapportionment no later than February 1st of the year following each decennial census. However, because of delays in obtaining final census figures and the need to conduct public hearings, the Board continued to draft and revise various proposed redistricting plans until well into the summer of 1981.

It may be said that the expenditure of such time and effort would have been required if the attack had been made in 1981 or 1982. But the data then would then have been relatively current and the resulting redistricting would have been in effect to control the elections for the following seven or eight years.

I note that the majority in rejecting the defendants' argument that the present lawsuit should be barred by the equitable doctrine of laches relies principally upon *Smith.* I have thought long and hard as to the effect to be accorded this ruling and the Supreme Court's affirmance. I conclude that the application of laches is not foreclosed by the ruling in *Smith.* It is clear that relief in voting rights cases is to be "fashioned in the light of well-known principles of equity." *Baker v. Carr,* 369 U.S. 186, 250, 82 S.Ct. 691, 727, 7 L.Ed.2d 663 (1962) (Douglas, J. concurring). These principles are by their nature case-specific. Thus, while *Smith* held that laches did not bar the plaintiffs in that case in their challenge to the election scheme for a single multi-member legislative district, its ruling should be limited to the specific facts of that case. It ought not be read to permanently enjoin a district court's exercise of equitable judgment in all redistricting voting rights cases forevermore.

As the majority points out, laches requires a finding of two key elements: inexcusable delay in commencing a suit resulting in undue prejudice to the defendant. However, the majority also takes the position that plaintiffs' delay in commencing their challenge to the 1981 apportionment should date from the decision in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In other words, the majority suggests that even if adequate evidence of a "Section 2" violation was available to the plaintiffs back in the 1981–1984 period, the pertinent law was so unclear and confusing that plaintiffs should be excused for any delay before *Gingles* cleared the air in 1986. And using this decision as the "pole star" of the law in this area, it is argued that plaintiffs waited only two years thereafter to commence this action, and that such a delay is not unreasonable. But I do not agree that this is the appropriate moment from which to measure plaintiffs' delay. To say that plaintiffs' "clock" began to run only after the *Gingles* decision had been rendered is to ignore a much broader sweep of recent history in the development of the law with respect to voting rights.

Specifically, the majority ignores that Congress amended Section 2 of the Voting Rights Act in 1982 by clearly prohibiting the use of any voting structure "which *results* in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a) (Emphasis applied). The amendment also added a new subdivision that stated that a violation of Section 2 could be established upon showing of such results "based on the totality of circumstances." *Id.* § 1973(b). The amendment was an unambiguous rebuke to the Supreme Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which held that a violation of the Voting Rights Act required a showing of discriminatory purpose.

Moreover, by amending the statute's language so that a violation of Section 2 could be established using a "results" analysis, Congress did not write on a clean slate or establish a new rule of law. It was reaffirming what it believed to have been the standard prior to *Bolden.* And note plaintiffs' contention in their pretrial brief that "[p]rior to the decision in *Bolden,* plaintiffs could prevail in a vote dilution case by showing either discriminatory results or intent." *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 53, *citing,* 1982 U.S.Code Cong. & Admin.News at 192–201.

The so-called Senate Report factors, which accompanied the 1982 amendment and which arguably must now be applied to the present case, were also not new. These factors were instead derived from the analytic framework first articulated in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (*en banc*), *aff'd on other grounds sub nom., East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96

S.Ct. 1083, 47 L.Ed.2d 296 (1976). *Thornburg v. Gingles, supra,* 478 U.S. at 36 n. 4, 106 S.Ct. at 2759 n. 4. And only days after passage of the amendments, the Supreme Court rejected a portion of the plurality's ruling in *Bolden* and held that the *Zimmer* factors are to be used to determine whether an election scheme purposefully discriminates against minority voters in violation of the Fourteenth Amendment. *Rogers v. Lodge,* 458 U.S. 613, 623–24, 102 S.Ct. 3272, 3278–79, 73 L.Ed.2d 1012 (1982). It is also interesting to note that these factors were known to the defendants back in 1981 as they prepared to develop a reapportionment plan.

After its initial meeting, the Board of Apportionment commissioned Professor Albert Witte of the University of Arkansas School of Law to prepare a lengthy legal memorandum on the current state of the law with rspect to legislative redistricting. Among its conclusions the memorandum noted that a challenge to an apportionment on vote dilution grounds could be supported with such evidence as "an historical pattern of underrepresentation, the current effects of past discrimination which hindered effective participation in the electoral process and the group's depressed economic and social status which further impeded their participation." Plaintiffs' Exhibit 14B, p. 27. The point is: The law was adequately clear to lawyers and legal scholars without *Gingles.*

While *Gingles* perhaps clarified the weight to be accorded the various Senate or *Zimmer* factors, it does not provide plaintiffs an excuse for waiting until January 1989 to commence this lawsuit. To say plaintiffs could do nothing without the benefit of *Gingles* is to say that the 1982 amendments to the Voting Rights Act were meaningless and without practical effect, indecipherable to anyone interested in voting rights issues. There simply is no basis for such a conclusion. Moreover, it is contrary to the experience of numerous other litigants, who in the absence of *Gingles,* still managed to challenge similar reapportionment schemes much earlier in this decade, and most immediately after the reapportionments took effect. *See e.g., Ket-*

*chum v. Byrne,* 740 F.2d 1398, 1401 (7th Cir.1984, *cert. denied sub nom., City Council of Chicago v. Ketchum* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985)); *Gingles v. Edmisten,* 590 F.Supp. 345, 350 (E.D.N.C.1984), *aff'd in part and rev'd in part, Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). (Complaint filed within two months after challenged apportionment adopted by the state; *Major v. Treen,* 574 F.Supp. 325, 327 (E.D.La.1983) (Trial in suit challenging 1981 congressional redistricting commenced in March 1983); *Rybicki v. State Board of Elections of Illinois,* 574 F.Supp. 1082, 1088 (N.D.Ill.1982) (State legislative redistricting plan adopted October 1981; district court opinion rendered four months later). Furthermore, prior challenges to Arkansas reapportionments were also brought soon after the adoption of the challenged plan. See *Yancey v. Faubus,* 251 F.Supp. 998 (E.D.Ark.1965), *aff'd sub nom., Crawford County Bar Ass'n v. Faubus,* 383 U.S. 271, 86 S.Ct. 933, 15 L.Ed.2d 750 (1966), *Kelly v. Bumpers,* 340 F.Supp. 568 (E.D.Ark.1972), *aff'd* 413 U.S. 901, 93 S.Ct. 3047, 37 L.Ed.2d 1019 (1973). The bases of these many attacks differ, of course, but all of the plaintiffs involved recognized the need to move promptly with their challenges.

Clearly then, plaintiffs should have been able to determine that a cause of action existed at least some time shortly after the 1982 amendment to the Voting Rights Act took effect, and also should have been aware of enough relevant evidence that could have been used in an effort to establish a violation of Section 2. Viewed in this context, plaintiffs' delay is more on the order of seven years rather than the two years suggested by the majority.

It is true, as Judge Arnold states, that this is a suit in equity. It is therefore not governed by any statute of limitations. Still, it is important to remember that in *Owens v. Okure,* —— U.S. ——, ——, 109 S.Ct. 573, 583, 102 L.Ed.2d 594 (1989), the Supreme Court held that a state's general or residual statute of limitations should be applied to Section 1983 claims. Arkansas' residual statute of limitations is three

years. Ark.Code.Ann. § 16–56–105. While this statute of limitations does not control here, it can provide a rough guide for the application of laches. *See* Dobbs, *Remedies,* § 2.3, p. 43–44 (1973).

Even if a case is not dismissed for laches, should not injunctive relief be denied where the time strictures caused by the tardy filing undermine the integrity or effectiveness of such relief? In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), Justice Warren, writing for the Court stated:

> [O]nce a State's legislative apportionment scheme is found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances such as where an impending elections is imminent and a State's election scheme is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state elections laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a state in adjusting to the requirements of the court's decree.

*Id.,* 377 U.S. at 585, 84 S.Ct. at 1393. I recognize that the majority is trying to avoid "disruption of the election process" but it is nevertheless my view that the order entered herein on December 4, 1989, will, because of the foreseeable time limitations, make "unreasonable or embarrassing demands" upon the state of Arkansas.

In *MacGovern v. Connolly,* 637 F.Supp. 111 (D.Mass.1986) the three-judge district court panel dismissed plaintiffs' complaint attacking a 1977 state legislature's apportionment plan where the suit was not filed until 1986 just prior to the commencement of the next reapportionment. The court interpreted *Reynolds* as allowing dismissal of an apportionment claim as well as the staying of equitable relief. *Id.* at 114–16. The court also held that laches required dismissal because plaintiffs' delay in commencing the action was inexcusable, and because going forward would result in undue prejudice to the defendant. *Id.* at 116.

In *Maryland Citizens for a Representative General Assembly v. Governor of Maryland,* 429 F.2d 606 (4th Cir.1970), the court of appeals upheld a district court's refusal to convene a three-judge panel and subsequent dismissal of a suit challenging the state's apportionment of the general assembly. The court found that in passing upon the motion to convene a three-judge panel, the district court was required to determine whether the suit made out a "substantial claim" and further reasoned that *Reynolds* supported the conclusion that a claim could not meet this test where injunctive relief was unavailable. *Id.* at 610–11.

Similarly, the court in *Simkins v. Gressette,* 631 F.2d 287 (4th Cir.1980), upheld the district court's dismissal of an apportionment challenge that was filed two days before the opening of the filing period for the 1980 election. *Id.* at 289. Significantly, *Simkins* involved a challenge to the South Carolina Senate apportionment plan on the grounds that it diluted black voting strength in violation of Section 2 of the Voting Rights Act, as well as the First, Thirteenth, Fourteenth and Fifteenth Amendments. *Id.* at 289. Nothing that the last election for the state senate had been held in 1976, the court stated:

> Instead of bringing suit then, they chose to wait for more than three years until the eve of the 1980 elections. The record reflects no good reason for the delay. Such a delayed suit, if maintained, would clearly cause a major disruption in the election momentarily to begin in South Carolina. This disruption, coupled with the fact that 1980 is also the year of a

national census which will likely require reapportionment in South Carolina, places this case squarely within our holding in *Maryland Citizens*.

*Simkins v. Gressette, supra,* 631 F.2d at 296.

Admittedly, dismissal of a voting rights challenge because of delay in filing represents a substantial step not necessarily supported by the language quoted above from *Reynolds*. However, these cases do make that very sound point that, although the judiciary may be called upon to enter the "political thicket," equity "demands that a federal court stay its hand when judicial relief makes no sense." *MacGovern v. Connolly, supra,* 637 F.Supp. at 116.

The time frames here are such that I see no way that a reasonable and fair remedy—commensurate with the complexity and difficulty of the task—could be crafted and properly implemented before the next "election season" begins.

The proximity of the next election as well as the next reapportionment, the mechanics and cost of attempting a remedy that will last only one election, the staleness and unreliability of the essential data, the likelihood of confusion to voters and loss of continuity of representation caused by these events, firmly weigh in favor of dismissal or at least in favor of denying any remedy beyond declaratory relief. Relief beyond that in the circumstances of this case should be denied as a matter of law. And, on balance, I conclude that dismissal would be more appropriate under the facts of this case.

The majority concludes that any disruption caused by implementing a remedy is outweighed by the fundamental importance of vindicating the right of equal participation in the political process. Consequently, the majority believes it would be unreasonable to say to the plaintiffs that they should "[w]ait for another census. The time is not yet ripe." *supra* at 203. But the principle at stake here is not ripeness. If anything, this suit is overripe. The critical facts presented at trial, and which control much of the court's determi-

nation, are admittedly stale. The equitable principle implicit in withholding a grant of relief is predicated not upon the theory that the plaintiffs should wait, but upon the theory that they waited entirely too long.

EISELE, Chief District Judge, concurring and dissenting. (Eisele # 2)

Filed Jan. 19, 1990.

In a dissenting opinion filed on the 7th of December 1989, I set forth my belief that this entire proceeding should have been dismissed because the plaintiffs waited without excuse until 1989 to challenge the redistricting plan adopted in 1981 and because of the prejudice caused thereby to the defendants, the people in the affected areas, and, indeed, to the integrity and reliability of the Court's fact-finding function itself. Acknowledging the broad discretion given the chancellor in such equitable proceedings, I nevertheless concluded that it would be an abuse of that discretion—as a matter of law—to permit this case to go forward under its unique facts and circumstances. My brothers disagree; so the case proceeds to resolution on the merits.

The only "merits" issue dealt with by the majority to date is whether plaintiffs established one or more violations of Section 2 of the Voting Rights Act. The constitutional and "intent" issues have been reserved for later resolution. And this opinion, in like manner, will be confined to the Section 2 issues. I dissent from the majority's opinion on those Section 2 issues.

When the majority announced its findings and conclusions on the Section 2 issues, I indicated that I also believed that some Section 2 violations had been shown. However, as I further reviewed the law and the evidence, I have become convinced that plaintiffs failed to prove any Section 2 violations. This blanket conclusion is based upon my opinion that plaintiffs did not prove, in connection with any of the House or Senate districts, that the redistricting plan of 1981 resulted in blacks in those districts having less opportunity than others to participate in the political process. As a matter of law I have concluded that

plaintiffs must make that showing and that simply proving that blacks, as a result of the district lines, have less opportunity than others to elect candidates of their choice will not suffice. Upon the assumption that I am wrong in this conclusion, then I would agree that plaintiffs have shown a Section 2 violation with respect to at least one district and perhaps more. See Section VIII, *infra.*

The views I express here follow from, and are consistent with, opinions I have previously expressed in other voter rights cases coming out of Lee and Phillips Counties, the former involving justice of the peace districts in Lee County and ward districts in the city of Marianna and the latter involving a challenge to the state's run-off law in primary elections. *See Campbell v. Lee County Election Commission,* H–C–86–48 (E.D.Ark.1986) and *Whitfield v. Democratic Party of Arkansas,* 686 F.Supp. 1365 (E.D.Ark.1988), *rev'd in part,* 890 F.2d 1423 (8th Cir.1989) (Bright, J., dissenting in part). I have also dealt with a challenge to multi-member districts in Pulaski County, under Section 2 as it was interpreted before the 1982 amendments. *See Leadership Roundtable v. City of Little Rock,* 499 F.Supp. 579 (E.D. Ark.1980).

I concur in the majority's opinion that plaintiffs have not shown any Section 2 violations in connection with any of the district's created in 1981 in Pulaski County, Arkansas.

OVERVIEW.

It is my view that many Voting Rights cases, such as this one, are changing the political landscape of America in fundamental ways without legislative mandate and without the benefit of scholarly legal and political discourse. In so doing these cases are, in an almost inadvertent manner, redefining the nature of our democratic form of government, contrary, I believe, to the Constitution.

Do we really believe in the idea of one political society or should this be a nation of separate racial, ethnic, and language political enclaves? Surely such issues are worthy of serious, focussed debate and dis-

cussion. Ironically, there has been precious little of either. I attribute this to inadequate awareness on the part of the courts, the Congress, and the people of this Nation. And, strange as it seems, it appears that some of those who are most involved with the voting rights cases are the least aware of the larger, long-range issues and consequences which are directly implicated.

When the Voting Rights Act was passed in 1965, its single aim was "black enfranchisement in the South. Obstacles to registration and voting, that is, were the sole concern of those who framed the statute." A. Thernstrom, *Whose Votes Count? Affirmative Action and Minority Voting Rights,* 3 and 18 (1987) [Hereinafter "Thernstrom"]. *See also* 42 U.S.C. § 1973 *et seq.* With the Supreme Court's decision in *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the emphasis began to shift as the Court "implicitly enlarged the definition of enfranchisement," making distinctions between "meaningless" and "meaningful" votes. Thernstrom at 4 and 22–24. Statutory amendments were enacted in 1982 empowering minorities to challenge any standard, practice, or procedure relating to elections on the ground of discriminatory "results." 42 U.S.C. § 1973 (1982). Court decisions interpreting Section 2 in an effort to deal with electoral discrimination have exposed questions relating to the nature and structure of our government and the efficacy of majoritarian democracy. *See,* e.g., *Whitfield, supra.* Where are we now in 1990?

We have arrived at a point no one envisioned in 1965. The right to vote no longer means simply the right to enter a polling booth and pull the lever. Yet the issue retains a simple Fifteenth Amendment aura—an aura that is pure camouflage. An alleged voting rights violation today is a districting plan that contains nine majority-black [or Hispanic] districts when a tenth could be drawn. The question is: how much special protection from white competition are black candidates entitled to? For instance, when a

different plan might give a seat to another black, should the interests of white incumbents give way to the goal of minority officeholding? The temptation to provide maximum protection (a maximum number of seats) is strong and has been only intermittently resisted. \* \* \* Districting plans are torn up following every decennial census. \* \* \* There is thus a need to devise new plans, to determine when black ballots "fully count." The phrase itself invites a definition that gives those ballots maximum weight, defined as officeholding; anything less suggests a compromised right. *Yet maximum weight implies an entitlement to proportionate ethnic and racial representation—a concept that is no less controversial with respect to legislative bodies than with reference to schools and places of employment. Voting rights has become another immensely complex affirmative action issue, distinctive only in not being acknowledged as such.*

The myth of moral simplicity has largely insulated the voting rights issue from debate, yet perhaps no other affirmative action question is more significant.

Thernstrom at 5–6. (Emphasis added)

My objective in formally stating my views in this dissent in such detail is not only to explain the law as I understand it but also to help open up the issues to legal, scholarly, popular and political debate, keeping in mind, as we must, that we are here dealing with the heart and soul of our democratic government. The issues raised in this case should be resolved before the 1990–1991 nationwide redistricting season begins.

## I. SECTION 2 OF THE VOTING RIGHTS ACT: THE INTERPRETIVE FRAMEWORK.

The courts are thrust into what Justice Felix Frankfurter called a "political thicket" primarily as a result of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. That section reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

I suggest that the federal courts have, in many cases, not followed the language of the Voting Rights Act or the U.S. Supreme Court's opinions interpreting that Act and, as a consequence, have unwittingly crossed constitutional lines. This is one of those cases. Claiming simply to be giving a liberal interpretation to the language of the statute to effectuate its purposes, "judicial decisions [have been] shaped less by the statute than the statute by the decisions." Thernstrom at 8–9. This approach has left judges without real guidance to, in effect, "do right" in this most sensitive of areas, where what is "right" is far from clear.

Congress and the courts have declared that members of minority groups are entitled to "an equal opportunity to elect representatives of their choice." What does that high-sounding phrase really

mean? Who counts as a "representative of their choice," and when are opportunities truly equal? If the ballots of white Democrats in an overwhelmingly Republican county "count," if Democrats who are never able to elect "candidates of their choice" are nevertheless fully enfranchised, what about black Democrats when no black ever wins? Are blacks and Hispanics ever properly represented by whites? Are black candidates who run as part of a white-dominated ticket consequently "white" candidates? Do socioeconomic disparities between whites and blacks mean that members of the two groups stand on unequal political footing, and that compensation in the form of special protection in the electoral process is appropriate?

Thernstrom at 6–7.

The grammar of Section 2 and the ordinary meaning of its words and phrases have taken second place to the felt need to remedy all perceived wrongs in the political processes through which we give expression to the "republican form of government" that is guaranteed to every state by the Constitution of the United States. *See* U.S. Const. art. IV, § 4. Although the language of Section 2(a) proscribes those things which result in a denial or an abridgement of the "right to vote," cases such as this carry us far beyond any possible issues concerning each citizen's "right to vote" to the new world of "group rights" to proportionate representation. Care must, therefore, be taken that in an effort to insure individual or even "group" rights, we do not undermine—perhaps unconstitutionally undermine—the basic principles of our democratic government.

So, while I agree with the majority that, "the statute should be construed liberally in favor of its object," I would not state that object quite as broadly as they do, to wit: "to open up the electoral process to full participation." Majority op. at 204. Rather, I would say the purpose of Section 2 in the context of this case is to prohibit states and other political subdivisions from imposing or applying any standard, practice or procedure which results in black citizens' having less opportunity than oth-

ers to participate in the political process and to elect representatives of their choice. It is the "opportunity" of blacks "to participate" and "to elect" to the same extent as other members of the electorate that may not be denied or abridged by some state created or applied barrier. In my view, a "liberal construction" (or, for that matter, a "conservative construction") is only available where the language of the statute permits more than one reasonable interpretation. In connection with the issues we are called upon to resolve in this case, it is my opinion that the language of Section 2 and the decisions of the United States Supreme Court give adequate guidance. We need look no further for some liberal construction consistent with the Act's remedial purposes. We should simply rigorously apply the law. And, if after so applying the statute we are still left with constitutional problems, so be it. We must then simply face up to the need to deal with them.

I will in the course of this opinion attempt to point out where the majority has departed from this standard of rigorous statutory construction in its resolution of the issues.

### A. *A Walk Through the Statute.*

By suggesting that the language of Section 2 is clear, I do not overlook the convoluted grammatical arrangement thereof which requires the reader to carefully follow the succession of phrases by which the statute "reinterprets" itself.

Subsection (b) of Section 2 makes it clear that the operative provisions of Section 2 are contained in subsection (a). In other words, the question always is whether the challenged standard, practice or procedure (hereinafter SPP) violates subsection (a). We know this because subsection (b) merely refers back to subsection (a) by use of the following introductory language: "A violation of subsection (a) is established if...." So the basic question which courts are asked to answer in applying Section 2 is whether the SPP is being imposed or applied "in a manner which results in a denial or abridgement of the right of any

citizen ... to vote on account of race...." If it is decided that the challenged SPP does not result in a *denial* of the right of any citizen to vote on account of race, then the court must determine whether that SPP results in an *"abridgement* of the right of any citizen to vote on account of race." In this context, it is assumed that "abridge" would mean to curtail, limit, or burden. In any event, we are dealing with *the right to vote*, either its denial or its curtailment or limitation.

As pointed out above, subsection (b) of Section 2 identifies what is necessary to establish a violation of subsection (a). Of course, it is assumed that there should be some logical nexus between the showing identified in subsection (b) and the "denial or abridgement" language of subsection (a). According to subsection (b), a denial or abridgement of the right to vote "is established if ... it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of ..." a protected class.

It is easy to determine whether a SPP *denies* any citizen the right to vote. If not, subsection (b) states that a showing that the "political processes" are not "equally open to participation," because of the challenged SPP, would nevertheless be adequate to establish that the SPP *abridged* the right to vote. So we look at the SPP and determine if it has resulted in the political process "not being equally open to participation" by black citizens. If it did not have that effect, then, logically, one would conclude no violation.

But subsection (b) of Section 2 has another phrase that must be dealt with. It, in effect, states that a showing can be made that the challenged SPP has caused the political process "not to be equally open to participation" by black citizens if it can be shown that such black citizens "have less opportunity than other members of the electorate to participate in the political pro-

cess and to elect representatives of their choice."

So, if the challenged SPP does not cause black citizens to "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," then it cannot be found that such SPP causes the political processes "not to be equally open to participation" by black citizens and, therefore, finally, there would be no violation of the operative language in subsection (a), i.e., the "abridgement of the right of any citizen ... to vote on account of race."

Absent a showing that the challenged SPP resulted in the *denial* of a citizen's right to vote, the first inquiry, then, will be whether that SPP caused blacks to have "less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice." [5]

**B.** *To Make Out A Section 2 Violation, Must Plaintiffs Prove Both Of The Following: That, As A Result Of The 1981 District Lines, Blacks (1) Have Less Opportunity To Participate In The Political Processes; and (2) Have Less Opportunity to Elect Representatives of their Choice?*

The defendants argue that, under the plain language of Section 2(b), plaintiffs must show two separate things: "(1) that they have less opportunity to participate in the political processes; *and* (2) that they have less opportunity to elect representatives of their choice." The majority opinion responds:

Moreover, the argument fails purely as a logical and linguistic matter. Even if plaintiffs failed to show less opportunity to participate in the political process, a showing that they have less opportunity

---

**5.** And Justice Brennan in *Thornburg* confirms this:

[T]he critical question in a § 2 claim is whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other

members of the electorate to participate in the political process and to elect representatives of their choice.
*Thornburg v. Gingles, supra,* 478 U.S. at 63, 106 S.Ct. at 2773.

to elect candidates of their choice would suffice to establish their claim. The right protected is the aggregate of these opportunities—the right to effective participation in the political system. . . .

I agree that statute would permit the interpretation placed on it by Judge Arnold if it were proper to speak of the "aggregate of these opportunities" as constituting the "right to effective participation in the political system." But the statute nowhere speaks of "the right to effective participation"; and the history of the act and the plain language of the statute strongly argue for the necessity of proving both.

If black citizens in the legislative district involved have as great an opportunity to vote and otherwise to participate in the political process as others, then their failure to elect candidates of their choice would be simply a function of the democratic process—no different from the fate of Republicans who consistently lose in a majority-Democratic district.

And, of course, if the black plaintiffs prove that the challenged SPP results in their having less opportunity to participate in the political process, then that would, in the usual case, automatically prove that that SPP also resulted in their having less opportunity to elect representatives of their choice. Ergo, a Section 2 violation. But the proof that the SPP results in blacks having less opportunity to elect candidates of their choice would not necessarily say anything about their opportunity to participate in the political process.

It is my view that Congress never intended that a simple showing that a challenged SPP resulted in a minority group's having less opportunity to elect representatives of their choice would suffice to establish a Section 2 claim in a districting case. Otherwise, it would be self-proving. If the district lines result in blacks being a minority voting age population (VAP), they clearly will have less opportunity than others to elect candidates. But it may be argued that the plaintiffs would at least have to show that, across the district lines, there were other blacks and that the lines *could have been drawn* to make the blacks the

majority. But this is just judicial "fault" reasoning. How can blacks claim that the Board was at fault in drawing the lines so that they are a minority VAP in the district if the Board had no alternative? (This is no doubt the type of rationale that was responsible for the development of the *Thornburg* "preconditions." We lawyers and judges seek reasonable interpretations.) But, first, we must admit that under a "results" test any time district lines are drawn so that blacks are a minority VAP, those lines result in blacks having less opportunity than others to elect candidates of their choice. This is true whether or not the district lines could have been drawn to make blacks the majority VAP.

So I disagree with Judge Arnold. I believe that Congress intended to require proof in all cases that the challenged SPP resulted in blacks or Hispanics having less opportunity than others to participate in the political process. I do not agree that proof that the challenged SPP resulted in blacks having less opportunity to elect candidates of their choice will alone suffice.

C. *Introducing the "Zimmer" and "Senate" Factors.*

Having illustrated the difficulties with the grammar, language, and structure of Section 2, we are left to deal—preliminarily at this point—with the effect of the "Zimmer" or "Senate" factors in this interpretive process. As explained earlier, with respect to the Voting Rights Act's "results tests," the Senate purports to certify certain "typical factors" that may establish whether the challenged SPP has a discriminatory effect. Those factors are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote re-

quirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are;

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep., at 28–29, U.S.Code Cong. & Admin. News 1982, pp. 206–07. Since the 1982 amendments, federal courts have almost unanimously felt the need to make the findings suggested by these "factors" whether or not they had any real relevance to the issues at hand.

Substantive due process issues may arise when there is a lack of scientific or "true" relevance between such factors and the "fact" they are intended to establish. To make the point by an absurd example, suppose the Senate had added the following factor: "The extent to which members of

the minority group drink coffee." Proof of this "factor"—one way or the other—could not give rise to any inference upon which it could properly be decided whether the minority group, because of the challenged SPP, had "less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice." I suggest that some of the actual Senate factors may have no more relevance than this hypothetical "coffee drinking" factor.[6] It is my opinion that some federal courts have decided "Section 2 cases" on the basis of these factors without any but token reference to the precise language of that statute and, as a consequence, have reached conclusions at odds with the clear language thereof. See further discussion under Section V, *infra*.

Having identified some of the interpretive problems with which courts must attempt to deal in disposing of Section 2 claims, I turn to certain specific disagreements which I have with my brothers. But first: the outer limits.

## II. CONSTITUTIONAL LIMITATIONS: USE OF "REPUBLICAN FORM OF GOVERMNENT" GUARANTEE OF ARTICLE IV, SECTION 4, U.S. CONSTITUTION.

Are there any constitutional provisions which protect certain voting or election standards, practices or procedures (SPPs) from effective challenge under Section 2, as amended? Stated otherwise, should federal courts in handling Section 2 challenges be sensitive to potential constitutional limitations or problems beyond those contained in the Fifteenth Amendment? It is my view that they should be. But rarely do we see evidence of such sensitivity. Even when enumerating a litany of "risks" involved in the application of Section 2, we do not find any suggestion of such constitutional limitations. Take the following language from the district court's opinion in *Gingles v. Edmisten, supra* at 345, 356:

---

**6.** And the Senate Report cannot legislate relevance. Even the Congress cannot mandate that a violation of Section 2(a) is established if it is shown that blacks drink coffee, for this would

invade the judicial fact-finding power. Compare the actual language of Section 2(b) quoted at page 228, *supra*.

In making that political judgment, Congress necessarily took into account and rejected as unfounded, or assumed as outweighed, several risks to fundamental political values that opponents of the amendment urged in committee deliberations and floor debate. Among these were the risk that the judicial remedy might actually be at odds with the judgment of significant elements in the racial minority; the risk that creating "safe" black-majority single-member districts would perpetuate racial ghettos and racial polarization in voting behavior; the risk that reliance upon the judicial remedy would supplant the normal, more healthy processes of acquiring political power by registration, voting and coalition building; and the fundamental risk that the recognition of "group voting rights" and the imposing of affirmative obligation upon government to secure those rights by race-conscious electoral mechanisms was alien to the American political tradition.

The suggestion is, I suppose, that, if there are constitutional problems, they are only for the Congress—not the courts—to deal with. I disagree.

For example, consider the attack raised in *Whitfield, supra,* on the majority vote requirement. That attack is pertinent here too because the plaintiffs in this case also point to that requirement of the Constitution and various statutes of the state of Arkansas, in an effort to show not only discriminatory intent, but also that the majority vote runoff requirement, in fact, discriminates against blacks by virtue of its

*effect.* I suggest that Senate Factor No. 3, unhappily, practically invites such an attack. That Senate Factor identifies "majority vote requirements" as one of those "voting practices or procedures that may enhance the opportunity for discrimination against the minority." The Senate Factor, in effect, asks courts to determine "the extent to which the state or political subdivision has used ... majority vote requirements...." The obvious suggestion is that if the state has used the requirement to a great extent, it should be assumed to have a discrimination-enhancing effect.

It is clear beyond question that the people of Arkansas have chosen, through their state constitution and through the acts of their state legislature, to use the "run-off," "majority vote" requirement in most primary and general elections.

Of course, in one sense, it can be stated that majoritarian democracy always discriminates against political minorities. But surely that is not the sense in which the Senate used its reference to "majority vote requirements." As explained in *Whitfield, supra,* run-off requirements do not have the effect of discriminating against blacks, even taken as a politically cohesive group. But let us assume that such requirements do have such an effect, as a panel of the Eighth Circuit has now decided in partially reversing this Court's *Whitfield* decision. See ADDENDUM, *infra.* It is fair to ask: are not some things "off limits" or "non-negotiable" in our political system? [7]

Mr. Justice Frankfurter cautioned the courts to steer clear of political questions.

---

7. Other "Section 2" questions that might raise constitutional issues:

   (1) May the courts recognize and protect black "group rights"?

   (2) May the courts order a system of proportional representatives based on race?

   (3) May courts order a state to increase its members of House and Senate seats for the purpose of creating districts small enough so that blacks could have a majority VAP therein?

   (4) May courts gerrymander districts for the purpose of creating "safe" black majority districts (i.e., *require* majority black VAPs in excess of, say, 60 percent)?

   (5) Where there are no legal barriers to registration or to voting, may courts hold that

blacks are the "minority" in any political district where their VAP exceeds 50 percent, on the ground that socio-economic factors, caused in part by past discrimination, make it more difficult for blacks to participate in the political process?

   (6) May the votes of individuals be scaled in value on the basis of comparative socio-economic factors such as wealth, income, literacy, education, health or age? If not, may votes of certain groups be so scaled? Does it make any difference that the current depressed socio-economic status of blacks as compared to whites may be found to result in part from prior official racial discrimination in the absence of present official discrimination?

His views are well described by Ms. Thernstrom:

What had actually been asked of this Court, he said, was nothing less than "to choose among competing bases of representation—ultimately, really, among competing theories of political philosophy."

Justice Frankfurter was convinced that courts and politics did not mix, and that political choices (beyond the competence of judges) were an inevitable component of every apportionment decision. That is, the *means* by which political influence was distributed inescapably suggested an *end*. To choose a particular distributive principle was to adopt a particular definition of democratic government. In every apportionment rule there lurked an implicit theory of representation, and no case of alleged malapportionment could be judged without such a theoretical framework. That is, the means not only suggested an end, but without a carefully delineated end, appropriate means remained uncertain. Lacking clearly articulated political values, Frankfurter asked, how could courts judge the equity of particular contested district lines? Without settled standards, how could judges weigh such competing considerations as the desirability of population equality, the value of an experienced incumbent, the need to honor community integrity or to provide a strong rural voice despite a sparse rural population?

Thernstrom at 64.

The Supreme Court nevertheless did get into the political thicket but only in a limited, non-comprehensive manner. The Court went far enough to decide that "one-person, one-vote" is required by the equal protection clause. This holding could be said to give real substance to the meaning of "Republican Form of Government," but the Court specifically eschewed Section 4 of Article IV, U.S. Constitution, as a predicate for its decision. The Court was able to announce this "one-person, one-vote" standard without precisely describing what practices are, and are not, essential to our democratic form of government. But, now, facing such attacks as the one upon the majority-vote requirement, can the courts still refuse to identify what is essential, and what is not essential, in our system of democratic government?

All of which leads me directly to a consideration of Article IV, Section 4 which provides, in part: "The United States shall guarantee to every State in this Union a Republican Form of Government...." Why has not this provision of our Constitution, which more clearly deals with the type of state government contemplated by the founders than any other, been the prolific source of great Supreme Court decisions, giving form and content to that which is essential in our democratic form of government? The answer will be found in a review of a few important decisions.

From *Luther v. Borden* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849) until *Baker v. Carr, supra,* it was accepted by the Justices of the Supreme Court that the Republican Form Clause can only be enforced *by Congress.* In *Luther,* the issue before the Court was which government of Rhode Island should be recognized as the legitimate state administration following the insurrection of 1841–42. The plaintiff brought a suit in trespass challenging the legality of a martial law decree under which the charter government's soldiers had invaded her home. She claimed the decree was invalid because the state government had been overthrown by popular convention. Justice Taney refused to review the case finding that only Congress had the power to decide questions of state legitimacy. Thus was born the political question doctrine.

Professor John Hart Ely opines that while *Luther* was correctly decided, it was "a gross mistake of logic to infer, as subsequent cases did, that all cases brought under the Republican Form Clause must therefore also present political questions." Ely, *Democracy and Distrust* p. 118 (1980).

The next large leap in the evolution of the political question doctrine came in *Pacific States Telephone & Telegraph Company v. Oregon,* 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912) in which Chief Justice

White found a utility company's challenge to a tax law passed by referendum to be a political question. Extending Justice Taney's reasoning, Chief Justice White declared that there was no judicial power to review any cases under the Republican Form Clause.

In *Baker, supra,* one of the seminal cases in the voting rights area, Justice Brennan concluded that state legislative apportionment was only justiciable under the Equal Protection Clause of the Fourteenth Amendment, the Republican Form of Government Clause being essentially a dead constitutional letter lacking standards to guide the Court's discretion. Justice Frankfurter in his dissent, commented that the *Baker* claim was, in essence, a "Guarantee Clause claim masquerading under a different label." He said:

> The present case involves all of the elements that have made the Guarantee Clause cases non-justiciable. It is, in effect, a Guarantee Clause claim masquerading under a different label. But it cannot make the case more fit for judicial action that appellants invoke the Fourteenth Amendment rather than Art. IV, § 4, ...

*Baker* 369 U.S. at 297, 82 S.Ct. at 754.

In a rare post-*Baker* case, *Kohler v. Tugwell,* 292 F.Supp. 978, 985 (E.D.La.1968), a three judge panel reached the merits of the Republican Form Clause claim that a confusing ballot to adopt a state constitutional amendment was constitutionally offensive. While ultimately finding that the ballot was not constitutionally *infirm* Judge Minor Wisdom, writing for the majority, found that the Republican Form Clause was incorporated in the due process clause and noted in dictum: "Federal courts should be loathe to read out of the constitution as *judicially* nonenforceable a provision that the Founding Fathers considered essential to formulation of a workable federalism." (Emphasis in original)

Has not the time arrived for the courts to take up and interpret the meaning of "a Republican Form of Government?" Put otherwise, can we really avoid such an interpretive process in the light of attacks such as the ones being made in this case? If the federal courts order a ban on run-off elections, or order proportional representation, are they not *sub silentio* ruling that such orders are constitutional? (Surely they would not enter such orders if they believed their actions in so doing would offend the U.S. Constitution.)

The language of the clause itself urges that we challenge Congress' exclusive power to act under the Republican Form Clause. The clause states: "The *United States* shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. If the framers had intended to leave enforcement solely to the Congress, the clause should have specified "Congress" as the guarantor of such rights as it does in four other occasions in Article IV where Congress' power is exclusive. Instead, "the United States," presumably through all of its coordinate branches, is charged with this responsibility. Even Justice Frankfurter, while agreeing with what he viewed as a general prohibition against federal courts' becoming fora for "political debate," recognized that Article IV did not limit the enforcement thereof to the Congress. He states:

> Art. IV, § 4, is not committed by express constitutional terms to Congress. It is the nature of the controversies arising under it, nothing else, which has made it judicially unenforceable. Of course, if a controversy falls within judicial power, it depends "on how he [the plaintiff] casts his action," ... whether he brings himself within a jurisdictional statute. But where judicial competence is wanting, it cannot be created by invoking one clause of the Constitution rather than another. When what was essentially a Guarantee Clause claim was sought to be laid, as well, under the Equal Protection Clause ... the Court had no difficulty in dispelling any mere confusion resulting from forms of expression, and considering the substance of things...."

Here appellants attack "the State as a State," precisely as it was perceived to be attacked in the *Pacific States [Tele-*

*phone & Telegraph Co. v. Oregon* ] case, id. [223 U.S. 118], at 150, 32 S.Ct. [224] at 231 [56 L.Ed. 377 (1912) ]. Their complaint is that the basis of representation of the Tennessee Legislature hurts them. They assert that a "minority now rules in Tennessee," that the apportionment statute results in a "distortion of the constitutional system," that the General Assembly is no longer "a body representative of the people of the State of Tennessee," all "contrary to the basic principle of representative government...." Accepting appellants' own formulation of the issue, one can know this handsaw from a hawk. Such a claim would be non-justiciable not merely under Art. IV, § 4, but under any clause of the Constitution, by virtue of the very fact that a federal court is not a forum for political debate. *Massachusetts v. Mellon* [262 U.S. 447, 485, 43 S.Ct. 597, 600, 67 L.Ed. 1078 (1923) ], supra.

*Baker* 369 U.S. at 298, 82 S.Ct. at 754. This last-stated, old view is weakening and should be reexamined. In any event, the idea that Section 4 of Article IV should be enforced only by the Congress is suspect. It should also be reexamined and, I suggest, abandoned.

The meaning of a "republican" government to the author of the clause, James Madison, indicates that the clause is the most logical source for judicial review of cases relating to voting. In *The Federalist No. 39* at 100 (New Amer. Lib. ed. 1961), he stated that a republican government "derives all its powers directly or indirectly from the great body of the people." And the heated debates about the possible "tyranny of the majority" are known to all. The inference of *majority election* of representatives appears quite obvious.[8]

Justice Douglas, in his concurring opinion in *Baker*, also found the abdication of judicial power over all cases involving vot-

ing rights an absurd extension of the erroneous holding in *Luther*. In reviewing the Constitution for voting rights, Justice Douglas focussed on the Republican Form Clause. "So far as voting rights are concerned, there are large gaps in the Constitution. *Yet the right to vote is inherent in the republican form of government envisaged by Article IV, Section 4 of the Constitution.*" *Baker, supra* at 242, 82 S.Ct. at 723, (Douglas, J., concurring) (Emphasis added).

Finally, the current awkward and unsatisfying analyses of reapportionment cases argue for a revival of the Republican Form Clause as a basis for review. Professor John Hart Ely writes:

> In fact it seems likely that this unfortunate doctrine—that all Republican Form cases are necessarily cases involving political questions—will wholly pass from the scene one of these days. Friend and foe alike have come to recognize the obvious, that although the various state voting rights cases decided by the Warren and Burger Courts have been styled as equal protection decisions, they cannot comfortably be understood without a strong injection of the view that the right to vote in state elections is a rather special constitutional prerogative, a view that cannot be teased out of the language of equal protection alone and in textual terms is most naturally assignable to the Republican Form Clause.

Ely, *supra*, at 118. *See also* Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind.L.J. 1, 19 (1972). I agree. And, although I believe that a proper interpretation of Section 2 as applied to the facts here avoids most constitutional problems, I am convinced that the majority's opinion does transgress constitutional limits by recognizing and enforcing "group affirmative political rights" and, in effect, requiring proportional representa-

8. As noted by Justice O'Connor in her discussion of the importance of federalism in *F.E.R.C. v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (O'Connor, J., dissenting) "federalism enhances the opportunities of all citizens to participate in representative government". *Id.* at 789, 102 S.Ct. at 2153. She then quotes de Tocqueville's remark that " 'the love and habit of the republican government in the United States were engendered in the townships and in the provincial assemblies.' " *Id.* at 789, 102 S.Ct. at 2153. *See* Tribe, *Constitutional Law* (1988), at 398.

tion based upon race—all without an adequate legitimate factual predicate—in violation of the due process clause, the equal protection clause and Section 4 of Article IV.

## III. HAVE PLAINTIFFS SHOWN THAT THE 1981 DISTRICTING PLAN RESULTS IN BLACKS HAVING LESS OPPORTUNITY THAN OTHERS TO PARTICIPATE IN THE POLITICAL PROCESS?

How does the majority deal with the defendants' argument that the plaintiffs cannot show that they "have less opportunity than other members of the electorate to participate in the political process." Judge Arnold, for the majority, appears to acknowledge that, "there are no presently existing legal barriers to voting by black citizens in Arkansas." Majority Op. at 204. But he nevertheless concludes that they do not have as much opportunity to participate in the political process as anyone else because of "the present effects of past racial discrimination, much of it official and governmental." Majority Op. at 204. The proof that he relies upon is principally supplied by the court's taking judicial notice of a finding in *Smith v. Clinton*, 687 F.Supp. 1310, 1317 (E.D.Ark. 1988) *aff'd mem.*, — U.S. —, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988), to wit:

> We further find that the history of discrimination has adversely affected opportunities for black citizens in health, education and employment. The hangover from this history necessarily inhibits full participation in the political process.

I disagree with this type of "bootstrapping," but I also have more fundamental objections. First, Section 2(b) requires a *cause and effect* showing that the *challenged SPP* is responsible for blacks having "less opportunity than other members of the electorate to participate in the political process." The finding in *Smith*, means that neither present legal barriers nor the districting plan formulated by the Board of Apportionment in 1981 is responsible for blacks having "less opportunity than other members of the electorate to participate in the political process." Rather, it is the present effects of past discrimination in health, education and employment. Stated otherwise, the opportunity of blacks to participate in the political process would be the same regardless of the manner in which the Board drew the district lines. (This is different from the question whether the line drawing by the Board affected the opportunity of blacks "to elect candidates of their choice." I agree with the majority that in some instances the line drawing by the Board in 1981 did affect the opportunity of blacks to elect candidates of their choice. But it is very important analytically to deal separately with the issue of the opportunity "to participate" and the issue of the opportunity "to elect.")

The majority would probably reply, as certain other federal courts have, that we must look at the "interaction" of the SPP with impairments blacks suffer as a result of prior discrimination to determine if that SPP results in blacks having less opportunity to participate in the political process. This is linguistic legerdemain. Clearly it is not the line drawing by the board—the SPP here—which "results" in blacks having less such opportunity; rather, it is the diminished socio-economic status found to have resulted from prior discrimination.[9] And Section 2 does not purport to give a remedy solely on the latter basis. At the risk of argumentative overkill, assume the Board had drawn the district lines exactly as plaintiffs now request. Would the opportunity of blacks "to participate" be any dif-

---

**9.** And rarely do courts try to quantify or identify the causes of the "diminished socio-economic status" of blacks. They appear to be satisfied if they can comfortably say it is in some degree the result of prior official discrimination. If no more is needed, this is an easy "given." But reality may make it apparent that prior discrimination played a small role. One has only to examine the reasons for the poverty and unemployment in the Delta counties of Arkansas to understand this. Blacks and whites were much better off (as compared to the rest of the state) in that area in 1970 than they are now. The district court in *Whitfield* referred to "the dire economic circumstances that have developed in that area of the state over the past decade." *Id.* at 1384.

ferent? Clearly not. This error in analysis I identify as the source of so much unnecessary intellectual conflict in the "voting rights" cases and as the principal source of the misuse of certain of the *Zimmer* or Senate factors.

Is not all of this obvious? The socio-economic condition of blacks in any given area—whatever it is—will always be a "given" in any voting rights challenge. And, unfortunately in this country, from sea to sea, blacks, although making significant progress, still suffer adverse effects in education, the economic arena and health, and, on a statistical basis, are simply not as well off as non-blacks in our society. So, if one accepts that being poor, uneducated, unhealthy, etc., decreases one's "opportunity to participate" in the political process, then there will be no voting SPP which will be immune from attack. Elections per se could be as readily attacked! And, although no one has pushed that far yet, again note the plaintiffs' success in the Eighth Circuit Court of Appeals in attacking a "runoff, majority-vote" statute. *Whitfield v. Democratic Party of State of Arkansas, supra.*

This Court (the U.S. District Court) in its *Whitfield* opinion discussed this problem. After quoting Senate Factor No. 5, see *supra*, p. 1384, the Court stated:

This is also a "given" for the state of Arkansas and Phillips County and probably for every other political subdivision in the nation. But the effects are more devastating in Phillips County than in other places because of the dire economic circumstances that have developed in that area of the state over the past decade. Although the court is finding that blacks still bear the effects of discrimination in such areas as education, employment, and health, nevertheless, the Court also finds that those effects should not hinder their ability to participate effectively and equally in the political process. The Court also notes that typical factor #5 refers to the "ability to participate"

rather than "opportunity" to participate as stated in the statute. The statutory language, not being ambiguous, controls. The effects of discrimination referred to do not, in any legally significant way, hinder the "opportunity" or, indeed, the ability of blacks to participate effectively in the political process.

\*      \*      \*      \*      \*      \*

And they can demonstrate that not having a telephone or an automobile makes it more difficult and less convenient for a citizen to qualify for, and to exercise, his or her voting rights. The tricky words are "difficult" and "inconvenient." . . . . But ordinary inconveniences such as one might experience if he wished to go to the doctor's office or to the post office or the general store should not be deemed to constitute legal barriers simply because the objective is to get to the voting place. The value one places on one's rights to vote will be reflected in the difficulties and inconveniences overcome in exercising that right.

*Whitfield, supra,* at 1384–85. *See also Butts v. City of New York,* 779 F.2d 141, 149 and n. 4 (2d Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (Section 2 does not employ a "difficulty of victory" test).

I conclude here, as I did in *Whitfield*, that the residual effects of past discrimination in such areas as education, employment and health do not in any legally significant way hinder the "opportunity" or, indeed, the "ability" of blacks to participate effectively in the political process.

So, since I agree with the defendants that plaintiffs, to succeed under Section 2(b), must, *inter alia*, prove the following two separate things, i.e., (1) that they have less opportunity to participate in the political process, *and* (2) that they have less opportunity to elect representatives of their choice, I conclude that the plaintiffs have failed to establish any Section 2 violations here.[10] However, if I agreed with the ma-

---

**10.** Justice O'Connor and the three justices who joined her concurring opinion in *Thornburg*

may also agree with defendants' argument here. Note her language:

jority that a simple showing that blacks have "less opportunity to elect candidates of their choice" would suffice, I would end up by concluding that plaintiffs have shown at least one Section 2 violation. *See* discussion, House District 100 in Section VIII C, *infra.* On the surface, this limited showing would appear easy to make, but the "preconditions" required by *Thornburg* alert us to the real difficulties. See Section V, *infra.* Before dealing with those preconditions, it is necessary to consider the "opportunity to elect" language in greater depth.

## IV. HAVE PLAINTIFFS SHOWN THAT THE 1981 DISTRICTING PLAN RESULTS IN BLACKS HAVING LESS OPPORTUNITY THAN OTHERS TO ELECT CANDIDATES OF THEIR CHOICE?

This provision of Section 2 is comparatively straightforward. Of course, if race is used to define politics and we assume only two parties, blacks and whites, then if district lines are drawn so that blacks constitute a majority of the voting age population (hereafter "VAP"), we can say that the lines do *not* result in blacks having less opportunity to elect candidates of their choice. But if lines are drawn so that blacks are not a VAP majority, we can say that the lines as drawn result in blacks having less opportunity to elect candidates of their choice. Note that the socio-economic status of blacks is a constant. The variable is where the district lines are placed: (a) Majority Black or (b) Majority White. Does this mean that every district drawn so that blacks are a VAP minority violates Section 2? No, because before one gets to this question, he or she must ascertain whether the *Thornburg* preconditions are satisfied. See Section V, *infra.* But if the *Thornburg* preconditions *are* satisfied, then the result will follow automatically regardless of the socio-economic condition of the blacks or the whites in the area. There is nothing in Section 2 that states that if the blacks in the district are richer, better educated and healthier than whites, they will not be entitled to the benefits of the law.

While I have agreed with my brothers that the percentages of VAPs are critical in determining what is, or what is not, a "majority" or a "minority," I must nevertheless acknowledge that there is a certain lack of realism in that approach. In the areas of the state of Arkansas challenged in this lawsuit, as well as in practically all other areas of the United States, the number of persons who actually vote, black and white, is far below the number of those of voting age and also far below the number of those registered to vote. So, when we talk about political districts which have VAPs for blacks or whites ranging between 30 and 70 percent, we may be overlooking the reality that a much smaller percentage of black or white voters can determine the outcome of the usual election. We will take an example.

In Phillips County, Arkansas, according to the 1980 census figures, there were a total of 22,110 persons aged 18 and older, of which 11,542 were white and 10,393 were black.[11] So, the black VAP was 47 percent. Plaintiffs' Exhibit 31, Table 45.

In the Democratic preferential primary held on March 8, 1988, Mr. Whitfield, a black, ran against several whites and led

---

I would adhere to the approach outlined in *Whitcomb* [*v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)] and *White* [*v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)] and followed, with some elaboration, in *Zimmer* and other cases in the Courts of Appeals prior to *Bolden.* Under that approach, a court should consider all relevant factors bearing on whether the minority group has "less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice." 42 U.S.C. § 1973 (emphasis added). The court should not focus solely on the minority group's ability to elect representatives of its choice. Whatever measure of undiluted minority voting strength the court employs in connection with evaluating the presence or absence of minority electoral success, it should also bear in mind that "the power to influence the political process is not limited to winning elections."

**11.** An additional 289 persons, or 1.3 percent of the VAP of the county, were of Spanish origin. See Table 45, n. 1.

the ticket with 3,465 votes. The combined votes of his white opponents totaled 5,812. Plaintiffs' Exhibit 61pp. The evidence establishes strong racial voting polarization in Phillips County. Let us therefore assume that only blacks voted for Mr. Whitfield and only whites voted for his opponents. If that were the case, Mr. Whitfield received only 33.3 percent of the black VAP and the white candidates combined received 50.3 percent of the white VAP. Then, under Arkansas law, there was a runoff on March 22, 1988. At that runoff, Mr. Whitfield received 3,439 votes and his opponent, Mr. Stoner, a white, received 4,839 votes. Plaintiffs' Exhibit 61oo. On the assumption made above, Mr. Whitfield received 33.08 percent of the voting age black population and Mr. Stoner received 41.9 percent of the white voting age population. Thus, it will be seen that if Mr. Whitfield received 1,401 more black votes in the runoff, he would have won. That would have given him a total of 4,840 votes, which is only 46.57 percent of the voting age blacks in the county.

The point is: because of the dismally low participation of Americans, black and white, in exercising their voting rights, a small, but active, minority could easily win most local races over a much larger non-participating majority. However, if racial polarization is established, then one could not safely predict that an actively participating minority would consistently overcome the majority. The minority might "slip up" on the majority one or two times, but the suggestion is that the majority would soon respond in kind. This rationalization at least tends to justify our choice of VAPs as the critical figures because those figures tend to set "per possibility" outside limits.[12] But, when the VAPs of blacks or whites range from 45 to 55 percent, say, the fact that one or the other group might be the "minority" on a VAP basis will not alone explain the success or failure of the black or the white candidates who have opposed each other in elections past.

For the reasons I detail in Section VIII of this opinion, *infra*, I find that the plaintiffs have shown that the 1981 district lines did result in blacks having less opportunity than others to elect candidates of their choice with respect to seven of the House districts. However, since, as I explain elsewhere, that is not all plaintiffs have to prove to establish Section 2 claims, I conclude that plaintiffs have not met their burden even with respect to these seven House districts. *See* discussion, Section III, *supra*.

## V. THE THORNBURG FACTORS.

The majority opinion herein identifies the *Thornburg* factors required to be established as a predicate for a vote-dilution claim:

> In evaluating a Section 2 claim, the Court must first determine whether three preconditions to a legally substantial impairment of plaintiffs' ability to elect the candidates of their choice have been met. First, the claimant minority must establish that it is sufficiently large and geographically compact to constitute a majority in a single-member district. Second, the plaintiffs must show that the group to which they belong is politically cohesive. *Thornburg*, 478 U.S. at 50–51, 106 S.Ct. at 2766–67. Third, the minority voters must show that the "majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as a minority candidate running unopposed ... to defeat the minority's preferred candidate." *Id.* at 51, 106 S.Ct. at 2766. The latter two factors can be shown by proving that voting in the jurisdiction is highly racially polarized. *Ibid. Accord, Smith*, 687 F.Supp. at 1314–1315.

Although the majority aptly states the three critical factors, it does not, in my opinion, rigorously apply them to the facts of this case; nor does it adequately explore the interrelationships among those factors.

---

12. The *Thornburg* opinion confirms this standard. Justice Brennan refers to "diluting the *potential* strength of the minority vote." *Id.* 478

U.S. at 50, n. 16, 106 S.Ct. at 2766 n. 16. (Emphasis added)

### A. *Political Cohesiveness.*

#### 1. **Black Voting Behavior.**

It is clear that the majority opinion does not conduct the intensely fact-specific appraisal required by *Gingles*. It has not systematically studied the separate groups of black citizens projected for incorporation into the proposed new districts to determine if they, taken together, constitute a "politically cohesive" group. This, however, is understandable.

The Section 2 law in this "gerrymandering" (districting or redistricting) area developed as a negative proscription. The law prohibits "fragmenting" or "packing" cohesive political groups of black citizens with the effect of diluting their voting power.[13] The law did not develop in the context of affirmative obligations to reach out and include larger numbers of black citizens *in order to enhance black political power.* In other words, the mandate was "you shall not harm" rather than "you shall help." When dealing with the negative proscription, the issues were simple and straightforward. If blacks possessing majority political power in a single district were divided into two districts, in each of which they constituted a minority, everything was quite simple and straightforward. Or, if one, say, took two 60% black VAP districts and divided the black VAP so that one district had 80% and the other 40%, the case would also be clear. And the multi-member-at-large district is likewise a relatively simple case.

But here, plaintiffs made no direct effort to show that district lines were drawn in 1981 in a way which had the effect of packing or breaking up or fragmenting *pri-or existing politically cohesive black groups.* I waited in vain for evidence comparing the political status of blacks in the districts created in 1971 with their political status in the districts created in 1981. I asked myself: did the new lines drawn in 1981 decrease, limit, curtail or lessen, the effectiveness of black political participation by fragmenting or packing or otherwise? But plaintiffs eschewed this approach in favor of a theory that they need only show that the defendant Board in 1981 failed to take the opportunity to enhance black political effectiveness. The plaintiffs' view apparently is that it is immaterial whether they were better off politically under the 1981 plan than under the 1971 plan. Their point is that they were not better off under the 1981 plan than they *could have been if* the Board had taken advantage of every opportunity to enhance their political position. This is clearly an affirmative action theory. Affirmative action by definition carries implications of intent which may relate to plaintiffs' constitutional claims but have only tangential relevance to their Section 2 "results" claims.

The plaintiffs, in the main, simply had their experts identify the geographic locations of black citizens. Then they drew lines incorporating such black citizens into new districts in which the blacks would constitute a majority of the voting age population without any showing that those blacks represented a politically cohesive group. For the most part, the plaintiffs simply asked the court to assume that all black citizens incorporated into the new district would think alike and vote alike.

---

**13.** *Thornburg, supra,* was a multi-member district case but it still provides our primary guidance here. It presented the first occasion for the Supreme Court to construe the Voting Rights Act of 1965, as amended in 1982. Note the following references therein to single-member districts:

> Dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority. *Id.* 478 U.S. at 46, n. 11, 106 S.Ct. at 2764, n. 11.

> We ... have no occasion to consider whether the standards we apply to respondents' [multi-member district] claim ... are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more ... single member districts resulted in the dilution of the minority vote. *Id.* 478 U.S. at 46, n. 12, 106 S.Ct. at 2764, n. 12.

So, although we cannot assume that the standards applied by the Supreme Court in *Thornburg* to multi-member districts will be "fully pertinent" here, that case clearly establishes the framework for the disposition of this case.

But I steadfastly resist the notion that we should presume—or that the law permits us to assume—that all blacks, regardless of their differing geographic and political backgrounds, will vote as a racial bloc whenever a black candidate is opposing a white candidate; or, for that matter, that all white citizens (likewise brought together for the first time in the new district) will respond in kind. I suggest that such assumptions represent stereotyping at its worst and should be rejected out-of-hand. But, more important, they invite us to ignore the specific *Thornburg* requirements.

The point is: some proof of the political cohesiveness of the different black groups proposed to be assembled into a new district must be brought forward. One of the dangers of a statewide, "scattershot" attack, such as is being made in this case, is that there may be no real focus on the particular facts and circumstances affecting each of the old (here, the districts established in 1981), and each of the proposed (proposed by the plaintiffs) districts. Even the Senate Factor on racially polarized voting directs the inquiry into the voting behavior of the particular "State or political subdivision" in issue. See Senate Factor No. 2, *supra*. But, even better, we have clear directions from the United States Supreme Court on this point:

> The inquiry into the existence of vote dilution caused by submergence in a multimember district is district specific. When considering several separate vote dilution claims in a single case, courts must not *rely* on data aggregated from all the challenged districts in concluding that racially polarized voting exists in each district.

*Thornburg* 478 U.S. at 59, n. 28, 106 S.Ct. at 2771, n. 28.

And as Justice Brennan pointed out, the trial court in that case "relied on data that were specific to each individual district in concluding that each district experienced legally significant racially polarized voting." *Id.* at 59, n. 28, 106 S.Ct. at 2771, n. 28.

Use of exogenous elections is permissable where, for instance, minorities have only recently sponsored candidates, and election data for the district in question is sparse. *Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25. On the other hand, "exogenous elections alone could not prove racially polarized voting" within the challenged district. *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502 (5th Cir.1987). Rather, such data can be a reliable source for determining polarization only when the "aggregate representation from those elections ... virtually" covers the entire district at issue. *See East Jefferson Coalition v. Jefferson Parish*, 691 F.Supp. 991, 999 (E.D.La.1988).

Most of plaintiffs' proposed new house districts cross county lines. In some instances, the plaintiffs might put on evidence showing polarized voting in one of those counties but then make no effort to show that blacks in adjacent counties, who would be incorporated in the proposed new House district, identified with the policies and the positions of the blacks in that county. In other words, proof, that the blacks from different political jurisdictions who were to be incorporated into a proposed new district were "politically cohesive," has not been required.

There are some exceptions to this generality. The plaintiffs have made proof of polarization in some adjacent counties, portions of which have been assembled into a proposed new district. And in high population counties where more than one legislative district lay within that county, "exogenous" county election results would sometimes reveal the political cohesiveness of groups of black voters residing in those different legislative districts through their common responses in the county elections. This proof, at least, affords some circumstantial evidence of possible future cohesiveness. Another exception might be the proof of how the blacks voted in the presidential democratic primaries when Reverend Jesse Jackson was a candidate. But everyone knows that this was a one-time *nationwide* response. If the results in that presidential primary, may, alone, properly be used to establish polarized voting, then polarized voting would simply be an-

other "given" not just in Arkansas and in the South but in every state in the Nation. Blacks in overwhelming percentages voted for Reverend Jackson, while whites voted against him. It is arguable that the white voters response to his candidacy had less to do with race than substantive issues.

### 2. White Voting Behavior.

How carefully has the majority's opinion dealt with the requirement that the plaintiffs prove that the "majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate,"? *Thornburg,* 478 U.S. at 51, 106 S.Ct. at 2766. Not very carefully, I suggest. We should be talking about racial discrimination here. The question should be: have a substantial majority of whites in the challenged 1981 legislative districts been discriminating against black candidates by voting against them solely because of their race? But the majority will say that is *not* the question and they have strong authority for that position.

Justice Brennan instructed that plaintiffs do not have to show that white "bloc voting" behavior is racially motivated. In fact, the defendants are not to be afforded the right or opportunity, under his view, to prove that the voting behavior of the white voters is *not* racially motivated:

> For purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates.

> \* \* \* \* \* \*

It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, we conclude that under the "results test" of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters.

*Thornburg, supra,* at 63–64, 106 S.Ct. at 2772–73 (emphasis in original).

Justice Brennan rejects arguments that "polarized voting" refers to "voting patterns that are determined primarily by the voter's race rather than the voter's other socio-economic characteristics," *Id.* at 64, 106 S.Ct. at 2773, and that "polarized voting" means that voters select or reject candidates *principally* on the basis of the candidate's race. Id. at 67, 106 S.Ct. at 2775. He concludes on this point: "Clearly, only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis." *Id.* at 68, 106 S.Ct. at 2775. Finally Justice Brennan rejects "the suggestion that racially polarized voting refers only to white bloc voting which is caused by white voters' *racial hostility* toward black candidates." *Id.* at 70, 106 S.Ct. at 2777. He says this would be contrary to Congress' intent in amending Section 2 to establish a pure "results" test.

> In amending § 2, Congress rejected the requirement announced by this Court in *Bolden, supra,* that § 2 plaintiffs must prove the discriminatory intent of state or local governments in adopting or maintaining the challenged electoral mechanism. Appellants' suggestion that the discriminatory intent of individual white voters must be proved in order to make out a § 2 claim must fail for the very reasons Congress rejected the intent test with respect to governmental bodies. See Engstrom, The Reincarnation of the Intent Standard: Federal Judges and At–Large Election Cases, 28 How.L.J. 495 (1985).

*Id.* at 71, 106 S.Ct. at 2777.

But "political cohesiveness" and "white bloc voting" are *judicially created* "preconditions" to Section 2 cases. Congress has expressed no judgment concerning the need for, nor the definition of, "polarized voting."

The *Thornburg* opinions reveal that a majority of the justices have not signed on to these views of Justice Brennan. It is my opinion that a majority will eventually reject, or at least significantly modify, those views. Why?

The extravagant interpretations and applications of Section 2 have reached the point where, absent some reasonable "preconditions," those interpretations would simply require the creation, for example, of black and hispanic majority VAP legislative districts *wherever possible*. Thus, we would have the establishment of the right of proportional representation based on race and ethnicity which is not only contrary to the express language of Section 2(b) (*Provided* that nothing in this section establishes a right to have the members of a protected class elected in numbers equal to their proportion in the population") but also, in my opinion, contrary to the Constitution. So only the *Thornburg* "preconditions" prevent this "slot machine" interpretation of Section 2.[13]

But if one interprets the "preconditions" to remove any necessity for the plaintiffs in Section 2 cases to prove fault or racial discrimination on the part of the white voters, then one has not significantly inhibited that "automatic" result. More importantly, that interpretation does away with the nexus between the result deplored, to wit, the dilution of black voting power, and the cause thereof: racially discriminatory voting on the part of whites. So it is my view that a majority of the justices on the Supreme Court will (1) go back to a more reasonable and defensible interpretation of Section 2, (2) give a "racial discriminatory" meaning and content to racial polarization, (3) both, or (4) accept the liberal interpretation of Section 2 and Justice Brennan's definition of the "preconditions" and conclude that Section 2 as so interpreted and applied is unconstitutional.

Justice Brennan also takes the position that the motives of the voters should not be gone into because that introduces the issue of "racism" and would therefore be divisive.

The Senate Report states that one reason the Senate Committee abandoned the intent test was that "the Committee ...

heard persuasive testimony that the intent test is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities." S.Rep., at 36, U.S.Code Cong. & Admin.News 1982, p. 214. The Committee found the testimony of Dr. Arthur S. Flemming, Chairman of the United States Commission on Civil Rights, particularly persuasive. He testified:

> [Under an intent test] [l]itigators representing excluded minorities will have to explore the motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquires can only be divisive, threatening to destroy any existing racial progress in a community. It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief. *Ibid.* (footnote omitted).

The grave threat to racial progress and harmony which Congress perceived from requiring proof that racism caused the adoption or maintenance of a challenged electoral mechanism is present to a much greater degree in the proposed requirement that plaintiffs demonstrate that racial animosity determined white voting patterns. Under the old intent test, plaintiffs might succeed by proving only that a limited number of elected officials were racist; under the new intent test plaintiffs would be required to prove that most of the white community is racist in order to obtain judicial relief. It is difficult to imagine a more racially divisive requirement.

*Thornburg, supra,* at 71–72, 106 S.Ct. at 2777.

Surely everyone understands that it is standard procedure for plaintiffs in these cases to also allege intentional racial discrimination as a basis for their constitution-

---

**13.** To spell this out: If one accepts that Section 2 protects not only the individual's "right to vote," which it specifically refers to, but also the right of groups to "effective" votes, then Section 2(b) makes the result automatic in a districting or redistricting case. If the lines are drawn so that blacks are a VAP minority in the district then is it not clear that this procedure "results in blacks having "less opportunity" than whites "to elect candidates of their choice"?

al claims. And even in a bare Section 2 "results" case, the record will overflow with efforts to prove racism. (Just note once more the Senate factors.) And why not? That is what such cases are ultimately all about. To say that the defendants in cases such as this may not show that race discrimination is *not* the true reason for the differing voting behavior of blacks and/or whites in the area is to deny the right to demonstrate that there is no constitutionally adequate basis for the Section 2 claim or for the potential relief which will follow from the "establishment" of that claim.

Justice Brennan also says a voter's motive and intent test should not be required because it would be too burdensome to prove.

> The new intent test would be equally, if not more, burdensome. In order to prove that a *specific factor*—racial hostility—*determined* white voters' ballots, it would be necessary to demonstrate that other potentially relevant *causal factors*, such as socioeconomic characteristics and candidate expenditures, do not correlate better than racial animosity with white voting behavior.

*Thornburg, supra,* at 72, 106 S.Ct. at 2777.

But proof of the true basis of the complaint should not be excused simply because it would be burdensome. Plaintiffs in these cases regularly use statistical experts. In Title VII cases we find sophisticated parties using multiple-regression techniques (to regress other variables besides race) to reveal whether race was, or was not, a factor in a certain employment decision. *See e.g., Allen v. Seidman,* 881

F.2d 375, 378 (7th Cir.1989). Regardless of difficulty I suggest we may not remove from the case the very predicate for the relief sought.

Finally, Justice Brennan says:

> Focusing on the discriminatory intent of the voters, rather than the behavior of the voters, also asks the wrong question. All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations. Moreover, as we have explained in detail, *supra,* requiring proof that racial considerations actually *caused* voter behavior will result—contrary to congressional intent—in situations where a black minority that functionally has been totally excluded from the political process will be unable to establish a § 2 violation. The Senate Report's remark concerning the old intent test thus is pertinent to the new test: The requirement that a "court … make a separate … finding of intent, after accepting the proof of the factors involved in the *White [v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) ] analysis … [would] seriously clou[d] the prospects of eradicating the remaining instances of racial discrimination in American elections." *Id.,* at 37, U.S.Code Cong. & Admin. News 1982, p. 215. We therefore decline to adopt such a requirement.

*Thornburg, supra,* 478 U.S. at 73, 106 S.Ct. at 2778.

So, there it is! Justice Brennan says that if we are to get rid of the "remaining instances of racial discrimination in American elections," we should not require proof of that racial discrimination! [14] I am convinced

---

**14.** Contrast Justice Brennan's attitude concerning the significance of black candidates' success in elections. He states that in evaluating the significance of such successes, the trial court:

> [C]ould appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to appellees' claim.

In a footnote, Justice Brennan cites the following language from *Zimmer v. McKeithen,* 485 F.2d, at 1307.

> We cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the

black vote. Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds. In either situation, a candidate could be elected despite the relative political backwardness of black residents in the electoral district.

that a majority of the justices do not subscribe to that notion. Assuming that I am right, what does this record show?

Unspoken is the assumption that black bloc voting is not a manifestation of racism whereas white bloc voting is. I am willing to accept that black bloc voting may simply reflect racial pride and the desire for a "breakthrough" in the democratic arena. And I am willing to accept on the basis of the experts' opinions, or, indeed, without proof that *some* portion of the white vote in political contests pitting a black against a white is, unfortunately, simply and solely based on race. But what portion?

The parties have not chosen to bring to this Court's attention all of the facts and circumstances involved in the political races which were relied upon by the plaintiffs to prove bloc voting. We were only given occasional glimpses at the relative qualifications of the black candidates vis-a-vis their white opponents. We have not been informed in any detail about the platforms or policies of the opposing candidates, their experience, their abilities as speakers, their "track records" in their communities, the name recognition of each candidate, their financial support, their personalities, the identity of their supporters and detractors, etc., etc., (i.e., those factors that one would look for to determine, or estimate, the likelihood of success or failure in a political contest in which race was *not* involved). We are invited to infer—in this evidentiary vacuum—that all of the whites who voted for the white candidate were simply engaged in yet another instance of racial discrimination. I do not agree that this is a reasonable or legitimate inference.

We must accept that, in cases like this, people are being penalized for the manner in which they exercise their right to vote, without being given the opportunity to show that racial considerations had nothing

to do with their votes. And there are potential partisan political overtones.

In a Republican district where Democrats never win, can we assume that Republicans who vote against and defeat a black Democrat candidate are racially motivated?

The views expressed by Justice Brennan may well have prevented the appropriate analysis and explanation of the voting behavior in this case. Since I take that analysis to be necessary, I conclude plaintiffs have failed to demonstrate the degree to which the white votes were motivated by race discrimination and have, therefore, failed to establish the very heart of their case: white discriminatory bloc voting.

And how does the majority herein define "sufficiently" in the *Thornburg* formulation (i.e., that the majority votes sufficiently as a bloc to enable it to defeat the minority's candidate)?

The Court may take judicial notice of the outcomes of the recent elections in Virginia and New York City. Mr. Doug Wilder, a black, was elected governor of Virginia in a very close election. The statewide Virginia and Arkansas black-white demographics are almost identical. Blacks constitute about 16 percent of the total population. Now if Mr. Wilder had lost, would that prove that whites had voted "sufficiently" as a bloc to defeat the black minority's candidate?

Before writing off the great majority of whites in the Delta, the South, and the Southeast regions of Arkansas, as racists, I would suggest that much more proof would be required than that introduced at this trial. How would a black candidate fare with white voters if he or she ran on a platform espousing moderate or conservative political views against a white person of liberal views? We simply do not know, but note one analysis of Mr. Wilder's race: [15]

*Thornburg* 478 U.S. at 76, n. 37, 106 S.Ct. at 2779, n. 37.

So, it is not a "two-way street." The defendants may not show that white votes were not motivated by racial discrimination. On the other hand, the plaintiffs are permitted to show that their successes at the polls were attributable to

the "work of politicians" or to "political expediency."

**15.** I feel justified in citing the popular press in addition to professional journals because many of the "legal" issues in this case are inherently "political" issues. Therefore, the views of political observers and experts may be as helpful as

Not everyone was thrilled with Doug Wilder's victory in the Virginia governor's race.

For starters, of course, there were the people who supported his opponent, Republican Marshall Coleman. The media grumbled about the narrowness of the contest. Wilder was supposed to win comfortably, or so the polls said, and when it didn't happen that way, when the election went down to the last precinct, the press and pundits were stunned. They were shocked, *shocked* to find that some of Virginia's white voters are still racially prejudiced and, what's more, anxious to conceal it from pollsters. And some blacks, having been weaned on liberal politics and seismic oratory, were disappointed that Wilder ran such a mainstream campaign with so little emphasis on race.

It was almost enough to obscure the plain, breathtaking fact that a black man, the grandson of slaves, had won a statewide election in Virginia just a generation after Jim Crow.

But some folks got the message right away. On the very morning after the election, Atlanta Mayor Andrew Young, a candidate for governor for next year's contest in Georgia, called a news conference and said he was rethinking his opposition to the death penalty. It was no coincidence, but a page torn directly out of Wilder's playbook. Like Wilder, who reversed himself over the years and became an advocate of capital punishment, Young is turning away from his liberal past and driving hard to the middle ground. It's the way black candidates will be running into the 1990s, and probably into the next century, and it's worth a look.

Wilder's style and strategy could be called "color-deaf." The usual term, colorblind, doesn't really apply, because voters are always going to notice a candidate's race. Granted, a black candidate does have to pay some attention to his appearance. Dashikis and Afros are out—but then, so are Nehru jackets and muttonchops for white men. A lot is made of Wilder's appearance in photographs from the early seventies, when he wore an Afro and loud shirts, but every man in America, black or white, looked like hell in the early seventies. What black candidates have to avoid is wearing the *politics* of the seventies. When Wilder won election to the Virginia Senate 20 years ago, his first issue was a strident attack on the state song, "Carry Me Back to Old Virginny." Since then he's simmered down. In 1984, a seeker of conciliation, he stitched together a compromise that made a state holiday of the birthdays of Robert E. Lee, Stonewall Jackson, and Martin Luther King, Jr. But before someone blurts out "Uncle Tom," let's be plain that the black candidate of the nineties doesn't have to shuffle and grin. He must be moderate to conservative, just as a white candidate must be. The most interesting thing about the Virginia race was its clear signal that most whites, even if they're not especially sympathetic to blacks— even if they're still openly bigoted—do not wish to turn back the clock. No one has happy memories of the fire hoses and freedom rides. Wilder's most effective TV spot charged that his opponent wanted to "turn back the clock." The subject was abortion rights, but the subliminal message was race, and the appeal was to maintain the status quo. To succeed, a black candidate doesn't have to be *anti*-civil rights, he simply has to be *post*-civil rights. It's worth noting that Wilder didn't send an invitation to Jesse Jackson, who would've loved sharing the election-night glory but instead ended up with Larry King on CNN.

F. Allen, "The Color–Deaf Candidacy," Southpoint, 16–17 (January 1990).

Whether one agrees with Mr. Allen's analysis or not, one has to accept that over 40 percent of the whites participating voted for Mr. Wilder, a black. If 30 percent of

those of legal scholars—perhaps more so. And, of course, the plaintiffs in this case introduced without objection a great number of newspaper articles expressing the opinions of reporters and journalists.

those whites casting their ballots had voted for Mr. Wilder—and he lost—I suggest that this would still not show "white bloc voting" as referred to in *Thornburg*. And I believe this bloc voting is a phenomenon that cannot be proved or disproved upon the basis of the results in one election alone. Some *consistent* voting behavior must be shown.

And, of course, similar observations could be made about the Dinkins' victory in New York City (tailored to reflect the political environment of that city as contrasted with Virginia). It is interesting to note that the black plaintiffs in *Butts v. City of New York, supra,* were challenging the 40 percent primary runoff provision (i.e., if no candidate received 40 percent or more in the general primary, then a runoff between the two top vote getters required) on the theory that it would prevent a black from being nominated for office in New York City. And here, *four years later,* we have a black man not only nominated in the face of that requirement, but also elected in the general election. Mr. Dinkins received 51 percent of the vote in the Democratic primary, Mayor Koch 43 percent and others 7 percent. In the general election, he received over 50 percent of the total vote, Mr. Guiliani 48 percent, others 2 percent. According to the opinion in *Butts,* the U.S. District Court found that the *combined* black-hispanic vote in New York City equalled 30 percent of the total.

Is it not obvious that large numbers of white voters are supporting black candidates, not because of race but because of the merits of their candidacies in terms of political philosophy, platform and perceived competency? And is it not equally obvious that large numbers of white voters are voting against black candidates (i.e., *for* their white opponents) not because of the black candidate's race but because of ideological or partisan factors (e.g., Republicans voting for Mr. Guiliani)? On what basis are we to assume that many, perhaps most, white voters in eastern Arkansas have not voted *against* black candidates for the same or similar reasons?

So it is clear that the majority opinion herein does not detail or evaluate the evidence supporting the *Thornburg* "preconditions" of either "political cohesiveness" or "white bloc voting" according to proper legal standards. Nor could it because, in many instances, sufficient evidence of such preconditions was not offered or received. And "district specific" evidence of such preconditions has not been made as to each district challenged in this action.

The breadth of the majority's decision (which excluded only Pulaski County) can be seen in the remedy fashioned. While not holding that the law requires creation of any particular number of majority-black districts, the court nevertheless states:

> We know, and have found in this opinion, how many such districts can be created, and we also know that their lines can be drawn so as to make them reasonably compact and contiguous. There is, therefore, a sort of presumption that any plan adopted should contain that number of majority-black districts.

Majority op. at 217.

In order for the Board to comply with the court's decree, it will inevitably have to change the district lines and the voting compositions of many legislative districts that are in no way tainted by any Section 2 violation. Because of the "ripple effect," the legislative House district lines in more than 25 such districts may have to be changed. The scope and significance of what we are about should be candidly faced. The court's order will affect the interest of many black and white citizens living in legislative districts that are not even being challenged herein. Many may be completely unaware of the lawsuit. The court's order will also affect many innocent (i.e., non-racist) whites. It will also affect many blacks who will end up in districts with a smaller percentage of black voters than before. If it can be said that the political power of those blacks who are included in the new black majority VAP districts will be enhanced, it must also be clear that the political power of blacks put in districts with reduced black VAPs will be diminished. I will try to provide some

measure of this effect by comparing the status of black political power under the 1981 districting plan to what it will be if plaintiffs' proposed plan were substituted therefor.

Excluding Pulaski County and those portions of Crittenden County that were the subject of the challenge in *Smith v. Clinton, supra,* blacks constituted pluralities of between 30 and 39 percent of the voting age population in eight House districts created by the Board of Apportionment in 1981.[16] They constituted substantial pluralities of 40 percent or more of the voting age population in five additional House districts, and a majority of the voting-age population in one other.[17] All tolled then, blacks constituted pluralities of 30 percent or more in 14 House districts under the 1981 plan, and a majority in one.

Under the proposed remedial plan developed by the plaintiffs in response to the majority's order of December 4, 1989, blacks would constitute a majority of the voting-age population in eight House districts including House Districts 82, where blacks already constituted a majority. So in terms of creating majority black districts, the proposed remedy will create more than existed previously. However, this is accomplished essentially by "packing" blacks into a few districts, and reducing their pluralities elsewhere.

For example, House District 47, which previously encompassed all of northern St. Francis County and had a 40 percent black VAP, will, under the plaintiffs plan, now be shifted to the western half of that county, and include portions of Lonoke and Lee counties, where 8,710 black residents will constitute 27 percent of the VAP.

In House District 85, which previously included all of Desha County as well as its largest city—Dumas—blacks had equalled 38 percent of the VAP. Now, Dumas and its adjoining townships will be placed in a district that will run up through Lincoln County and into northern Jefferson County including portions of Pine Bluff so as to create a majority black district. As for the 5,934 blacks left behind, they will constitute 27 percent of the VAP in the "new" House District 85.

In House District 73, which had included most of Phillips County outside of the Helena/West Helena region, as well as Monroe County, where blacks constituted 42 percent of the VAP, the remedy will leave 8,284 black residents to constitute only 20 percent of the VAP in the new District 73.

So the political power of those black citizens who have been left behind (i.e., not placed in majority black VAP districts) has clearly been diluted. What remedy do they have?

The pertinent *Thornburg* "preconditions" findings of the majority are:

> The 1981 apportionment plan created only five legislative positions, one in the Senate and four in the house, representing districts in which a majority of the voting-age population was black. We find that a total of 16 such districts, three in the Senate and 13 in the House, could have been created, and that these districts would have been reasonably contiguous and compact. We further find that voting in the areas of the State in question is markedly polarized by race. Both black and white voters usually prefer candidates of their own race.

Majority op. at 198.

Note there is no specificity to the polarization finding. There is no effort to deal with each of the challenged districts separately in accordance with the totality of the circumstances affecting each such district. No, the majority simply states: "voting in the areas of the State in question is markedly polarized by race." On page 208 of the opinion, we find the following:

> We also have little difficulty in finding that voting patterns are highly racially polarized, in the sense that black and white voters prefer different candidates with a high degree of frequency. Furthermore, the white voting majority is

---

**16.** These were House Districts: 24 (30%), 38 (32%), 80 (37%), 83 (39%), 85 (38%), 88 (31%), 89 (30%) and 91 (31%).

**17.** House Districts: 47 (40%), 73 (42%), 75 (45%), 74 (47%), 82 (67%) and 100 (47%).

powerful enough, and consistent enough, to defeat black voters' preferences for black candidates almost without exception.

*Id.* at 208.

Finally, on page 209 of the opinion, we find:

> It is true here, as it was in *Smith,* see 687 F.Supp. at 1317, that there is racially polarized voting in races for the Arkansas State Legislature, that black voters usually vote cohesively, as a unit, and that white voters have the strength under the present plan of apportionment (except in majority-black districts) to enable them to frustrate the choices made by black voters.

Elsewhere in this opinion I point out the deficiencies in the proof to establish these findings. Unless the elements of proof required in a state-wide redistricting challenge are different from those stated in *Thornburg* and generally applied in "gerrymandering" cases, the proof here cannot support the majority's broad conclusions of Section 2 violations or the broad remedy imposed. The failure of proof is obvious. The majority is simply saying that the Board in 1981 did not create as many black VAP Senate and House districts as they could have. It did not require proof that the 1981 plan split (or packed) previously existing "politically cohesive" black groups; not that black citizens proposed to be placed in new districts were "politically cohesive." In this connection it does not meet the very test it, itself, postulates. In analyzing the *Butts* case (an analysis with which I agree), Judge Arnold states:

> It does not hold that unlawful dilution is impossible when a multi-member body's members are chosen from single-member districts that have been drawn in such a way as to split a certain class of voters among different districts.

There has been no showing that previously existing politically cohesive groups of black voters were "split" except in the seven

House districts I discuss in Section VIII, *infra.* And only House District 82 appears to be "packed." But plaintiffs apparently are not complaining about that. See Section VIII, *infra.*

We must keep in mind the differences between a Section 2 case and claims of *constitutional* violations which require proof of discriminatory intent. It may well be that the precision in the proof required to establish a "results" claim under Section 2 would not be required to establish a constitutional claim. We are reserving the plaintiffs' constitutional claim for later discussion. But I mention it here because there is some suggestion that the majority's opinion on Section 2 may have been influenced by thoughts that the Board *intentionally* drew district lines "so as *to avoid* " creating majority black districts. Note the following language:

> If lines are drawn so as to avoid majority-black single-member districts, and reasonably compact and contiguous majority-black districts could have been drawn, and if racial cohesiveness in voting is so great that, as a practical matter, black voters' preferences for black candidates are frustrated by this system of apportionment, the outlines of a Section 2 theory are made out.

This may explain the majority opinion's seeming indifference to the specificity required by the *Thornburg* preconditions. Note further discussion of plaintiffs' proof under Section VIII, *infra.*

### B.   What is a "Minority?" [18]

In *Whitfield, supra,* which was an attack upon Arkansas' primary runoff laws, the Court observed:

> And, as indicated above, when the voting age population of blacks approaches equality with the voting age population of whites and the evidence shows, in addition, a consistent pattern of "crossover" votes in actual elections, which,

---

18.   Note discussion in Section IV above of the "opportunity to elect" language of Section 2, which relates to, but is different from, this issue. This "minority" definition section accepts Voting Age Populations as the correct premise.

The "opportunity to elect" discussion looks at actual voter turnouts in assessing the opportunity of black voters to elect candidates of their choice.

although small percentagewise, are sufficient to "bridge the gap," the basic assumption used to challenge runoff provisions appears to be undermined.

*Whitfield, supra,* at 1376.

And this is equally—perhaps more—true in a redistricting, gerrymandering case such as this.

In *Thornburg,* the court identified the standard for evaluating polarized bloc voting:

> And, in general, a white bloc vote that normally will defeat the *combined* strength of *minority* support *plus white "crossover" votes* rises to the level of legally significant white bloc voting.

*Id.* 478 U.S. at 56, 106 S.Ct. at 2769 (Emphasis supplied).

So to determine if there is "legally significant" bloc voting, the Court should first make an effort to determine whether blacks constitute a "minority" in the challenged districts and, if so, then determine if, in spite of racial polarization, the voting strength of the black minority *combined with "white 'crossover' votes"* is still insufficient to overcome the white bloc vote. If this combined voting strength is insufficient, then *Thornburg* would say we possibly have legally significant white bloc voting.[19] If it is sufficient, then the attack fails.

The voting data here, as in *Whitfield,* and *Perkins,* indicates (with rare exceptions) that there have been "crossover" white votes for black candidates—in some cases considerably in excess of 5 percent. So what is the proper test to determine if Afro–Americans constitute a "minority" within a challenged district? Conversely, when are whites considered a "majority?"

It appears that all parties to this action agree that voting age population (VAP) is the critical inquiry—not total populations or the number of registered voters (especially where, as here, there are no barriers to registration). And I reject the notion that we should use some such nebulous standard as "effective voting majority," *see Gingles v. Edmisten, supra,* based assumedly upon some history of voting "success." We are trying to determine under Section 2 if the *right* of blacks *to vote* is being denied or abridged by virtue of the "political processes" not being equally open to them in that they have "less opportunity" than others "to participate in a political process and to elect representatives of their choice." We are talking about "opportunity to participate." And assuming no barriers to voting or registration, the actual "turnout" of voters at a particular election tells us nothing about that "opportunity." (But see *Whitfield* Majority op. in Eighth Circuit, *supra,* and in ADDENDUM.) No one in America is required to vote or to participate in the political processes of local government, the state, or the nation.

In my dissent on the issue of laches, I pointed out how dramatically VAPs can change in a ten-year period. And since we are over nine years into the ten-year period, we must assume changes have occurred. As explained in that dissent, although we will not know until the census is taken for 1990 (starting within a few months of this decision), the most plausible inference is that the 1980 VAPs understate to some degree the 1989 black VAPs. And this understatement does not have to be great to change the "minority" to the "majority."

But even accepting the 1981 VAP figures, if one adds thereto the consistent "crossover" white vote even in the racially polarized areas, it becomes clear that, in at

---

19. "Possibly" is used because the concept of "bloc voting" must have some inherent limitations and also must be evaluated in relation to the size of the minority. Assume, for instance, that the VAP in a political unit was 90 percent white and 10 percent black. Then assume various divisions of that white vote in an election contest between a black and a white. Then compare such percentage divisions when the VAP is assumed to be 60 percent white and 40 percent black. The whole concept of white bloc voting arguably should not come into play unless one race consistently votes over 70 percent for that race's candidate. Otherwise, we are dealing with ordinarily expectable spreads. This, in turn, suggests that the concept also will not be pertinent if the black VAP is *below* a certain percentage such as, say, 30 percent. See district court opinion in *Whitfield,* at 1376.

least one of the 1981 legislative districts where the 1980 black VAP was 45 percent or greater, blacks have, and have had, the "opportunity to elect candidates of their choice" even when that candidate was, or is, black. That is because the crossover white vote has usually been in excess of 5 percent. The facts that blacks may not have registered in the same proportion as whites (although it appears they have), that they may not have turned out to vote in the same proportion as whites, or that they did not vote 100 percent for the black candidate are all beside the point. They had the "opportunity" to participate and to elect the candidate of their choice.

The plaintiffs take the position that even if blacks constitute a majority of the VAP in a particular district, they may still be considered a "minority" for the purposes of the Voting Rights Act. I referred to the same argument in the *Whitfield* case:

> The case, *Campbell, et al. v. Lee County Election Committee*, (No. H–C–86–48), which is still before the court, involved a plan of reapportionment to produce equal single member districts. The black plaintiffs argued that they would need a voting age population of 60 percent or more in order to have a "safe" black district and any real opportunity of electing the representatives of their choice. In the absence of demonstrated barriers to full political participation by blacks in the electoral process, the court characterized such an argument as a racial slur against blacks.

*Whitfield, supra*, at 1380–81.

As long as the parties are using VAP figures that they agree upon, and as long as there are no legal barriers to registration or voting, then it is my view that 50–plus percent VAP is a "majority" and 50–minus percent VAP is a "minority". And it is my further view that courts may not constitutionally mandate the creation of "super-majority" districts. And in this case there are not even the excuses usually used to justify such action. There is no reliable evidence that whites and blacks are registering at differing rates and we have only limited evidence of such differentials

in turn-out. And even if we had solid evidence of consistently lower turn-outs by, say, black voters, still it would, in my opinion, be contrary to law to use such evidence as a predicate for ordering the creation of super-majority districts. If nothing inhibits the opportunity of citizens to vote, we certainly should not reward the failure to exercise that opportunity.

Plaintiffs must fail in connection with their challenge to House District 74 since the evidence shows that *the districting lines* as drawn in 1981 for that district do not interfere with the opportunity of black citizens to participate in the political process or to elect candidates of their choice, even when such candidates are black. Strangely the voting results in House District 100 and House District 75 do not consistently show the white crossover votes we find in House District 74. [At this point, I want to express my skepticism about the plaintiffs' statistical expert's basis for concluding that there were no (i.e., zero) white crossover votes in certain elections. The actual precinct returns keyed to the racial composition of those precincts negates this "statistical" conclusion.]

## VI. THE "ZIMMER" AND SENATE FACTORS.

### A. Relevance and Effect.

I sense that most of my differences with the majority stem from the different ways in which we treat the "Zimmer" and Senate factors. The majority, like many other federal courts (See e.g. the opinion of the majority of the Eighth Circuit panel reversing this district court in *Whitfield, supra*), seem to take the view that such factors *must* be considered and applied in all cases. They seem to state that the relevance of those factors has been established *by law* and that judges handling Section 2 cases must uncritically accept and rely thereon even when it is obvious that those factors have no real or scientific relevance to the particular challenge being made under Section 2. See pages 204–05 and 208 of Majority Opinion. Judge Arnold refers to "the list of relevant factors contained in the

report of the Senate Judiciary Committee." and then states:

> The relevance of this list is confirmed by the Supreme Court's opinion in *Thornburg,* 478 U.S. at 44–45 [106 S.Ct. at 2763–64].

I do not so read Justice Brennan's opinion. In fact, Justice Brennan makes it clear that courts are to use their own judgments in dealing with most of the "senate factors." He states:

> The Senate report specifies factors which typically *may be* relevant to a Section 2 claim.
>
>    \*      \*      \*      \*      \*      \*
>
> While the enumerated factors *will often be pertinent* to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. *Id.,* at 29–30. Furthermore, the Senate Committee observed that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."

*Thornburg, supra,* 478 U.S. at 44–45, 106 S.Ct. at 2763–64 (Emphasis added).

Indeed, any view which purported to require the court's acceptance of the Senate Factors as always relevant to the factual issues raised by Section 2 challenges would invade the fact-finding and truth-establishing province of the courts. So the courts must look at each factor and determine its relevance, or lack of relevance, to the issues in the case. As with other cases tried to the courts, irrelevant factors must be ignored.

Of course, it is almost certain that two of the Senate Factors will be relevant in any Section 2 case. Those two factors are "the extent to which voting in the elections of the state or political subdivision is racially polarized" and "the extent to which members of a minority group have been elected to public office in the jurisdiction." This is because the plaintiffs in a Section 2 case must prove, inter alia, that the group to which they belong is "politically cohesive" and that the "majority votes sufficiently as a bloc to enable it ... to defeat the minority candidate." These two factors are usually shown by proving that voting in the particular jurisdiction is highly racially polarized and that members of the minority group have had limited success in becoming elected to public office in that jurisdiction. Otherwise, the relevance of the factors will depend upon the nature of the challenge asserted.

If a particular jurisdiction still had a voting literacy test or a financial burden test (e.g., poll tax), then the relevance of many of the other senate factors would be apparent. But when there is an attack on a legislative reapportionment plan, I challenge the relevance of most of the other factors.

In a special concurrence in *Nevett,* Judge Wisdom noted that when a court is confronted with a test consisting of an aggregate of factors, "the case turns on the attitude of the trial judge and the appellate judges...." *Nevett v. Sides,* 571 F.2d 209 (5th Cir.1978), p. 233. As stated by Mr. Howard M. Shapiro, "with such an elusive standard, judicial discretion is at a maximum and outcome is likely to be inconsistent." Note, *Geometry and Geography: Racial Gerrymandering and the Voting Rights Act,* 94 Yale L.J. 189, 195 (1984). Later in that article, it is stated:

> Some of the *Zimmer* factors—those which focus on electoral structure—simply have no relation to single-member districting. The remaining factors are important to establish the social context, but, *since they are independent of any particular districting configuration, they can provide no insight into the relative merits of various districting plans....* More generally, in cases of racial gerrymandering, where the denial of access is unlikely to be complete, the *Zimmer* factors are unable to distinguish between alternative districting plans. Use of the *Zimmer* factors is simply not an effective way to evaluate claims of racial gerrymandering. (Emphasis added)

*Id.* at 197.

The role of the Senate Report "typical factors" was also dealt with extensively by the trial court in *Whitfield* at 1381–82.

The concerns expressed by Judge Wisdom and by Mr. Shapiro should be taken quite seriously. The assumed relevance of the Senate factors provides an escape from the discipline imposed by the specific statutory language involved. Once so liberated, the judges must rely upon their own personal or even political philosophies. This can be dangerous business. The temptation of judges to overly rely on their own "life experiences" and personal values becomes difficult to resist. The proper limits upon the concept of judicial notice are lost in the process. Note how the majority "confirms" its conclusion that voting patterns are highly polarized:

> And our own experience as citizens of this State, which we are not required to lay aside, strongly confirms this conclusion.

Majority op. at 208.

Of course, each of the three judges on this Court brings a lifetime of personal exposure to, and involvement in, the political affairs of our state, but, as this case demonstrates, we do not always come away from that exposure and involvement with the same conclusions, views, ideas and opinions. If judges are to avoid being lost in a sea of subjectivity, they must harken back to the language of Section 2 for guidance and resist the siren song of the *Zimmer* and Senate factors. Hear the words of an expert on the Voting Rights Act:

> I have tried here to suggest a way of thinking about the issues raised by section 2 litigation. They do not lend themselves to resolution by too great a preoccupation with the Senate checklist. I argued ... that, with the *Zimmer* factors to guide them, the constitutional decisions assumed "an orderliness and rationality that disguised their subjectivity." But the subjectivity derived from the arbitrariness of the listed factors themselves, which, in turn, resulted from an effort to measure an undefined phenomenon. What is justice in the electoral sphere? these cases asked. What is the normal relation between racial and ethnic groups in the political sphere? When are the "opportunities and occasions of power" properly shared? The

inadequacy of the courts' decisions reflected the magnitudes of the task before them.

> The Senate's list is no improvement over the one provided by *Zimmer*. It obfuscates rather than clarifies; simplifies what cannot be simplified; makes orderly a process that is inherently disorderly.

Thernstrom at 227.

The emphasis upon the *Zimmer* and Senate factors has, I suggest, resulted in plaintiffs having unanticipated success in challenges brought under Section 2. Note the comment of Ms. Thernstrom:

> And that inescapable element of subjectivity in section 2 decisions suggests the wisdom of judicial restraint in upholding plaintiffs' claims. As of 1986, however, such restraint has been in short supply. "No objective observer of the political process in the South can argue that it is less open to minorities today," Katherine Butler has noted, "... yet in the past plaintiffs never enjoyed the degree of success evidenced by recent decisions."
>
> Such unprecedented success would be appropriate, of course, if past legal standards had been found wanting. It is clear, however, that in amending section 2 Congress did not expect substantial deviation from what the Senate Judiciary Committee report described as an extensive, reliable, and reassuring track record." The "results" test, as the report depicted it, was nothing "radically new" or "untested"; it was "well-known to federal judges" and not "easy." It was easier, of course than an intent test (defined as demanding evidence of a "smoking gun"), but the decision in *Mobile*, requiring proof of discriminatory intent, had virtually halted vote dilution suits, advocates of the amendment claimed. "We are acting to restore the opportunity for further progress," the report stated. The intent was to restore normal traffic—to repair a light stuck on red.
>
> What Congress envisioned is not what happened. In the first four years in the life of the amended provision, the suc-

cess rate of plaintiffs in section 2 cases exceeded 90 percent.

\*　　\*　　\*　　\*　　\*　　\*

Indeed, the plaintiffs' victories in court only hint at the magnitude of that success. An uncounted but unquestionably large number of suits are settled out of court by jurisdictions reluctant to commit scarce funds to an almost hopeless cause or to take a stand that might be interpreted as "anti-black."

\*　　\*　　\*　　\*　　\*　　\*

Those in the civil rights community who fought hard for the 1982 amendments are justly elated by the results. Not only at-large systems, but also multi-member and single-member districting plans that fragment black and Hispanic residential concentrations are "falling like dominoes." Perhaps their demise is nothing to mourn. *But it has occurred not as a consequence of considered legislative judgment that such electoral procedures violate fundamental rights or entail unacceptable costs as a consequence of their disparate racial impact; rather, this change has resulted primarily from threatened legal action by attorneys whose arguments have been given credibility by confused courts— courts that have neglected the statute's focus on fair process and come close to embracing the principle of group rights to proportionate officeholding.*

Thernstrom at 227. (Emphasis added)

### B. *Application of Senate Factors in This Case.*

Judge Arnold deals with the Senate factors in Section C of the majority opinion. See pp. 209–15. Even though I do not agree that many of them are relevant in this case, see *supra,* I will, nevertheless, review certain of his findings and conclusions with respect to some of the factors and then explain my disagreement therewith.

### 1. Senate Factor # 1.

The extent of any history of official discrimination in the state or political subdivision that touched the right of the mem-

bers of the minority group to register, to vote, or otherwise to participate in the democratic process;

In addition to taking notice of the Court's findings in *Smith, Perkins,* and *Sherpell v. Humnoke School District,* 619 F.Supp. 670, 680–681 (E.D.Ark.1985), *appeal dismissed* 814 F.2d 538 (8th Cir.1987), Judge Arnold states:

A number of witnesses testified to the difficulties experienced by blacks in electoral politics in various of the areas affected by this litigation. Polling places have been moved on short notice; deputy voting registrars have, with isolated exceptions, been appointed only as a result of litigation; efforts have been made to intimidate black candidates. It is not necessary to decide at this point which (if any) of these barriers were motivated by invidious discrimination. It is sufficient for present purposes to note that these and similar practices clearly result in discouraging black participation in elections. Partly this is due to a higher level of illiteracy, poverty, economic dependence, even timidity, among the black population. And while defendants can hardly be blamed for creating these conditions, it is an inescapable fact that they are in large part the legacy of a history of discrimination, much of it governmental, beginning with the constitutionally sanctioned institution of human slavery.

As I have previously explained, none of these facts and circumstances tend to prove or disprove that the *district lines* as drawn in 1981 *resulted in* blacks living in the contested areas having less opportunity than other members of the electorate to participate in the political process and to elect candidates of their choice. Being irrelevant they should be entirely ignored.

Relevant or not, do I agree with the findings, and the inferences drawn therefrom as stated by Judge Arnold? Again, no. He states, "polling places have been moved on short notice." In this case, the majority is ordering the most massive redistricting ever required by a federal court in this Nation encompassing in its potential effect approximately one-third of the coun-

ties of Arkansas. To emphasize evidence of a few instances of changes in polling places "on short notice" in a few communities; the evidence that a few deputy voting registrars were appointed only as a result of litigation; and evidence of a few isolated instances of attempted intimidation is to trivialize this important case. And, although obviously not so intended, to me, that emphasis tends to unfairly patronize our fellow citizens who are black.

In *Whitfield,* I dealt with much the same, or same type of, evidence which we considered in this case. As a consequence I made the following findings:

> The Court finds that the black citizens of Phillips County do not still face harrassment or intimidation in registering, or in voting, or in running for office. The location of polling places is always a difficult problem. Blacks on the average, being poorer and having less access to transportation, may be said to experience more difficulty on a statistical basis in getting to the polls. Of course, poor whites face the same problem. The Court does not find that the location of the polls as described in the evidence constitutes a significant barrier to black or white participation given even minimal motivation to so participate.

*Whitfield, supra,* at 1375.

I would make the same findings on the basis of the evidence in this case. And is it not clear to all that none of the things here referred to by the majority opinion should be considered "barriers" to participation.

Under its discussion of this factor, the majority also documents its findings of "efforts to intimidate black candidates" by citing the testimony of Mr. Roy Lewellen, a black attorney who ran for the State Senate in 1986 against the incumbent, Senator Paul Benham. The majority found Mr. Lewellen's testimony "entirely credible" noting that, "Defendants called no witnesses to rebut it."

This gives me the occasion to make a more general comment about this case— one which, I suspect, would apply to many Voting Rights cases. Possibly because of the identity of the defendants, the nature of the issues, or the economics or politics— if you will—of this type of litigation, certain issues were not developed with the usual adversarial zeal. True, the defendants vigorously defended against allegations that they intentionally or purposely discriminated against blacks in formulating and implementing the 1981 redistricting plan. Beyond that, the defense was at best spotty. Little effort was made to develop all the facts and circumstances surrounding each incident alluded to by the plaintiffs' many witnesses.

With respect to the Lewellen incident, the defendants did bring on Senator Benham but they did not call the prosecutor or the sheriff or others with knowledge of the facts including Mr. Lewellen's client and relatives. The majority states that it believed Senator Benham's testimony that he had nothing to do with the prosecution. The majority also acknowledges that, "Mr. Lewellen's difficulties were to some degree of his own making." Majority op. at 210–11.

On the basis of Mr. Lewellen's own testimony, I am convinced that he opened himself up to serious charges. But mostly, I disagree with the majority's finding, "We do not think that a white lawyer, even one who opposed the powers that be, would have been treated this way." *Id.* I find myself in complete disagreement with this finding. It is inconceivable to me that a white lawyer in the same circumstances would have been treated any differently. Maybe political campaigns in other states are more "civilized" but in the rough and tumble of Arkansas politics, one does not give his political enemies such opportunities and expect them not to try to take advantage thereof. And this is not to express any judgment on the "merits," since those merits were never tried out in this case. It is to say that a serious issue was raised which legitimately might be considered to bear upon an candidate's qualification to serve his district as a state senator. Perhaps, absent the political race, the issue of witness-bribing would not have been pursued. If not, this whole episode would reflect badly on the prosecutor and upon his exercise of his official discretion.

But, in any event, I am convinced that if the "in" political faction would seize upon the situation for political advantage against a black lawyer, they would as assuredly have done so against a white lawyer.

So I agree with the majority that "there has been a long history of official discrimination." I agree "[i]t has a present effect." But I am unaware of any evidence that "some instances of it [official discrimination] are still occurring."

2. Senate Factor # 5.

The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

The majority, under this heading, states:

Many more whites than blacks are high-school graduates, and many blacks were educated in schools that were both separate (by compulsion of law) and unequal. There is a tremendous amount of white poverty, especially in the Delta, but poverty among blacks is more nearly the rule than the exception. Blacks tend to have fewer telephones and fewer cars. If a person has no phone, cannot read, and does not own a car, the ability to do almost everything in the modern world, including vote, is severely curtailed.

*Id.* at 211.

The majority acknowledges that the defendants have not produced these conditions; indeed they "are determined to alleviate them." But, he notes, "as long as blacks, as a group, remain in a depressed socio-economic status, their political power will necessarily be less and the impact upon them of vote-diluting boundary lines will be greater." *Id.* at 211. Then the majority incorporates into its opinion a table "setting out some of the economic facts of life for the two races in the 16 counties where this suit challenges district lines." *Id.* at 211.

This issue has already been discussed *supra*, perhaps *ad nauseam*. In any event, see discussion in Sections III and V, above, and in *Whitfield*, at 1384–85. It is my view that Section 2 of the Voting Rights Act does not call upon courts to decide in the abstract if deficiencies of blacks as a group compared to whites in education, economic status, or health (evidenced by less education, more illiteracy, less income and wealth, fewer telephones, fewer automobiles, etc.) result in the curtailment of "the ability to do almost everything in the modern world, including vote." *Id.* at 211. It simply begs the question and adds nothing of substance to the discussion to say that the political power of those in a depressed socio-economic status will be less and the impact upon them of vote-diluting boundary lines will be greater. The socio-economic level of blacks in the area will be the same regardless of where the lines are drawn. It is also noted that the majority opinion speaks of "ability ... to vote." This is a common mistake made by courts in Voting Rights cases. The statute nowhere uses the term "ability to"; it unambiguously uses "opportunity to."

3. Senate Factor # 3.

The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority.

Judge Arnold's caption here is "Use of Majority–Vote Requirements and Other Devices." He states:

There is a requirement that candidates for the State Legislature get a majority of the vote in the primary to obtain a party nomination. And this majority-vote requirement, in four separate recent instances in which black candidates either won office by a plurality or were threatening to win, has been expanded to cover elections (*e.g.*, for municipal judge) to which it has traditionally not been applied. * * * For present purposes we simply note the existence of a majority-vote requirement affecting races for the

General Assembly and many other public offices in Arkansas.

*Id.* at 212.

Later in the opinion, after discussing the Senate factors separately, Judge Arnold purports to "balance" those factors and come to a conclusion on the ultimate issue. In the process, he states, *inter alia:* "Also on the plaintiffs' side is the existence of a majority-vote requirement." *Id.* at 215. After reviewing all the factors, he concludes that the 1981 apportionment plan violates Section 2 of the Voting Rights Act.

It is my strong view that majority-vote run-off statutory requirements do not have any identifiably racially discriminatory effects. I add to what I have already said on the subject the views of Ms. Thernstrom:

> [I]ts effect depends on the number of candidates running and on voter response, and both that number and voter behavior may change with an alteration in procedures. In a single-member district in which blacks are in the minority (the circumstances that were the focus of Jackson's concern), a black candidate who leads the first primary with 40 percent of the vote may lose in the subsequent runoff. But without the runoff, there might not have been that 40 percent support to begin with. As Harold Stanley notes, without a majority-vote rule the field of candidates is likely to shrink; certainly where the white community is determined to keep blacks out of office, preelection bargaining to settle on one white candidate is likely to occur if the first election is the decisive one. In fact, if one assumes that such preelection bargaining will not occur, then black candidates may actually be in trouble without a second election. In Yazoo County, Mississippi, for instance, four blacks and one white ran for a county supervisor seat in a beat (district) that was 75 percent black; the black vote was thus splintered, and the white might have won without a subsequent runoff.

> Even if the number of candidates remains large, voters will cast their ballots differently depending on how many chances they expect to have to register their choice. As Katharine Butler has put it: "The majority [vote] requirement allows a voter 'for' his candidate, without much thought about the opponents. The voter may realize that his first choice is a long shot, but will support the candidate anyway, knowing he will get another chance to affect the 'real' election. If the first election is the only election, the same voter may select his second or even third choice ... hoping to ... defeat a candidate he hopes will not be elected." This strategy may fail, of course, but if the candidate a voter dislikes is a black Democrat, in the general election the voter can usually cross party lines and vote for a white Republican. A change in procedure that appears good for blacks may thus benefit Republicans.

> Where whites are determined to stop the election of a black, plurality rules will not help. On the other hand, where whites are not thus determined, a majority-vote rule may aid a black or a white moderate. In the primary, moderate white votes may be distributed among several candidates. But if the choice in the second round is between a conservative white and a moderate—black or white—a biracial coalition may form to defeat the conservative. Without a majority-vote requirement, that biracial coalition would perhaps have formed for the first and only election. This is not to assert the superiority of a majority-vote requirement over plurality elections, but only to indicate the uncertain value and unpredictable effect of either.

Thernstrom at 223–24.

If one assumes—contrary to this view—that run-off statutes hurt political minorities (because it deprives them of the gambler's chance [20] that the majority will run

---

**20.** The logic which convinces us to use VAP figures for determining when a group is a minority or a majority and for determining the "opportunity to elect" is pertinent here also. See Section V, *infra.* We recognize, because of low turn-out figures that, as a practical matter, blacks with VAP as low as 40 percent in a district could win most elections if they just turned out. But we also recognize that, while the minority might "slip up" on the majority

more than one candidate and thus possibly split its vote and, at the same time, the minority will be disciplined enough to run only one candidate and unite behind that candidate) then how does that circumstance fit into a redistricting case? Is one to say that the run-off statute is all right (perhaps required?) in those districts in which blacks are a majority of the VAP but bad in all those districts in which blacks are a minority of the VAP? And what happens when one changes from 5 majority black districts to, say, 15 or 16 majority black districts? If, by packing blacks into those districts we have reduced the VAP population of blacks in 10 other districts from, say, 40 percent to 25 percent, what happens to the chances of those blacks (i.e., blacks in districts where their VAP has been reduced) to pull off a plurality nomination or election?

So what are we to say? If a redistricting board decreases the percentage of VAP blacks in District A in order to create a majority black VAP in District B, does a majority-vote, run-off statute, or, indeed, the absence thereof, result in an increase or decrease in black political power?

It is my further opinion that courts may not constitutionally prohibit, or do away with, majoritarian democracy as a remedy for violations of Section 2. *C.F., Butts v. City of New York, supra,* 779 F.2d at 149. Finally, it is my view that the circumstance, that the state of Arkansas has majority-vote run-off requirements in most of its elections, primary and general, may not lawfully be considered in determining whether the manner in which the Board of Apportionment drew the Senate and House lines in 1981 resulted in black citizens having less opportunity to participate in the political process or to elect candidates of their choice. My views on this subject have been discussed in detail in *Whitfield, supra,* at 1374–1381, which views I simply incorporate herein by reference. But a final irony can be noted: When the district

lines are redrawn so that blacks are an "effective majority" in many of the districts, then, according to plaintiffs theory, the *absence* of a majority-vote, runoff requirement will *hurt* them in those very districts.

4. Senate Factor # 6.

Whether political campaigns have been characterized by overt or subtle racial appeals;

The majority opinion states:

*Racial Appeals in Campaigns.* Racial appeals, some quite offensive, are common in campaigns in which a white candidate is running against a black candidate. Sometimes simply informing the voters that one's opponent is black seems to be enough to do the trick. Some white candidates have bought newspaper ads or distributed political leaflets containing their black opponent's picture. Sometimes references to race are more explicit. In the Mayor's race in Pine Bluff in 1975, for example, a supporter of a white candidate publicly warned that if white voters didn't turn out, there would be a black mayor. Sometimes coarser words are spoken.

Majority op. at 212.

The majority opinion then documents the last sentence by reviewing the testimony of Andrew J. Willis and his brother, Carol Willis, concerning a race for County Judge in Desha County in 1976. I agree with the majority that that testimony was strong and quite compelling. But it involved one election in one county some thirteen years ago. To further document its finding that political campaigns have been characterized by overt or subtle racial appeals, the majority opinion, citing the testimony of one witness, states:

To this day, the races live separately, he said, they go to church separately, and they even die separately. And as late as

---

once or twice, the majority would quickly respond. So we opt for VAP figures rather than turn-out figures. Similarly, with districts without run-off laws. If whites have more than one candidate and blacks have only one, the black candidate might slip up on the white opposition

once or twice, but then whites would attempt to respond in kind by agreeing on only one candidate like the blacks. No rational political principle can therefore be built around the presence or absence of run-off statutes.

October 2 of this year, the City of Marianna was maintaining, at public expense, a cemetery for whites only.

*Id.* at 212–13.

Although the testimony referred to was an eloquent expression of the "separateness" of the races, and, by inference, the evil thereof, it does not document "racial appeals" in political campaigns. (But I also ask: Who is fighting for, and who is fighting against, separateness in this case?)

When one considers the extreme elements present in our national society—even though those elements may have relatively few adherents—one would be inclined to be surprised at how little strong evidence was brought forward by the plaintiffs upon this issue. Mostly the plaintiffs' witnesses pointed out that some supporters of white candidates attempted to inform voters that the opponent was black. However, elsewhere, they testified that "everyone knew" of the race of each of the candidates in the elections referred to. I agree with Mr. Allen's statement in "The Color–Deaf Candidacy," quoted *supra*, that, "the usual term, color blind, doesn't really apply, because voters are always going to notice a candidate's race." Surely, black candidates want black voters to know that they are black.

Frankly, I was surprised at how little evidence of overt or subtle racial appeals plaintiffs were able to find in recent political campaigns throughout the state of Arkansas. What I said in the *Whitfield* case, I can firmly repeat here:

In their Pre–Trial Brief, plaintiffs state: "While recent campaigns in Phillips County have not been characterized by overt racial appeals, plaintiffs will present evidence of the central role race plays in Phillips County politics." The Court does not find evidence of significant, overt or subtle racial appeals, but accepts that those participating in the electoral process in Phillips County in recent years have more or less come to accept race as playing a central role in that county's politics.

*Whitfield,* at 1385.

I add the comments of Ms. Thernstrom:

The Senate report, however, lists only one such roadblock: "overt or subtle racial appeals." The reference, of course, is to such appeals on the part of whites in majority-white jurisdictions; the message from blacks to vote black is never considered a forbidden racial appeal.

\*    \*    \*    \*    \*    \*

What is a "subtle" racial appeal? Subtlety in campaigns risks political ineffectiveness; only overt appeals are reliable heard. The phrase would seem to invite courts to condemn messages the voters do not get—to condemn indiscriminately all discussions of issues connected to race. Plaintiffs in the Norfolk case sought to persuade the judge that news accounts of the 1982 city council campaigns mentioning both the candidates' race and their references to busing were invidious appeals for white solidarity. But the court held that the candidates had been racially identified not by whites but by blacks, who were alleging black under-representation, and furthermore that busing was a legitimate topic for public debate. Comments on an issue with a racial dimension do not necessarily constitute racial appeals—that is, calculated efforts to deny black candidates white support.

\*    \*    \*    \*    \*    \*

Evidence that political campaigns—whether on behalf of candidates or of propositions on the ballot—have been "characterized by overt or of subtle racial appeals" is certainly pertinent to the question of equal electoral opportunity in a jurisdiction. But that evidence must involve more than one campaign. The Senate report refers explicitly to "campaigns" in the plural. In addition, the appeal in question must be truly racial. When an "expert" for the plaintiffs in North Carolina litigation cited as examples of racial slurs slogans such as "Eddie Knox will serve all the people of Charlotte" and "Knox can unify this city," he certainly seemed to be reaching too far. And even though the Senate report does not mention the need to dem-

onstrate that racial appeals had a significant influence on election results, this surely is a key question. *The American political scene is filled with fringe candidates peddling lines to which no one listens, and in many communities racists operate on the fringe.*

Thernstrom at 202–204. (Emphasis added)

5. Senate Factor #7.

The extent to which members of the minority group have been elected to public office in the jurisdiction;

Although I do not agree that the plaintiffs have presented a balanced picture of the success of black candidates in Arkansas or, more importantly, the overall political success of black citizens in Arkansas over the last decade, I do agree with the following finding of the majority:

Only in majority-black districts have black candidates been elected to the Arkansas General Assembly. All other black candidates have been defeated. It was not until 1972 that any blacks were elected to the Legislature in this century. Four black members, three in the House and one in the Senate, were elected at that time. Today there are only six black members, and one of them owes his seat to this Court's decree in *Smith.* No black person has ever won statewide office by election. And in all of the 75 counties of Arkansas, no black person has ever been elected, since Reconstruction, to any county-wide constitutional office.

Majority op. at 213.

However, I add the comments of Ms. Thernstrom on this Senate Factor:

The end of a campaign comes on election day. The Senate report directs courts to look at who has won, who has lost, and how blacks, Hispanics, and whites have cast their ballots. A crude count of minorities in office does not indicate whether black and Hispanic voters have had the "opportunity ... to elect representatives of their choice," nor whether they have actually succeeded in doing so. Section 2, referring only to "representatives of their choice," does not equate minority representation with the election of blacks or Hispanics to office; it clearly allows for the possibility that such representatives could be whites elected with strong minority support. Moreover, a tally of those in office (whether white or black) only marks the starting point for the inquiry into opportunity. Voting patterns must be analyzed to determine not only the level of support for competing candidates, but the reasons *why* voters have cast their ballots as they have. A candidate preferred by black voters may have been defeated in spite of adequate opportunity for black voters to organize for common ends. Success is not the measure of opportunity, and opportunity is the section 2 question.

Some contend that the level of opportunity may be gauged simply by looking at who has voted for whom. That whites and blacks prefer different candidates is seen as decisive evidence of electoral exclusion. Thus in *Thornburg v. Gingles* (1986), the only section 2 case to reach the Supreme Court to date, Justice Brennan argued: "It is the difference between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives ... Only the correlation between race of voters and selection of certain candidates, not the causes of the correlation, matters.

Justice Brennan's view was that of only a minority on the Court, and it is an odd definition of opportunity. Black voters clearly lack an equal chance to elect representatives of their choice when whatever candidate they choose—simply by virtue of having been their choice—can almost never garner enough white votes to win, and when the usual rules of politics that permit shifting coalitions in response to changing issues do not seem to apply to them. In such circumstances, their race has left them politically isolated—without potential allies in electoral contests. But unless black voters in a majority-white jurisdiction are entitled to representation, the absence of white support for black candidates does not per se

constitute a denial of electoral opportunity. And such a right to representation was explicitly rejected both by the Supreme Court in the constitutional decisions resurrected by section 2 and by Congress in amending the act.

Justice Brennan distorts the meaning of electoral opportunity while simultaneously showing excessive faith in statistical analyses of voting patterns.

Thernstrom at 205–206.

### 6. Lack of Responsiveness of Elected Officials.

I agree with the majority's conclusion that: "The charge of unresponsive-ness has not been proved." Majority op. at 213. There is no convincing evidence that the elected white representatives in the questioned areas are presently insensitive to the interests of their black constituents. On the contrary, the evidence indicates that they are concerned about their black constituents' interests and concerned about their votes, which they assiduously pursue. So it is wrong to conclude that blacks do not have representation just because their representative may be white, just as it would be wrong to conclude that whites do not have representation just because their repre-sentative may be black.

This finding is very important. Justice Brennan states that voting along racial lines not only deprives blacks of their preferred representative, "... 'it also allows those elected to ignore [minority] interest without fear of political consequences.' *Rogers v. Lodge* [458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982)] ... leaving the minority effectively unrepresented." *Thornburg* 478 U.S. at 48, n. 14, 106 S.Ct. at 2765, n. 14. But, as demonstrated in this case, this is not always true. The three judges on this Court have unanimously agreed that the plaintiffs have not proved their charge that the white elected representative from the challenged districts have not been sensitive to, and responsive to, the interests of their black constituents.

### 7. The Strength or Tenuousness of Policies Underlying the Plan of Apportionment.

It is my view that the guidelines and stated policies of the board of apportionment, as promulgated in 1981, were not tenuous but, instead, reflected reasonable policies and approaches that one could expect to be adopted to give guidance to the execution of any apportionment plan. If all the people in the state of Arkansas were white or all were black, no one would be suggesting that the stated guidelines and policies were "tenuous." In attempting to discharge their duty under the one-person, one-vote principle, it was obviously necessary for the Board to depart from its stated guidelines and policies on occasion. On the whole, I find that the Board attempted to adhere to the policies and did a fairly good job in doing so.

And I do not fault the Board for recognizing the importance and value of incumbency—not so much because of the admitted personal interest of the incumbent but more because of its value to his or her constituents. Long legislative tenure is usually rewarded through an increase in power, prestige and effectiveness. It is only natural that this reality of political life be recognized in the redistricting process.

### VII. THE MAJORITY'S DECISION TO EXCLUDE PULASKI COUNTY DISTRICTS: AN ANALYSIS.

The emphasis on the Senate factors and the failure to adhere to the language of Section 2 and the three *Thornburg* "preconditions" can be seen in this case, too, when the majority attempts to explain why it is excluding Pulaski County as a Section 2 violator. Plaintiffs here suggested that four majority-black, single-member districts could have been created by the Board of Apportionment in 1981 rather than the existing three-member at large district. After briefly noting the evidence of racial appeals in campaigns, socio-economic disparities, racially-polarized voting and the history of official discrimination in Pulaski County, the majority concluded that evidence relevant to these factors had been

established, although not to the same extent as in other challenged areas of the state. Majority op., at 215. Then, in a statement that is perhaps most telling of the inherent flaws in relying solely upon the senate factors, the majority asks: "Is it [Pulaski County] different enough? The question, in the end, is one of judgment, as to which reasonable politicians and judges may differ." *Id.*, at 216.

Note what finally "tips the balance" for the majority with respect to Pulaski County: The testimony of two incumbent black legislators expressing their desire to maintain the status quo, and their beliefs that a multi-member district in the county was "more palatable", as well as the minutes of the Board of Apportionment's public hearing in 1981 in which no one testified in favor of creating single-member districts in Pulaski County. *Id.*, at 217.

> We recognize that many political scientists disagree with this view, and that the opinions of two elected officials do not necessarily represent the views of all of their constituents, let alone the views of black citizens in other parts of the County. We note, however, the testimony of Governor White in the present case that no black citizen of Pulaski County *asked for* single-member districts.
>
> After a careful consideration of all the factors, we resolve this close question in favor of the defendants. It would be unfair to fault the Board of Apportionment for *acceding to the expressed wishes of the only two black legislators from Pulaski County who appeared before it.*

*Id.*, at 217. (Emphasis added)

In short, the majority did not analyze the Pulaski County situation in accordance with the language of Section 2 to determine if the plaintiffs made a case thereunder pursuant to the "results" test. The Senate factors only led the majority to the conclusion that the situation in Pulaski County is different, but only in degree, from that of the other areas. It leaves the majority with no more of a standard than Justice Stewart's definition of obscenity—"I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964). *See also Karcher v. Daggett*, 462 U.S. 725, 755, 103 S.Ct. 2653, 2672, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring) (Advocating use of objective criteria for judging constitutionality of gerrymandered districts). Ultimately, the majority decides this "close" issue on the basis of the "preference of the black community in Pulaski County as expressed by two of its elected representatives." Using this approach, what guidance is there to inform the use, or to prevent the abuse, of the exercise of judicial discretion? The law can find no resting place along this slippery slope!

I agree with the majority that the plaintiffs have not established a Section 2 violation with respect to the House or Senate districts in Pulaski County, but not on some theory that we should not "fault" the Board or that Pulaski County "is not quite as bad" as the other challenged areas. Rather, plaintiffs have failed, with respect to the House and Senate districts created in 1981 in Pulaski County, to meet the requirements of Section 2 and have failed to establish the preconditions required by *Thornburg*. It is as simple as that. I completely reject the notion that a Section 2 violation can ultimately turn upon the "preference of the black community," even if that "preference" is determined upon a more solid basis than simply the opinion of two elected representatives.

## VIII. DID PLAINTIFFS ESTABLISH ONE OR MORE SECTION 2 VIOLATIONS?

Herein we will review some of the legal principles discussed earlier in this opinion and attempt to apply those principles to the actual facts of this case. This exercise will, I believe, also reveal the inadequacy of the majority's analysis.

In *Gingles* the Supreme Court set forth what should be seen as a rigorous test for establishing violations of Section 2. To begin with, the Court explained that the "flexible fact-intensive" list of factors in the Senate Report "limits the circumstances under which Section 2 violations may be

proved in three ways." *Id.*, 478 U.S. at 46, 106 S.Ct. at 2764. The first two of these limitations are of particular importance here, and give support to the position that the Voting Rights Act should provide remedial assistance for unintentional governmental wrongs, rather than impose affirmative duties on the state to enhance minority political power.

Thus, the Court in *Gingles* first noted that no electoral device may be considered *per se* violative. Plaintiffs must demonstrate, under the totality of the circumstances, that the devices challenged "result in *unequal access* to the electoral process." *Id.* (emphasis added). Second, the Court in *Gingles* explained that the existence of an allegedly dilutive electoral mechanism and lack of proportional representation alone does not establish a violation.

In the present case, the "electoral mechanism" at issue is the placement of legislative district lines. Plaintiffs claim that the districts have been drawn in a way that results in the dilution of the potential political strength of black voters. "District lines are rarely neutral phenomena." *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973). Gerrymandering cannot be seen as violative of the Act per se—not *unless* plaintiffs demonstrate that the placement of district lines resulted in unequal access to the electoral process. Plaintiffs nevertheless largely rely upon the conjunction of two circumstances that *Gingles* clearly states are insufficient to prove a violation: 1) that district lines were drawn and 2) that the resulting plan did not proportionately reflect the black population in Arkansas in terms of number of possible majority black districts.

Unfortunately, the majority opinion does not specifically identify the effect placement of various district lines had on black voters. *Cf.*, *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); *Rybicki v. State Bd. of Elections, supra*, 574 F.Supp. 1082. (placement of district lines excluded blacks and included whites in disproportionate numbers thereby dem-

onstrating the effect lines had on creation of majority-black districts). There has been no coherent explanation of how the various legislative district boundaries "operate[d] to minimize or cancel out [plaintiffs'] ability to elect their preferred candidate." *Gingles*, 478 U.S. at 48, 106 S.Ct. at 2765.

Aside from these initial limits, *Gingles* also makes clear that minority voters who contend that an electoral structure violates Section 2, must demonstrate "a conjunction" of three preconditions: "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district." *Id.*, at 50, 106 S.Ct. at 2766. Where, as here, plaintiffs allege that the Section 2 violation stems from the gerrymandering of single-member district lines, the Court suggested that a necessary precondition would be a showing that the minority group "that is sufficiently large and compact enough to constitute a single member district has been split between two or more multimember or single-member districts, with the effect of diluting the potential strength of the minority vote." *Id.*, n. 16.

To define geographic compactness, plaintiffs' post-trial brief relies principally upon *Dillard v. Baldwin County Bd. of Education*, 686 F.Supp. 1459 (M.D.Ala.1988), in which the district court stated: "a district is sufficiently geographically compact if it allows for effective representation." *Id.*, at 1466. Of course *Dillard* involved a challenge to an at-large voting system used in a single county. Implicit in the challenge was a commonality of interest among the residents of that county, and particularly its minority residents. That is not so here. Plaintiffs alternative districts join and split communities for which no similar commonality should be assumed. Even *Dillard* recognizes that "a district would not be sufficiently compact if it was so spread out ... or if it was so convoluted that there was no sense of community...." *Id.*

The second precondition is that the minority group show that it is politically cohesive. *Id.* Failure to show political cohe-

siveness would prevent a finding of a violation under Section 2 since it would be impossible to establish that a particular "electoral structure thwarts distinctive minority group interests." *Id.* The separate treatment of demographics and political cohesiveness, and definition of the latter in terms of distinctive group interests, is strong indication that *Gingles* bars the assumption that all blacks vote alike, or can be presumed to constitute cohesive political blocs no matter where they reside or what might be their prior political experience and behavior.

Finally, plaintiffs must demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority's preferred candidate. *Id.* In order to be "legally significant," plaintiffs must show that the white bloc vote "normally will defeat the combined strength of minority support plus white 'crossover' votes." *Id.*, 478 U.S. at 56, 106 S.Ct. at 2769.

The Court also explained that the various factors listed in the Senate Report "are supportive of, but *not essential to,* a minority voter's claim." *Id.*, 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. A corollary then is that evidence relating to these factors cannot alone support a vote dilution claim.

Determining the existence of compactness, political cohesiveness and majority bloc voting is a critical threshold matter that must ultimately be linked to a finding that these preconditions interacted with the challenged electoral mechanism (here, the district lines) in a manner that results in the minority (here assumed to be African–Americans) having less opportunity than others to participate in the political process and to elect candidates of their choice. The majority opinion glosses over these critical elements, and emphasizes instead the Senate factors in finding Section 2 violations.

It appears that this case is the largest, most ambitious, Section 2 redistricting challenge ever filed. The directly affected areas include 16 counties spread out over several hundred miles. It is insufficient for purposes of applying *Gingles* to analyze plaintiffs' claims in the holistic manner adopted by the majority. For instance, the majority found that plaintiffs were a geographically compact group in a portion of Arkansas running roughly down and along the delta region in the east, and including several counties in the southern portion of the state. This is based on the testimony of plaintiff's expert Jerry Wilson and various maps that show existing and alternative districts in relation to areas of concentration of black residents. Plaintiffs' Exhibit 6 through 13. However, as more fully explained below, close examination of this evidence does not always support the finding that the blacks residents included are geographically compact in the very areas that plaintiffs contend majority-black districts could have been formed during the 1981 apportionment.

The generalized approach to plaintiffs' claims also makes it almost impossible to evaluate racial polarization, and political cohesiveness among black voters since in many instances, there is no way to predict how black voters assembled from diverse parts of the state would behave if suddenly placed into a common political unit. Can it be said, as Plaintiffs' Exhibit 6 suggests, that black voters in Pine Bluff and Dumas form a politically cohesive unit? *Cf., Dillard v. Baldwin County Bd. of Education, supra.* What evidence is there that they share distinctive group interests beyond skin color?

There is a question of law that must be faced and resolved before one can determine if plaintiffs succeeded in establishing any Section 2 violation in this case. The question will be fundamental in all redistricting cases. For instance, in this case plaintiffs have made no effort to systematically prove that the defendant Board in 1981 split prior existing groups of politically cohesive black voters. All that they attempted to prove is that the district lines split black voters who, predictably, would constitute a politically cohesive group if they are at sometime in the future placed in one legislative district. It is a matter of prediction, not history. Is that enough to

satisfy the *Thornburg* precondition of "political cohesiveness"? I think not.

However, even though the plaintiffs made no effort to systematically establish this precondition district by district, they put on sufficient evidence from which I have been able to make a finding of political cohesiveness in relation to seven of the House districts. In most cases this evidence is found in the results of "exogenous" elections in which groups of black voters from different legislative districts have voted in the same county elections. I accept such circumstantial evidence of voting behavior as an adequate basis for such findings. Nevertheless the overall weakness of the "election" evidence in this case becomes apparent when it is compared with the evidence used in *Thornburg*. There the plaintiffs used 53 *legislative* primary and general election results over a period of three different election years in the six multi-member districts. When one must rely on exogenous elections, as here, voting behavior becomes more difficult to compare.

The analysis below uses counties as a base by which to analyze plaintiffs' evidence of compactness, political cohesiveness, white majority bloc voting and their relation to the effect of district boundaries. Municipalities are evaluated separately where their populations under the 1980 census were sufficiently concentrated to form one or more separate legislative districts, i.e., separate from the rest of a county, as with Helena/West Helena and Pine Bluff. Where population was sparse, as in the area of House District 38, and plaintiffs' exhibits indicate that it would be necessary to merge voters from several different counties to form a single district, the analysis attempts to synthesize evidence relevant to that general area.

Using counties and populous municipalities as a starting point is sound for two reasons: First, there were relatively few elections for legislative districts in which black candidates faced white opponents, and thus most of plaintiffs' evidence of racially polarized voting comes from "exogenous" county-wide elections. Sec-

ond, the counties form long-standing political subdivisions that often possess their own natural boundaries. They also possess characteristics in terms of economic base and governmental services that distinguish them from, and may in some instances place them in competition with, neighboring counties and their cities. It was this feature that prompted the Board of Apportionment to promulgate as a guideline the belief that counties, wherever possible, should not be split by legislative districts. Plaintiffs point to the Board's failure in some districts to adhere to this guideline as evidence of dilution. It seems only natural then that plaintiffs' evidence be evaluated by the same "ground rules."

### A. *Mississippi and Crittenden Counties.*

Plaintiffs claimed, and the majority found, a violation in existing House District 38, which includes most of Mississippi County and portions of northern Crittenden County. According to 1980 census data, the district had a 32.33 percent black VAP. At the same time, the county had a total population of 59,517, of which 16,164 were black residents. *See* Plaintiffs' Exhibit 37 at p. 17 (hereinafter "Census Table"). House District 24, which includes the entire city of Blytheville, had a black VAP of about 30 percent. Overall, the black population of Blytheville equalled 37.99 percent. This is significant since plaintiffs use portions of the city to establish that a majority-black district could have been formed in this area. However, blacks only constituted 27.1 percent of the total population of Mississippi County at the time of the 1981 apportionment.

In order to establish that blacks in this region were sufficiently numerous to have formed a majority in a single-member district, while leaving undisturbed the legislative district created in the remainder of Crittenden County by the district court in *Smith v. Clinton, supra,* plaintiffs would create a narrow, elongated, two-county district. (See Plaintiff's Exhibit G: Alternative District 8).

Specifically, the plaintiffs suggest that a majority black voter district could have been drawn that would have included portions of Crittenden and Mississippi counties. The district would run essentially north to south, with the Mississippi River as its eastern border. To reach majority black voting strength, the district would split Monroe Township in Mississippi County, solely for the purpose of capturing black voters in Osceola. The proposed district would also apparently split Osceola itself into two separate legislative districts. From there, the district reaches further north, creating a thin isthmus along the river until it reaches the city of Blytheville, where again the district would capture predominately black portions of the city, while excluding the rest. Currently, Blytheville and its surrounding township create single-member H.D. 24. In short, plaintiffs would merge black residents living in three, non-contiguous regions, consisting of portions of municipalities and rural townships in two counties to form a single, majority black district.

This does not support a finding that blacks formed a sufficiently large and geographically compact group here to form a single-member black majority district. *C.f., Dillard, supra,* 686 F.Supp. at 1466. Once the southern portions of Crittenden County are excluded from this inquiry—as the plaintiffs request—the map shows that the black community in the region is not compact, but rather spread out over a large area in several pockets comprised of both cities and rural townships. This is not an area where a contiguous and concentrated area of black residents has been split or fragmented into several districts by the 1981 districting lines thereby diluting their "potential strength." *Thornburg v. Gingles,* 478 U.S. at 50 n. 16, 106 S.Ct. at 2766 n. 16 To the contrary, the creation in 1981 of a district out of the Blytheville area apparently enhanced the political strength of black voters relative to the rest of the county. While black voters do not form a majority in any of these House districts, the evidence does not demonstrate that this is a function of splitting or fracturing an insular group of voters who would have

formed a majority but for the placement of boundaries for House Districts 38, 23 or 24.

Moreover, plaintiffs did not present any evidence of racially polarized voting in Mississippi County, or either of the municipalities that would be "directly" affected by this lawsuit. The existence of such polarization must be accepted in Crittenden County on the basis of the holding in *Smith v. Clinton.* However, to say such polarization exists in the townships and cities north is pure speculation, just as it would be guesswork to say that black residents of Blytheville in Mississippi County share distinctive group interests with black residents of the rural townships of Crittenden County. *C.f., East Jefferson Coalition v. Jefferson Parish, supra,* 691 F.Supp. at 999. Therefore, plaintiffs failed to establish the preconditions of a Section 2 violation in House District 38, or any of the other districts within this region of the state.

### B. *Phillips County.*

Under the 1981 apportionment, parts of Phillips County were divided into three House districts. These were: House District 75, which includes Helena and West Helena and the immediate surrounding townships; House District 73, which includes all but two of the remaining townships in Phillips County, and all of Monroe County to the west; and House District 85, which includes most of Desha County, but also includes the two southernmost townships in Phillips County near the junction of the Arkansas and Mississippi rivers.

### 1.

To begin, plaintiffs did prove political cohesiveness among blacks as reflected in studies of various elections held in the last decade in which black and white candidates opposed each other. In 1986, L.T. Simes, a black candidate ran in the Democratic Primary for the office of Representative from House District 75. His estimated support among black voters ranged from 87.5 percent to 92.5 percent.

This was the only reported instance of a black candidate running for House District

75. However, other election data from county-wide elections also support the conclusion that blacks tend to support common candidates. In eleven county-wide elections held between 1984 and 1988 in which black candidates faced white opponents, estimated black support for black candidates ranged between 80.2 percent to 100 percent of all black voters.

There is also evidence of "legally significant" majority white bloc voting. As noted above, blacks accounted for almost 45 percent of the voting-age population of House District 75. In the only election in that district involving a white and black candidate, white "crossover" vote ranged between an estimate 0 to 6.7 percent. In eleven county-wide elections involving four candidates, white "crossover" was estimated to range between 2.4 percent to 13.8 percent in analyses of homogeneous districts, and between 0.6 to 4.9 using either single or double regression analysis. *See* Plaintiffs' Exhibit 3, Report of Dr. Engstrom (hereinafter "Engstrom Report"), Table 2. Meanwhile, in four city-wide elections in Helena in 1986, white "crossover" was estimated at 3.7 percent in only one race. In the rest, it was estimated that black candidates received no white voter support at all. Plaintiffs' Exhibit 2, Table 3. Thus, it can be concluded that white majority bloc voting existed that enabled white voters to usually defeat candidates preferred by blacks and white "crossover" voters both in and around House District 75 in Phillips County and Monroe counties. In short, the 45 percent black voters were not ordinarily joined by 5 percent or more white "crossover" votes in enough elections to usually defeat the remaining white bloc.

But the inquiry into whether a Section 2 violation has been established cannot end here. A finding of vote dilution in H.D. 75 cannot stand unless plaintiffs have demonstrated that the electoral mechanism at issue in this case, the placement of district boundaries, operated to minimize or cancel out the potential strength of black voters. Thus, in addition to polarized voting, plaintiffs must show that black voters resided in this area in sufficient numbers so that they could have formed a politically cohesive majority in a district but for the placement

of district boundaries. This standard "would only protect racial minority votes from diminution *proximately caused* by the districting plan; it would not assure racial minorities proportional representation." *Thornburg, supra,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17 (citations omitted; emphasis added). Plaintiffs have not shown this to be the case in House District 75.

At the time of the apportionment, Helena and West Helena had total populations of 20,965, of which 10,708, or 51.07 percent, were black residents. *See* Census Table at 19. Consequently, population in these cities was insufficient to reach the ideal house district size of 22,855 persons established by the Board of Apportionment, or the minimum of 21,713 persons.

In short, more people had to be added to the cities in order to form a single member district that would comport with one-person, one vote constitutional requirements. This was achieved by incorporating into House District 75 the rest of Horner, St. Francis and L'Anguilline townships, in which Helena and West Helena are located. This brought the total population of the district to 22,582 persons, of which 11,542 were black residents. It must be noted that extending the district boundaries to include the remainder of the townships actually increased the percentage of blacks in House District 75 to 51.1 percent of the total population. It is true, that the district as created in 1981 only had a 44.59 percent black VAP. Yet again, this was a function of disparities in age in the black and white community, and of sheer numbers of persons living in and around Helena and West Helena. Although the district enabled blacks to form a large and geographically compact community, and a majority of total population, they were not large enough to constitute a voting-age majority as of 1980. What the figures are now, or at the time of the elections analyzed by Dr. Engstrom, is anyone's guess.

However, there is nothing in the record that demonstrates that the placement of the boundaries for House District 75 resulted in the dilution of the potential "political"

strength of black voters. The evidence does not demonstrate the black voters in this region could have formed a majority, and does not show that their numbers were split or fractured in a manner that reduced or cancelled out their existing political strength. Plaintiffs' proposed alternative district for this area supports this conclusion because they could not draw a district that would give blacks a majority in the Helena and West Helena region. Rather, plaintiffs would split the cities and incorporate them into two separate districts comprised of portions of Phillips, Desha, Monroe, Lee and St. Francis counties. *See* Plaintiff's Exhibit 6, Alternative House District 1 and 9.

This proposed district illustrates a fundamental weakness in plaintiffs' case, i.e., their evidence of geographic compactness ignores every other legitimate competing policy concern inherent in redistricting except race. In *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the Supreme Court struck down on equal representation grounds New Jersey's Congressional districting plan even though the plan had deviations of less that one percent. In doing so, the Court eschewed the notion that a districting scheme could be immune from constitutional attack so long as the districts' populations fell within some acceptable numeric range of deviation. At the same time, the Court noted that any number of consistently nondiscriminatory applied policies could justify population variances among districts including a state's desire to "preserv[e] the voting strength of racial minority groups," *id.*, at 742, 103 S.Ct. at 2664, as well as "making districts compact, *respecting municipal boundaries*, preserving the cores of prior districts and avoiding contests between incumbent Representatives." *Id.*, at 740, 103 S.Ct. at 2663 (emphasis added). Plaintiffs would turn race into an overriding concern rather than one of several that a state must balance in an effort to achieve equal representation. Such an approach cannot be sustained in view of both the Supreme Court's and Congress' clear rejection of guarantees of proportional representation. *See* 42 U.S.C. § 1973(b).

Obviously, such districts *could* have been drawn in the 1981 apportionment. But that does not prove that what *was* drawn operated, or had the effect, of diluting black voting strength in the area adjacent to Helena and West Helena. What could have been drawn would have enhanced, even created, a dominant black political base that did not already exist. But to use this as evidence of vote dilution is to apply principles of affirmative action to the Voting Rights Act that would render meaningless the proviso in Section 2 that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population." 42 U.S.C. § 1973(b). Therefore, plaintiffs have failed to demonstrate that Section 2 was violated through the creation of House District 75.

2.

Under the 1981 apportionment most of Phillips County outside the Helena/West Helena area was placed into House District 73, which also includes all of Monroe County, and had a 41.66 percent black VAP. Phillips County was then split a third time through the placement of Tappan and Mooney townships into House District 85, which otherwise is comprised of Desha County. House District 85 had a black VAP of 37.76 percent.

As noted earlier, data from county-wide elections suggest that blacks are politically cohesive, at least in terms of their support for black candidates, and there existed a white majority bloc vote that is able to usually defeat candidates preferred by blacks plus any "crossover" white votes. The evidence of political cohesiveness and racially polarized voting is supplmented by the 1984 Democratic Primary for House District 73, in which blacks in Phillips and Monroe counties supported a black candidate by an estimated 85 percent to 100 percent. In that same election, estimated white "crossover" support ranged between 5.6 percent and 12.5 percent.

Excluding the townships used to create House District 75, the rest of Phillips County had a total population of 12,190 persons

in 1980, of which 6,868, or 56.3 percent were black. *See* Census Table at 19. Obviously, Phillips County had insufficient population alone to form a legislative district, and additional residents needed to be incorporated from surrounding counties. On the other hand, merely combining the remainder of Phillips County and all of Monroe County would have created a district of 26,242 people, or approximately 4,000 over the ideal size. To get back within the acceptable population range, the Board needed to exclude some number of townships either in Phillips or Monroe. The Board chose Phillips, and excluded from House District 73 Tappan and Mooney townships and their 1,489 black residents. With these townships included, the oversized district would have had a 48.0 percent black population. The exclusion of these townships further reduced the percentage of black residents to 47.4 percent.

It would be speculation to say which Monroe County townships might have been excluded from House District 73 instead. One reasonable choice would have been those townships that lay farthest from Phillips County, and a review of the evidence indicates this would have meant excluding virtually all-white townships, and consequently increasing the percentage of blacks in House District 73 to some number above 48 percent.

It should be noted that the exclusion of the Phillips County townships not only represented a third division of the county, it also placed residents in Mooney and Tappan townships in an area that was separated by the Arkansas River from the bulk of House District 85 in Desha County. As a result, some Phillips County residents would have to travel some 90 miles to reach their representative's office.

Given these circumstances, the splitting of black residents in Phillips County into House Districts 73 and 85 can be seen to have operated in a manner that diluted black political strength.

C. *Chicot, Desha and Ashley Counties.*

The strongest evidence of dilution was presented in and around Chicot County.

House District 100 encompasses all of the county, as well as several townships in Ashley and Desha counties. Although blacks constituted a majority in the total population of the district, they only comprised 47.21 percent of the voting-age population. *See* Plaintiff's Exhibit 5, Report of Jerry Wilson, Appendix D (Hereinafter "Wilson Report").

Both the census tables and plaintiffs' maps indicate that a geographically compact area of blacks resided both in Chicot County and in the townships immediately to the west in Ashley County, and that they resided in sufficient numbers to form a single-member district majority.

There was also ample evidence of political cohesiveness and "legally significant" white majority bloc voting. No black candidate ran for office in House District 100. However, in five elections involving all voters from Chicot County, estimated black voter support for black candidates ranged between 59.8 percent to 96.8 percent. In all but one of these races, black support for the black candidates exceeded 72 percent.

At the same time, in these five countywide elections held between 1984 and 1988, it was estimated that there was no white "crossover" at all. Consequently, the white majority bloc vote rose to the level of legal significance since it could, in every election, defeat the candidate preferred by the minority.

No election data was available from Ashley County. However, in Desha County, in the only election involving a black candidate running against a white candidate, estimated black support ranged between 84 percent and 100 percent, with no white crossover whatsoever.

Therefore, the minimal preconditions of geographic compactness, political cohesiveness and white majority bloc voting have been met. The remaining determination is the effect of the placement of district lines. The clear answer is that the boundaries diluted potential black political strength in this region.

Because House District 100 retained its shape from its earlier 1971 apportionment

more than any other existing district, the effect of the boundaries can be determined easily by comparing changes made by the Board of Apportionment in 1981 in relation to the racial composition of the resulting district. *Compare* Plaintiffs' Exhibits 8 and 42.

In 1971, all of Chicot County, as well as Banner, Bayou, Union and Montrose townships in neighboring Ashley County comprised what was then designated House District 79. The 1970 racial composition of that district was not made a part of the record in this case, and the absence of such evidence, both for this district and throughout the state, deprived the court of a valuable tool or benchmark with which to analyze plaintiffs' claims.[21]

However, judicial notice can be taken that according to the 1970 census, House District 79 had a total population of 19,430 people of which 10,473 or 53.9 percent were black.[22] Further, it was the opinion of Judge Henley, then deciding the constitutionality of the district, that "Negroes ought to be able to elect a Representative from District 79...." *Kelly v. Bumpers*, 340 F.Supp. 568, 586 (E.D.Ark.1972), *aff'd*, 413 U.S. 901, 93 S.Ct. 3047, 37 L.Ed.2d 1019 (1973).

By 1980, the population of Chicot County had dropped two percent. Census Table at 6. Coupled with the state's overall increase in population and the corresponding "ideal" district size, it was necessary during the 1981 apportionment to expand the legislative district's boundaries outward. So in 1981, House District 100 was drawn to once again include all of Chicot and the previously mentioned Ashley County townships. Also added from the latter county were Portland, Beech Creek and DeBastrop townships. This expansion alone would have only brought the district's total population to 20,636, but still 1,077 below lowest

acceptable deviation from the ideal district size. *See* Census Table at 4 and 6.

Given the geography in this area, the Board had only two choices for further expansion: it could have expanded north into Desha County, or further west into Ashley County where the district would have picked Wilmot township, the last remaining township on the Ashley/Chicot County border.

Had the Board chosen to add Wilmot to House District 100, it would have brought in an area with a total population of 1,495 people and thereby bring the district within the acceptable range for population. It would have also incorporated into the district a predominately black township and created a legislative district that would have had a 53.7 percent total black population. *Id.* Instead, the district boundaries were expanded into a third county, Desha, where it picked up almost all-white townships, and thereby created legislative district with a 51.98 percent total black population. Wilson Report: Appendix D.

Therefore, the placement of boundaries for House District 100 somewhat diluted the potential political strength of black voters. Dilution is also apparent when comparing the changed racial composition of the old 1971 district with the 1981 district. So it is clear that the manner in which the lines were drawn in 1981 resulted in blacks having less opportunity to elect representatives of their choice than they had before those lines were drawn. Therefore, if I agreed with the majority that plaintiffs need only show that the lines as drawn in 1981 resulted in blacks having less opportunity than others to elect representatives of their choice, I would concur in the majority's judgment that plaintiffs have established a Section 2 violation with respect to House District 100. But since plaintiffs did not prove that the drawing of the lines resulted in blacks having less opportunity

---

**21.** Comparative census data was critical to the factual findings of other courts faced with similar claims of racial gerrymandering. *See e.g., Ketchum v. Byrne, supra,* 740 F.2d 1398, 1401–02; *Major v. Treen,* 574 F.Supp. 325, 328–332 (E.D.La.1983); *Rybicki v. State Bd. of Elections, supra,* 574 F.Supp. 1082, 1089–91.

**22.** These figures are derived from the racial breakdown of population figures in Chicot County and the Ashley County townships incorporated into H.D. 79 in 1971. *See 1970 Census of Population,* Vol. 1, Part 5 at pp. 5–97 and 9–98 (February 1973).

than others to participate in the political process, they have failed to establish their Section 2 claim even with respect to House District 100.

### D. *St. Francis and Lee Counties.*

St. Francis and Lee Counties combined, form a geographic area roughly the shape of a rectangle with the Mississippi River as a jagged eastern border. This rectangle was then split lengthwise in the 1981 apportionment to form two legislative districts. House District 74 encompasses all of Lee County and the southern half of St. Francis County. It had, according to 1980 census figures, a 47.04 black VAP. House District 47 meanwhile included the remaining northern half of Lee County, and included the heavily populated area of Forrest City. This district had a 40.37 percent black VAP.

The issue of geographic compactness is somewhat difficult to determine. In 1980, Lee County had a total population of 15,539 persons, of which 54.8 percent were black. Census Table at 15. Because the county possessed insufficient population to form a district on its own—while St. Francis County, with its 30,858 residents was too big—House District 74 added to Lee County the townships of Wheatley, Goodwin, Prairie, Franks, Black Fish and Garland along the southern border of St. Francis County. In doing so, more white than black residents were added to the district, and this reduced the total black population to 51.9 percent and, as already mentioned, the voting-age population to approximately 47 percent.

Incidentally, the separation of these townships from the rest of St. Francis County had little effect on the overall racial balance of House District 47. Of the county's total population, 14,190 persons, or 45.9 percent were black. The exclusion of the southern townships from House District 47 created a district with a 46.09 percent black total population. *See* Census Table at 21.

Nor is it clear that dividing these two counties vertically rather than horizontally would have achieved a majority-black district in either. Plaintiffs do not propose this. Rather, as mentioned earlier, plaintiffs' alternative District 1 would split Forrest City in St. Francis County, pick up additional, predominately black townships in western Lee County and split the city of Marianna, then swing southeast into Phillips County where it would end by splitting West Helena from Helena. *See* Plaintiff's Exhibit 6. Suffice to say if blacks formed a geographically compact and sufficiently large community to constitute a majority black district in either Lee or St. Francis counties or some combination thereof, plaintiffs have not shown it—at least not without engaging in their own form of extreme gerrymandering.

Evidence of political cohesiveness and white bloc voting was also incomplete. In the past decade, no black candidate ever ran against a white opponent in either legislative district. County-wide election data for races with opposing black and white candidates was available for Lee County, but not St. Francis County.

According to the data available, in seven county-wide elections involving four different black candidates, the estimated support from black voters in Lee County ranged between 47 percent to 90.4 percent. In all but one of these races, estimated black support for black candidate was 60 percent or higher.

Meanwhile, the estimated white "crossover" vote ranged from 0 percent to a high of 21.6 percent. Of the seven county-wide elections analyzed, the estimated white "crossover" exceeded 8 percent in all but two races in Lee County.

These figures appear to suggest that blacks tended to vote for black candidates—though not in as unified numbers as in other counties previously discussed. The data also suggests racially polarized voting, yet some degree of white "crossover" that theoretically should have been able to combine with House District 74's 47 percent black VAP to defeat white bloc voting. As for St. Francis County, plaintiffs appear to suggest it is safe to assume the experience of black voters there would be the same. But they have not proven it.

*C.F. Thornburg v. Gingles, supra,* 478 U.S. at 46, 106 S.Ct. at 2764.

### E. *Jefferson County and Pine Bluff.*

All of Jefferson County is divided among four legislative districts: House Districts 80, 81, 82 and 83. Each of these districts converge on and incorporate portions of the City of Pine Bluff, which lies roughly at the center of the county in Vaugine and portions of Niven townships. House District 80 includes the northeast portion of the city and several predominately black sections of Vaugine Township. From there the district spreads out across most of Jefferson County, wrapping itself around Pine Bluff into a rough, inverted "C"-shaped district. With only a few exceptions, most of the townships incorporated by House District 80 are predominately white. Thus, black VAP overall is only 37 percent.

To the west, House District 81 includes several predominately white townships, as well as a small, again predominately white section of the city. The district has a 6 percent black voting-age population. The remaining portions of Pine Bluff are split between districts 82 and 83, which have black VAP's of 67 percent and 39 percent respectively.

A black representative has been elected from House Districts 82, and while plaintiff make no charge of "packing" or otherwise challenge that district's legality, the evidence submitted to show geographic compactness indicates that additional majority black districts could have been drawn in the area only by making substantial changes in the boundaries of House District 82 that would reduce black VAP there to 62.69 percent. *See* Exhibits 5, Appendix B and 10.

Aside from the anecdotal evidence offered, data from elections in that area demonstrates that blacks are politically cohesive. This data also demonstrates, with the exception of House District 82, that whites in Jefferson County tend to vote as a bloc in a manner that enables them to usually defeat candidates preferred by black and white "crossover" voters. In six county-wide elections involving three black candi-dates who faced white opponents between 1986 and 1988, black support for black candidates was estimated to range between 84.2 percent and 99.9 percent. In four of these six elections, black support for these candidates was greater than 90 percent.

White support for these same candidates ranged from an estimated low of 2.2 percent in one election (using single regression analysis) to a high of 20.1 percent (under double regression analysis). In five of six elections, the candidate preferred by black voters got more than 5 percent of the white vote. However, except in House District 82, the white bloc vote would have been able to defeat the combined minority and white "crossover" vote in every election. Therefore, it must be said that majority white bloc voting in this area rises to the level of legal significance. *See Gingles,* 478 U.S. at 56–57, 106 S.Ct. at 2769–70.

The evidence also established that blacks were sufficiently large and geographically compact in the county to form majorities in single member districts. According to the 1980 census, Jefferson County black residents constituted 40.5 percent of the total population. Census Table at 19. Meanwhile, 49.05 percent of the population of Pine Bluff were black residents. Given these figures it would not be unreasonable to assume that black and white residents would split districts evenly. However, as noted above, out of four legislative districts within the county, only one had a majority black population. This was the result of creating a district, House District 82, that had a black population much higher than either Pine Bluff or the surrounding county, and reducing the percentage of black voters in the other three districts to pluralities of 40 percent or less.

Without passing on plaintiffs' alternative districts in this region (which would create two majority black districts in Pine Bluff and then include every other predominately black township in the county with portions of Lincoln and Desha counties to form a third majority black district), the evidence as restricted to Jefferson County alone, clearly shows that lines as drawn resulted black voters being "packed" into a single

district thereby reducing their potential strength in the rest of the county. However, as stated above, plaintiffs have not claimed that House District 82 violated Section 2 by unnecessarily "packing" blacks into that district. This is perhaps because of the oft-repeated argument that a "safe" district would require 65 percent black VAP. Nevertheless, the proof required for a Section 2 violation is there. Furthermore, plaintiffs' proposed new districts for the area in effect reduce the percentage of black VAP in District 82. So what should be the Court's response?

Some district courts appear to answer: the result is whatever the plaintiffs want. *Gingles v. Edmisten, supra,* 590 F.Supp. at 356. This is irrational and dangerous. This should not be an acceptable legal standard for Section 2 cases. Is House District 82, with its 67 percent black VAP, an example of "packing" in violation of Section 2, or is it the only district created by the Board of Apportionment that had an "effective" black majority?

Plaintiffs would appear to want it both ways. I would have given plaintiffs the opportunity to amend their pleadings to specifically contend that the packing of House District 82 resulted in a Section 2 violation. If they did so amend, I would find the violation on the basis of the evidence discussed above. If they chose not to so amend, the the Section 2 challenge to House District 82 would, I accept, go out of the case. The result is that plaintiffs would control the decision at least in the absence of black intervenors who might seek to tender the issue. Even in public-interest lawsuits such as this, there are limits upon the Court's authority to *sua sponte,* take up and deal with issues it sees in the case but which the parties choose to ignore.

### F. *Lincoln and Cleveland Counties.*

Directly south of Jefferson County lies House District 91, which includes most of Lincoln and Cleveland counties. House District 91 is not among those that the majority found would be "directly" affected by their findings on plaintiffs' Section 2 claim. However, plaintiffs' proposed districts indicate that these counties would be affected by a remedial plan, since predominately black townships in Lincoln County would have to be combined with portions of Desha and Phillips counties in order to demonstrate that blacks reside in sufficient numbers in a geographically compact area to form a single-member black majority district. Considering Lincoln and Cleveland counties on their own, however, and examining the effect the placement of district boundaries in this area had on black voters, demonstrates no Section 2 violation here.

Under the 1981 apportionment, House District 91 had a voting-age black population of 30.64 percent and a total black population of 33.27 percent. Neither Lincoln, nor Cleveland counties, however, were sufficiently large to constitute a single district on their own, and thus needed to be combined with other counties to form a legislative district. One option in Lincoln County would have been to include portions of Jefferson County in the north to form a single district. This had been the arrangement under the 1971 apportionment although not in the manner suggested by plaintiffs now. *See* Plaintiffs' Exhibit 42, House District 58.

Another option, and the one taken by the Board of Apportionment, was to join most of Lincoln, with the exception of predominately white townships in the south, with virtually all of Cleveland County, which lies immediately to the west. According to 1980 census data, blacks constituted 35.8 percent of Lincoln's total population, and 15.7 percent in Cleveland County. As noted above blacks formed roughly one-third of the population in the resulting district. Therefore, it cannot be said that the joinder of these two counties significantly reduced the relative strength of black voters in Lincoln. Indeed, that joinder may have enhanced the possibility of black voters in Cleveland County electing a black representative.

To demonstrate that blacks could have formed a majority district in this area, plaintiffs' proposed District 13 would cut off black townships in Cleveland County,

but then incorporate virtually every predominately black townships in a line running from northern Jefferson County, southeast through portions of Lincoln County and ending just past the town of Dumas in Desha County. The alternative district would have a black VAP of 52.07 percent, and does incorporate contiguous predominately black townships across this region of the state.

Again, however, demonstrating what could have been drawn is not a demonstration of vote dilution—not without a showing of political cohesiveness and racially polarized voting. As noted above, there was ample evidence that black voters in Jefferson County tended to support the same candidate, and that with the exception of House District 82, they were unable to draw sufficient white "crossover" votes to usually defeat the candidate preferred by the white majority bloc. In Desha County, data from one election suggested a level of racially polarized voting. However, no election data was presented from either Lincoln or Cleveland counties. Again, plaintiffs would appear to have the court rely upon the presumption that blacks throughout this three-county area form a politically cohesive group with distinctive interests. But that has not been demonstrated, at least with respect to Lincoln and Cleveland counties. And thus, the preconditions necessary for finding a Section 2 violation have not been met here.

## G. *Ouachita, Nevada and Columbia Counties.*

The last geographic area in which plaintiffs' claim the 1981 apportionment diluted black political strength encompasses House District 88, which includes portions of Ouachita County, all of Nevada County and a single township in Columbia County. Blacks do not form a majority of the population in any of these counties. Their numbers range between 30.6 percent in Nevada County, 34.6 percent in Columbia County and 36.0 percent in Ouachita County. House District 88, as created by the Board of Apportionment in 1981, had a total black population that was higher than any of the

three counties (37.95 percent) and a black VAP of 30.75 percent.

To demonstrate that black voters could have constituted a majority black district in this area, plaintiffs propose that a district could have been drawn that would incorporate most of Ouachita County, three predominately black townships that run along the eastern edge of Nevada County, and then portions of townships in Columbia County including the town of Magnolia. This district would have a black VAP of 52.07 percent. *See* Plaintiffs' Exhibit 6, and Wilson Report, Appendix B. This district would essentially encompass what is presently a contiguous area of predominately black townships that lie at the junction of the three counties.

Assuming this evidence adequately demonstrates geographic compactness, plaintiffs' claims of vote dilution in this area should nevertheless be denied because the evidence demonstrated, at best, political cohesiveness among blacks in one county, but not the others, and further did not demonstrate that the white majority in these counties vote sufficiently as a bloc to enable it "usually to defeat the minority's preferred candidate." *Thornburg v. Gingles,* 478 U.S. at 51, 106 S.Ct. at 2767.

There have been no elections in Columbia County in which a black candidate faced a white opponent, and thus no statistics from which racial polarization can be inferred. However, in Nevada and Ouachita counties, county-wide elections where blacks faced whites showed both evidence of racial bloc voting, and at the same time, the ability of a black candidate to gain white support. For example, in the 1988 Democratic primary race for Ouachita County sheriff, it was estimated that the black candidate, received between 7.8 to 14.5 percent of the non-white vote, while at the same time receiving approximately 86 percent of the black vote. (In an earlier election for the same post in 1984, the same candidate received approximately the same percentage of support). And in a 1982 race for county coroner, the black candidate received only between 7 and 13 percent of the white vote, while receiving overwhelming support from

black voters. On the other hand, in 1988, Municipal Judge Keaton, running as an incumbent, received between 42 and 49.5 percent of the white vote, and at the same time was supported by an estimated 88.3 to 90.7 percent of black voters.

More relevant to the present challenge is the 1984 Democratic primary election for House District 88. In that race, Earl Foster, who is black, ran against Richard Arrington, a white candidate. While Mr. Foster received an estimated 57.4 percent of the black vote in his native Nevada County, only 15.6 percent of black voters in neighboring Ouachita County supported him against his white opponent. In fact, Foster received a higher percentage of the vote from non-black voters (22.3 percent) residing in Ouachita County. See Plaintiff's Exhibit 3, Table 1 p. 3. Plaintiff's expert, Dr. Engstrom, nonetheless opined that these figures evidence racial polarization because it showed that in neither county was Mr. Foster the preferred candidate among non-black voters. However, a more accurate description is that the figures showed Mr. Foster was not preferred among any voters—regardless of their race—and the inclusion of greater numbers of blacks within that district would not have likely changed the election result with respect to Mr. Foster's candidacy. Therefore, plaintiffs' have not established the preconditions of political cohesiveness or significant racially polarized voting, and their vote dilution claim in this area should have been denied.

### H. The Senate Districts.

Thus far, this Court has attempted to give to plaintiffs' House districting claims the "fact-intensive" analysis that I believe Gingles requires in order properly to apply Section 2 of the Voting Rights Act. The plaintiffs chose to take a more generalized approach in litigating this case. And unfortunately, the defendants offered little or no rebuttal to those generalizations, thus failing to help bring into focus the critical isues before the Court. While this generalized approach made it difficult to evaluate plaintiffs' House district claims, the approach rendered it impossible for this judge to rationally find support for claims of dilution in the drawing of the Senate district lines. Therefore, I dissent from the majority's finding of Section 2 violations in the drawing of district lines for Senate Districts 27, 28, 19 and 30.

There are only 35 Senate seats. To comport with one-person, one-vote requirements, the Board of Apportionment determined in 1981 that Senate districts could have a minimum total population of 62,035 and a maximum of 68,565 persons. With the exception of areas of dense population, such as Pulaski and Jefferson counties, sufficient population could only be captured into a single district by merging two or more counties or portions of counties. As a result, the geographic areas covered by each Senate district are much larger than House districts. This circumstance obviously results in a dilution of the ability of any one discreet group to constitute a dominant political force within any given Senate district. This also necessarily affects the ability of plaintiffs to establish the precondition that blacks resided in sufficient numbers, and in geographically compact areas, to constitute majorities in any given Senate district.

As already noted, blacks constituted 16 percent of the total population of Arkansas under the 1980 census. The sixteen counties directly affected by this lawsuit represent the areas of highest concentration of black residents. However, even in this region, blacks only constitute a majority of the total population in three counties.[23] Only two of these, Phillips and Lee, are contiguous and both were incorporated into a single Senate district (i.e., Senate District 30) in the 1981 apportionment.

23. According to the 1980 census, the three counties in which blacks formed a majority of the total population were: Chicot (52.9%), Lee County (54.8%) and Phillips County (52.9%). See Plaintiffs' Exhibit 14. Of the remaining counties affected by this lawsuit, black population ranged from a high of 46% of the total population in St. Francis County to a low of 23.9% in Pulaski County. Id.

Because Phillips and Lee counties combined still did not contain sufficient population to reach even the minimum requirement for a Senate district, the Board added to Senate District 30 the whole of Monroe County, where blacks only constituted 40.8 percent of the total population as of 1980. This brought the black VAP in the resulting district to 43 percent. Plaintiffs suggest that the Board could have excluded Monroe County from Senate District 30, and instead incorporated predominately black portions in St. Francis and Crittenden counties thereby creating a majority black Senate district.

In Jefferson, Lincoln and Desha counties, the census tables and maps indicate that there exists a contiguous line of predominately black townships that contained sufficient population to form another Senate district. Had the Board of Apportionment simply drawn a line around these townships in 1981 (as plaintiffs now suggest) it would have created a second, majority black Senate district.

Clearly then, there existed geographically compact and contiguous regions of predominately black residents that could have formed Senate districts. However, plaintiffs' evidence of the remaining *Gingles* preconditions was deficient and incomplete. As with all of plaintiffs' evidence, there has been little or no attempt to establish the political cohesiveness of groups of black voters who reside in different areas that have not heretofore functioned as a single political unit. The sole evidence on this point has been the estimates of racially polarized voting in several legislative district, and county-wide, exogenous elections. Because House districts are geographically smaller, it was possible in certain cases to find sufficient overlap in these elections from which political cohesiveness could reasonably be inferred. This was not the case relative to the proposed Senate districts. Moreover, plaintiffs failed to offer any data on racial polarization in elections in St. Francis County, portions of which plaintiffs suggest could have formed a district in the region presently comprised by Senate Districts 30 and 19, or in Lincoln County, which would be merged with portions of

Jefferson and Desha counties to form another majority black Senate district. Even under a totality of circumstances analysis, plaintiffs must still shoulder the burden of proving their claims of vote dilution. While it may be true that plaintiffs could have carried their burden of establishing the prerequisites of political cohesiveness and "legally significant" majority white bloc voting in the proposed Senate districts, they simply failed to do so.

I. *Summary.*

Without first establishing the prerequisites of geographic compactness and size, political cohesiveness and majority bloc voting, plaintiffs cannot prevail under *Gingles* on a Section 2 violation. The so called Senate Factors may be supportive of such claims, but cannot alone be used to establish the violation. If I were to assume that plaintiffs are correct in their contentions (1) that plaintiffs need not show that black voters in the districts drawn in 1981 were harmed by the manner in which those district lines were drawn (i.e., that their political power was lessened thereby) and (2) that they need only show that the line drawing resulted in blacks having less opportunity than others to elect candidates of their choice, then applying the "fact-intensive" examination that *Gingles* requires would lead me to the conclusion that a demonstration of vote dilution was established in Phillips County, exclusive of the Helena/West Helena area; in Chicot County and the immediately surrounding townships in Desha and Ashley counties; and in Phillips County. To put it in a manner more in line with the majority's finding, plaintiffs would have established a violation in the areas directly affecting Districts 73, 80, 81, 83, 85 and 100. Clearly plaintiffs' strongest case would be House District 100. In all other areas, (i.e., House Districts 38, 47, 74, 75 and 88; Senate districts 27, 28, 19 and 30), plaintiffs' failure to adequately establish geographic compactness, political cohesiveness or majority bloc voting would bar their claim that the electoral mechanism at issue here, namely the placement of district lines in

1981, resulted in violations of Section 2. House district 82 with a black VAP of 67 percent would appear to have the makings of a "packing" claim, but no such claim is being pursued by the named plaintiffs.

## IX. CONCLUSION.

The courts have run amuck. They have ignored the clear language of Section 2 opting instead to search for some mandate in perceived legislative intent [24], improperly converting Section 2 into a mandate for proportional representation—directly contrary to congressional intent. Apparently, there is no one willing to say, "No, stop!" or even, "At least, think before you proceed down this path." Ms. Thernstrom identifies the problem and explains the reason:

> But the unfinished business of the reapportionment cases remains unfinished; the courts, Congress, attorneys, and scholars are still fumbling to define the vote at "full value without dilution or discount."
>
> The question is unresolved, but the record is now cluttered with unsatisfactory, often inconsistent, judicial and administrative decisions, and, from Congress and the press, careless rhetoric. *In theory, no group is entitled by law to proportional representation on a legislative body.* Yet both lower courts and the Department of Justice—encouraged by mixed signals from the Supreme Court—rest decisions involving minority voting rights on that *unacknowledged standard.* A maximum number of safe minority districts—or close to it—has become the rule in an electoral landscape from which at-large voting is being systematically cleared.

Thernstrom at 232. (Emphasis added)

Once judicial discretion is relieved of the obligation to follow the language of Section 2, political philosophies and ordinary politics can easily take over. The perceived interest of Democrats and Republicans may ironically coincide. In recent years, blacks have been considered the most loyal supporters of the Democratic Party. So the theory of linkage cannot be ignored. Although it would be unlawful and, indeed, unconstitutional to gerrymander a legislative district for the purpose of guaranteeing a "safe" Democrat or Republican legislative district, nevertheless, if one guarantees a "safe black" legislative district, it can be said on the basis of current realities that one thereby guarantees a "safe Democratic" district. But Republicans surprisingly may not view this result with alarm. As stated by Ms. Thernstrom:

> Republicans have an additional reason for overlooking racial gerrymandering that benefits black candidates: what is good for black candidates is often good for Republicans. As blacks are drained from white districts, the latter become fertile ground for conservative candidates. In Jefferson County, Alabama, an out-of-court settlement in 1985 replaced an at-large system—under which only whites had been elected—with five single-member districts. Two safe black districts were created, leaving three that were almost completely white, and the Republicans benefited from the change. Unless unopposed, Democrats could not win in districts that contained few blacks, and in 1986 two Democratic incumbents lost.
>
> The Jefferson County story was not unique. As a consequence of a compromise reached by South Carolina and the Department of Justice (joined by the NAACP), the state increased the proportion of black voters in two senatorial districts. In the 1984 election, in four districts from which blacks had been drained, conservative Republicans replaced incumbent liberal Democrats. In *Gingles,* the North Carolina case, state Republican leaders openly acknowledged the "happy coincidence" between the interests of blacks and Republicans. Indeed, they had much to celebrate. Fol-

---

**24.** "Judges interpret laws rather than reconstruct legislators' intentions. Where the language of those laws is clear, we are not free to replace it with an unenacted legislative intent." *INS v. Cardoza Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1224, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring.)

lowing the district court decision, the North Carolina general assembly created thirty-one single-member districts out of eight that had been multimember. In 1984 the new districting helped Republicans double their share of state legislative seats. Ironically, it was the Democrats—usually quick to charge the Republicans with lax civil rights administration—who were unhappy. Safe black districts, they said, isolate black voters and deprive liberal white Democrats of crucial black support.

Thernstrom at 234.

With no one saying "No," we are heading toward a political structure that can only be described as "separate but equal." And experience in other areas tells us how long we can expect "separate" to remain "equal." Again note the comments of Ms. Thernstrom:

> [Section 2] promises "political processes ... equally open to participation" without regard to race, color, or language minority status. The breadth of the promise is actually somewhat misleading. Income and educational disparities alone may tip the balance of power in electoral contests to the side of whites. The effort to compensate for every potential source of inequality, however, can only lead to a covert system of reserved seats such as those India provides for its "scheduled castes." Congress settled, it might be said, for imperfect equality, lest inequality in a different form result.

\*       \*       \*       \*       \*       \*

It might be said that blacks in *every* jurisdiction benefit from having their own in office. However, that is an argument not for federal intervention but for black political organization. "The extension of trust or 'friendship' beyond the family and of citizenship beyond race, ethnicity, and religion, is a significant political achievement," Michael Walzer has written. "I think," he adds, "we will want ... to limit the ways in which group membership counts as a qualification for office, much as we limit the ways in which blood relationship counts, and for similar reasons." In amending sec-

tion 2, Congress unequivocally and wisely rejected the notion of group entitlement to even one legislative seat.

\*       \*       \*       \*       \*       \*

I have argued that the Senate report and the testimony of Armand Derfner, a key civil rights witness at the 1982 hearings, properly focused the section 2 inquiry. Nevertheless, an implied trust in the political process left substantially to its own devices is not shared by most spokesmen for the civil rights organizations. They see America as too racially divided to sustain a political life that transcends color. They believe that minority representation means minority officeholding, that whites cannot represent blacks, and that blacks elected with white support have questionable credentials. In "Hands That Picked Cotton," a defeated black candidate says of his victorious black opponent: "He got all the white votes ... Doc is not classified as black to me. You black when black folks elect you. White folks don't vote for black folks."

This is too bleak a picture, too hard a line, and it confuses the issues. The "two societies" argument rests on the fact of severe and continuing economic and other problems in the black community to which whites appear largely indifferent. But the appalling level of black teenage pregnancy is not an argument for creating a maximum number of 65 percent black districts. Racially mixed dinner parties may still be rare, but a mix of blacks, browns, and whites in politics is not. "To start and stop analyses on the assumption that race is all that matters," Harold Stanley has written, "distorts rather than delivers an understanding of southern politics." The same can be said about northern politics. Not all whites are racists (whether in Boston or in Selma, Alabama), and whites vote for whites for reasons other than skin color. Personalities and issues divide the black community as well as the white. Most blacks who

vote for whites are neither intimidated nor misguided.

\*    \*    ¦    \*    \*    \*

If a community of citizens is an unattainable ideal, and if blacks and Hispanics are represented only by one of their own, then aggressive federal action to restructure methods of voting to promote minority officeholding is appropriate. But if the logic of politics works for inclusion (once basic enfranchisement has been assured), then a lighter touch, a more hesitant intervention, is possible.

\*    \*    \*    \*    \*    \*

Perhaps most important [cost attached to maximizing minority officeholding] is the danger that categorizing individuals for political purposes along lines of race and sanctioning group membership as a qualification for office may inhibit political integration. As James Blumstein argued at the 1982 Senate hearings, such categorization amounts to a racial "piece-of-the-action approach," perhaps freezing rather than thawing the previous system of racial politics. The heightened sense of group membership works against that of common citizenship. And as Donald Horowitz pointed out at those same hearings, ethnic boundaries, by diminishing the sense of common citizenship, may "ultimately smother democratic choice and threaten democratic institutions."

\*    \*    \*    \*    \*    \*

The pressure for such interracial, inter-ethnic coalitions lessens with the existence of single-member districts drawn to maximize minority officeholding. Political necessity brings groups together. The majority-white county, city, or district in which whites vote as a solid bloc against any minority candidate is now unusual. Especially in districts or localities with a substantial minority population, divisions among white voters send white candidates scurrying for those important black votes. The process not only enhances political integration but also may serve to heighten minority electoral influence. "For thirty years, the minority vote was the deciding vote in the [at-large] Anniston [Alabama] elections," a black former city councilman noted. "Now it has gerrymandered itself into a corner where it can't wield any power at all," he continued. In city-wide elections, or in cities in which no districts are safe for either blacks or whites, blacks are often the swing vote in every election contest. A ward plan may sacrifice influence for guaranteed seats.

Candidates who have joined hands in a victorious biracial coalition will tend to stick together on a governing body, since the next election is never far off. But when whites on a city council or other legislative body owe nothing to black support, blacks in the minority may find themselves consistently outvoted and thus isolated. "I am bitterly opposed to any effort to resegregate me ...," a black judge in Norfolk, Virginia, testified at a voting rights trial. "How does it help the black community to limit itself to two predominantly black wards and be of no consequence in the remainder of the community? Political power is not merely symbolic."

To emphasize the dark side of current affirmative action policy is too pessimistic a note on which to conclude. As President Lyndon Johnson stated in 1965, the Voting Rights Act flowed from a "clear and simple wrong." At that time no one imagined that the statute would so quickly and effectively right that wrong. Eighteen years later, giving a sermon in Boston, Andrew Young recalled his fear when driving through Georgia in the early 1960s. "It was the worst place in the world," he said. "If someone had told me then that I would be a congressman in Georgia, an ambassador to the United Nations, and a mayor of Atlanta, what I would have replied cannot be said in a church." Particularly in the South, the Voting Rights Act has radically altered politics. "Southern politics today is like the sprawling shopping mall that rises on a former tobacco field," one observer has noted. "The old lay of the land is still there, but the transformation has left it barely recognizable."

Thernstrom at 237–44.

To which I say, "Amen!" How will our democracy express itself? Will it be

through one political society or two (or three, or more) separate political societies? Which is the dream?

## ADDENDUM

## THE EIGHTH CIRCUIT REVERSAL IN WHITFIELD: SAME PROBLEM; SAME RESULT

By a vote of two to one, the Eighth Circuit Court of Appeals reversed this Court's holding that the plaintiffs had failed to show that the Arkansas primary runoff laws resulted in a violation of Section 2 of the Voting Rights Act.[25] That decision was filed on December 7, 1989. I am informed that a petition for an *en banc* hearing has been filed and is presently pending. I, therefore, do not accept the two-to-one panel's opinion as the final decision of the Eighth Circuit on the Section 2 issues and conclude that it would not be inappropriate to discuss the panel's decision in connection with the issues raised in this case.

*Inter alia,* the district court in *Whitfield* had held:

[A]s a matter of law, that the undisputed population figures here are not such as will permit the plaintiffs to challenge the primary runoff law of the state of Arkansas as a violation of Section 2 of the 1965 Voting Rights Act, as amended.

*Whitfield, supra,* 686 F.Supp. at 1381.

This ruling was based upon "the circumstances that the voting age populations of blacks and whites in Phillips County are equal for practical purposes." The district court rejected the idea that where black voting populations equal or exceed white voting populations, blacks should nevertheless be considered a "minority because of the evidence that they have not participated in the past in the political process of the county in as large a proportion as whites." The majority of the Eighth Circuit panel disagreed with the district court's analysis. It states:

Section 2 is not restricted to numerical minorities but is violated whenever the voting strength of a traditionally disadvantaged racial group is diluted. "[H]istorically disadvantaged minorities require more than a simply majority in a voting district in order to have ... a practical opportunity to elect candidates of their choice." *Smith v. Clinton,* 687 F.Supp. 1361, 1362, (E.D. Ark.), *aff'd mem.* [—— U.S. ——], 109 S.Ct. 548 [102 L.Ed.2d 576] (1988). We conclude, as a matter of law, that a numerical analysis of the voting age population in a particular geographic area does not automatically preclude application of section 2 to a challenged voting practice used in that area.

*Whitfield v. The Democratic Party of the State of Arkansas,* 890 F.2d 1423, 1428, (8th Cir.1989).

The panel does not stop to explain how a majority vote requirement can possibly harm a political majority. The quoted language makes it appear that a majority of the Eighth Circuit panel believes that the majority vote requirement can be challenged by blacks regardless of how large their voting age population might be vis-a-vis the white VAP. But the, I suggest, fuzzy nature of the analysis becomes more apparent as the panel further explains its position:

[A]t every election studied by Whitfield's expert, blacks turned out at a lower rate than whites. Thus, although theoretically a black candidate may be able to muster a majority of the votes in Phillips County, the practical reality is that there simply are not enough blacks voting in each election to allow a victory for a black candidate.

At 1427.

In effect, the Eighth Circuit panel is saying that, even if the blacks have a voting age majority, and could "theoretically ... muster a majority of the votes in Phillips County," the black candidate cannot win because not enough black voters "turn out"

---

**25.** The panel unanimously affirmed the district court's holding that the plaintiffs had not established a *constitutional* violation by virtue of their failure to establish that the majority vote, primary run-off laws had been enacted or maintained with discriminatory legislative intent.

to vote. There is no effort to show that blacks do not have the "opportunity" to participate and to vote; it is simply stated that they turn out to vote at a lower rate than whites. This is simply a "success" test.

Finally, the panel majority in the Eighth Circuit discusses its own reasons for finding and concluding that the plaintiff in *Whitfield* established a violation of the Section 2 results test. And what do they rely on? The answer is: the typical factors in the Senate report.

After enumerating the Senate "typical factors," the Eighth Circuit panel majority goes on to state:

> The district court reviewed the evidence presented by Whitfield as it related to the factors set forth in the Senate Report. For five of the seven factors, the court made factual findings which favored the conclusion that section 2 had been violated in Phillips County.
>
> \* \* \* \* \* \*
>
> Contrary to the district court's opinion, we conclude that the factors set forth by the Senate Report are to be used primarily as proof of a section 2 violation under the results test. *See id.* at 28, 1982 U.S.Cong. & Admin. News at 206.

*Id.* at 1430–31.

While relying upon the lower court's findings concerning the senate factors, the majority of the Eighth Circuit panel did not deal with the lower court's conclusion that such findings would not, in any way, prove Section 2 violations. I strongly disagree that my factual findings on five of the seven factors "favored the conclusion that Section 2 had been violated in Phillips County." The lower court in *Whitfield* stated:

> Although the Court is finding that blacks still bear the effects of discrimination in such areas as education, employment, and health, nevertheless, the Court also finds that those effects should not hinder their ability to participate effectively and equally in the political process. The Court also notes that typical factor # 5 refers to the "ability to participate" rather than "opportunity" to participate as stated in the statute. The statutory language, not being ambiguous, controls. The effects of discrimination referred to do not, in any legally significant way, hinder the "opportunity" or, indeed, the ability of blacks to participate effectively in the political process.

*Whitfield, supra,* at 1384.

I submit that the majority on the Eighth Circuit panel accepts uncritically the notion that proof of the senate factors automatically establishes a violation of Section 2, even though the standard, practice, or procedure challenged does not result in blacks having less opportunity than whites to participate in the political process or to elect candidates of their choice. The comments made elsewhere herein about the senate factors need not again be repeated here.

The district court in *Whitfield* held that the plaintiff had failed to prove a causal connection between the runoff requirement and the lack of minority elective success. The majority on the panel of the Eighth Circuit disagreed, stating "during the past four years, but for the runoff elections, four black candidates would have been the Democratic party's nominee." It is my view that that conclusion is highly conjectural, overly simplistic, and entirely speculative. As stated by the district court in *Whitfield:*

> There is nothing in the evidence which supports the contention that the plaintiffs here would have been the nominees of the Democratic Party in the general election had they run in a single, plurality-win primary. Had there been a single primary, plurality-win law in effect, and this was known to all before the fact, one can only speculate as to what would have happened.

*Whitfield, supra,* at 1378.

When there is no runoff provision, the political dynamics are entirely different. As further explained by the district court in *Whitfield:*

> It goes without saying that runoffs are of no importance if only two candidates are in the race. Putting aside the remote possibility of a tie vote, in that situation,

the winner must gain majority support. So a plurality election system, where racial voting and racial polarization exist, will result in attempts to limit the number of candidates on one's own side and, at the same time, to attempt to increase the number of candidates on the opposition side.

How thin a reed are plaintiffs relying on! Rationality is not involved. Only happenstance. The idea is: Maybe the black community can agree on one candidate and somehow prevent other black candidates from filing while the white community does not respond in kind and therefore ends up with two or more white candidates in the race. This is not a political theory or philosophy; it is gamesmanship, political Russian roulette; and it is based solely on race. Note Professor Stanley's comments on the studies of Bradley Canon,

> Ending the runoff accomplishes little, if political forces then tend to restrict contests to two candidates. Experience with single primary and runoff systems in the South and the Border South indicates that runoffs encourage multiple candidacies in the first primary, but that single primary systems work to limit the number of candidacies to two. This difference has political, rather than racial, roots—although racial considerations can reinforce the tendencies. Bradley Canon examined gubernatorial primaries, runoffs, and nominations in 16 southern and border-south states between 1932 and 1977: He found that, in the 10 states with runoffs, the top two candidates averaged 67 percent of the first primary vote; but that, in 6 states with single primaries, the top two candidates averaged 93 percent of the vote. In a runoff system, several candidates can enter the first primary and strive to qualify for the runoff; should they fail in that quest, they can productively bargain with the first- or second-place finisher to deliver support in the runoff. Under a single primary system, such bargaining takes place before the primary, as interested parties seek to line up behind a winner. The single primary system's tendency to limit contests to two serious candidates—in conjunction with the pressures provided by racial polarization—make it likely that a black candidate for the nomination would face a single white candidate. This matchup would produce defeat for the black candidate in election districts that are not winnable by a black in a runoff.

*Whitfield, supra,* at 1378–79.

So, it might be correct to state that, had there been no runoff primary *election,* the four black candidates (having led in the preferential primary) would have been the Democratic Party nominees. It is not correct to say that, had there been no primary-runoff *law,* four black candidates would have been the Democratic Party nominee.

Next, the Eighth Circuit panel majority states its agreement that a causal connection must be shown between the primary runoff law and the "diluted voting power of the minority." They find that proof as follows:

> First, the plaintiffs have proved that the majority vote requirement has impaired their ability to elect a candidate because blacks of voting age, although they are numerous in Phillips County, fail to turn out at the polls in numbers sufficient to meet a majority vote requirement. Second, the plaintiffs have established, through proof of Senate factors, that the political climate of Phillips County has caused the low voter participation, because "[o]nce lower socio-economic status of blacks has been shown, there is no need to show the causal link of this lower status on political participation." *United States v. Dallas County Comm'n,* 739 F.2d 1529, 1537 (11th Cir.1984).

At 1430–31.

We are told that because blacks "fail to turn out at the polls in numbers sufficient to meet a majority vote requirement," the plaintiffs have thereby established that the majority vote requirement "impaired their ability to elect a candidate." Surely, proof of the failure of blacks to turn out at the polls cannot be used to establish that a

majority vote requirement violates Section 2. So, once again, the Court is forced to rely upon the "Senate factors." It states that, by proving the Senate factors, the plaintiffs have established "that the political climate of Phillips County has caused the low voter participation." Note: It is the "political climate" that is identified as the culprit and the cause. Again, there is nothing to show that the runoff requirement has resulted in blacks having less opportunity than whites to participate in the political process or to elect candidates of their choice.

My further views—including my view that courts may not, as the Eighth Circuit panel majority purports to do in *Whitfield*, constitutionally prohibit or do away with majoritarian democracy as a remedy for violations of Section 2—will be found elsewhere herein, particularly in Sections II and VI. And, I ask, how can a federal court, consistent with Equal Protection principles, forbid the application of Arkansas' run-off law in only one county, leaving to the rest of the state the benefits of majority-rule? And what will be the effect of the Eighth Circuit's rule after this court-ordered redistricting: will run-offs be required in legislative races in Phillips County (blacks then being a majority VAP) but prohibited in the county elections there?

Although of less importance, I note another disagreement. In a footnote, Judge Beam states that research had turned up a significant factor which the parties had not addressed, to wit:

> Arkansas election law does not preclude cross-party voting in runoff (general) primary elections. It is factually uncontested that virtually no white voters support black candidates in Phillips County.
>
> Thus, the Phillips County runoff system permits white Republicans, if they have a mind to do so, to, at least in limited circumstances, support a white Democrat in a runoff primary and to further dilute black voting strength. This cross-over factor distinguishes and attenuates the holding in *Butts v. City of New York*, 779 F.2d 141 (2d Cir.1985) since *Butts* clearly dealt with a closed (no cross-over)

runoff primary. While we subscribe to Chief Judge Oakes' panel dissent, which opinion fully supports our results, we believe that the precedential value of the majority opinion in *Butts* is erased when the cross-over component is added to the factual mix.

At 1432, n. 3.

But Ark.Code. Ann. 7–1–103(23) provides that: "No person shall cast a ballot or vote in the preferential primary of one (1) political party and then cast a ballot or vote in the general primary of another political party in this state." So the premise that Arkansas law does not preclude cross-party voting in run-off elections is not correct.

### Addendum Conclusion

Section 2 as written is an "equal opportunity" statute. With no clear mandate from Congress, it should not be transformed into an affirmative action law. The majority here and in the Eighth Circuit's opinion in *Whitfield*—like many other cases—have turned the word "opportunity" on its head. Instead of accepting it to mean a "fair chance" or, in effect, an "open door" without state-imposed legal barriers, they define it as "ability" and then measure it on the basis of actual voting behavior as reflected in vote "turn-outs." So if black voters do not turn-out to vote and therefore lose, that proves that they had less "opportunity" to participate in the political process than whites who assumedly did turn-out and therefore won! They like to talk of the "practical reality" of the situation rather than the language of Section 2. Yet, they make no effort to show—perhaps because it cannot be shown—that the existence of run-off statutes is responsible for such low "turn-out."

But that is not all. The courts have elevated the Senate factors to statutory status—a status Congress did not give them—and then proceeded to interpret and apply them without concern for their relevance to the issues in the particular cases before them.